**No. 24-1280**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**
_____

**UNITED STATES OF AMERICA**
**v.**

**MARTIN EVERS**
**Appellant.**
_____

On Appeal from Judgment in the
United States District Court for the Middle District of Pennsylvania
No. 19-CR-250 (Mariani, J.)

_____

**BRIEF FOR APPELLANT**
_____

LISA A. MATHEWSON
Mathewson Law LLC
1617 John F. Kennedy Blvd., Suite 2027
Philadelphia, PA 19103
215-399-9592
lam@mathewson-law.com

*Attorney for Appellant Martin Evers*

# TABLE OF CONTENTS

Table of Authorities ................................................................................................. iiv

Introduction          ........................................................................................... 1

Statement of Jurisdiction ......................................................................................... 3

Related Cases and Proceedings ............................................................................... 4

Statement of the Issues with Statement of Places Raised and Ruled ..................... 5

Statement of the Case ............................................................................................... 8

    A.    Dr. Evers's practice and the government's evidence of substandard medical care with respect to the three patients named in the indictment ........................................................................ 8

    B.    Government expert Stephen Thomas testifies Dr. Evers knowingly breached the standard of care, while defense expert Richard Rauck is barred from testifying about the import of lack of trading for prescriptions. ............................................ 11

        1.    Dr. Thomas ......................................................................... 12

        2.    Dr. Rauck ............................................................................ 16

    C.    The government presents testimony that local pharmacists expressed concern to Dr. Evers that he was overprescribing opioids to patients not named in the indictment. ............................... 18

        1.    Defense's objection, government's response, and district court's ruling ............................................................ 19

        2.    Pharmacists' testimony .................................................... 22

        3.    Limiting Instruction ......................................................... 24

D.    The jury is instructed to convict if it finds Dr. Evers knowingly breached the medical standard of care. ...........................24

E.    Government's summation ...............................................................28

    1.    Authorization standard ....................................................28

    2.    The excluded Rauck criterion ..........................................29

    3.    Pharmacists' testimony ....................................................30

F.    Conviction, sentence, and appeal ...............................................33

Summary of the Argument ...............................................................................34

Argument        ..........................................................................................36

I.    The jury was improperly allowed to convict Dr. Evers of unlawfully dispensing a controlled substance if it found that he knowingly deviated from the prevailing standard of medical care. .........36

    A.    Conviction requires a finding that the prescriptions had no legitimate medical purpose, not just that Dr. Evers knowingly breached the standard of care. .............................37

        1.    The criminal standard:  knowingly acting as a drug dealer rather than as a physician .....................................37

        2.    A knowing breach of the standard of care does not suffice. .........................................................................40

    B.    The jury was allowed to convict based only on a knowing breach of the medical standard of care. .....................................43

II.   The standard for criminal liability instructed and argued to the
      jury—knowingly deviating from the generally-accepted standard
      of medical care—is unconstitutionally vague as applied to Dr.
      Evers, who prescribed to bona fide patients with serious medical
      conditions. ...................................................................................................46

III.  Admitting the testimony of government expert Stephen Thomas
      that Dr. Evers knowingly deviated from the standard of medical
      practice violated 704(b). ...........................................................................51

IV.   Excluding the testimony of defense expert Richard Rauck that
      improper trading for a prescription is an important criterion for
      determining its legitimacy was an abuse of discretion.................................56

V.    Admitting the testimony of local pharmacists that they expressed
      concern to Dr. Evers that he was overprescribing controlled
      substances to patients not named in the indictment violated Rule
      404(b). .......................................................................................................60

      A.    Requirements for admission.........................................................61

      B.    The first and second requirements were not met. ............................63

            1.    Permissible purpose ............................................................63

            2.    Relevance............................................................................67

      C.    The error was prejudicial, requiring a new trial. ................................67

Conclusion      ...................................................................................................69

Required Certifications ........................................................................................70

Certificate of Service............................................................................... (attached)

## **TABLE OF AUTHORITIES**

### **Cases**

*Diaz v. United States*, 602 U.S. 526 (2024) ..........................................................52

*Gonzales v. Carhart*, 550 U.S. 124 (2007) ...........................................................47

*Hill v. Colorado*, 530 U.S. 703 (2000)..................................................................47

*Johnson v. United States*, 576 U.S. 591 (2015) .....................................................46

*Kolender v. Lawson*, 461 U.S. 352 (1983) .............................................................47

*Michelson v. United States*, 335 U.S. 469 (1948) ..................................................61

*Neder v. United States*, 527 U.S. 1 (1999) .............................................................68

*Pringle v. Court of Common Pleas*, 778 F.2d 998 (3d Cir. 1985) ..............................44

*Ruan v. United States*, 597 U.S. 450 (2022)...................................................*passim*

*San Filippo v. Bongiovanni*, 961 F.2d 1125 (3d Cir. 1992)......................................48

*Sullivan v. Louisiana*, 508 U.S. 275 (1993) ..........................................................44

*United States v. Armstrong*, 550 F.3d 382 (5th Cir. 2008)......................................43

*United States v. Bado*, 764 F. App'x 284 (3d Cir. 2019) ....................................... 1

*United States v. Bailey*, 840 F.3d 99 (3d Cir. 2016) ..............................................60

*United States v. Baroni*, 909 F.3d 550 (3d Cir. 2018) ...........................................57

*United States v. Bennett*, 161 F.3d 171 (3d Cir. 1998) ..................................52, 54, 58

*United States v. Birbragher*, 603 F.3d 478 (8th Cir. 2010) ............................... 50, 51

*United States v. Boyd*, 999 F.3d 171 (3d Cir. 2021) ...............................................44

*United States v. Brown*, 765 F.3d 278 (3d Cir. 2014)......................................62, 65, 68

*United States v. Caldwell*, 760 F.3d 267 (3d Cir. 2014)......................... 61, 62, 65, 68

*United States v. Cammarata*, 129 F.4th 193 (3d Cir. 2025) .......................54, 58, 67

*United States v. Davis*, 726 F.3d 434 (3d Cir. 2013) ..............................................63

*United States v. Dispoz-O-Plastics, Inc.*, 172 F.3d 275 (3d Cir. 1999).......54, 58, 67

*United States v. Edwards*, 792 F.3d 355 (3d Cir. 2015) .................................................45

*United States v. Elonis*, 841 F.3d 589 (3d Cir. 2016)....................................................44

*United States v. Esham*, 2022 WL 20718578 (3d Cir. 2022).......................................... 1

*United States v. Fattah*, 914 F.3d 112 (3d Cir. 2019)............................................. 52, 60

*United States v. Feingold*, 454 F.3d 1001 (9th Cir. 2006) ................................... 41, 44

*United States v. Heaton*, 59 F.4th 1226 (11th Cir. 2023) .............................53, 50, 51

*United States v. Huddleston*, 485 U.S. 681 (1988) .........................................................62

*United States v. John-Baptiste*, 747 F.3d 186 (3d Cir. 2014).....................................46

*United States v. Johnson*, 27 F.3d 1186 (6th Cir. 1994) .............................................57

*United States v. Kohli*, 847 F.3d 483 (7th Cir. 2017) .............................................. 43, 44

*United States v. Li*, 819 F. App'x 111 (3d Cir. 2020)......................................... 1, 22, 57

*United States v. MacKay*, 715 F.3d 807 (10th Cir. 2013)...................................... 50, 51

*United States v. Maynard*, 278 F. App'x 214 (3d Cir. 2008) ......................................... 1

*United States v. Mazurie*, 419 U.S. 544 (1975)...............................................................50

*United States v. McIver*, 470 F.3d 550 (4th Cir. 2006)........................... 11, 36, 42, 44

*United States v. McKinney*, 445 F. App'x 605 (3d Cir. 2011) ....................................... 1

*United States v. Moore*, 423 U.S. 122 (1975) ...........................................................*passim*

*United States v. Nelson*, 383 F.3d 1227 (10th Cir. 2004) ...........................................43

*United States v. Piekarsky*, 687 F.3d 134 (3d Cir. 2012)............................................36

*United States v. Reese*, 92 U.S. 214 (1875).................................................................. 47, 50

*United States v. Rosenberg*, 515 F.2d 190 (9th Cir. 1975).................................. 50, 51

*United States v. Rottschaefer*, 178 F. App'x 145 (3d Cir. 2006) ................................. 1

*United States v. Sampson*, 980 F.2d 883 (3d Cir. 1992)....................... 60, 61, 62, 68

*United States v. Shaker*, 827 F. App'x 204 (3d Cir. 2020)............................... 1, 43, 57

*United States v. Smith*, 725 F.3d 340 (3d Cir. 2013) .....................................................62

*United States v. Watson*, 260 F.3d 301 (3d Cir. 2001)...........................................51, 54

*United States v. Wood*, 207 F.3d 1222 (10th Cir. 2000)...........................................53

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982)...........................................48

*Virgin Islands v. Martinez*, 620 F.3d 321 (3d Cir. 2010)........................................44-45

## **Statutes**

18 U.S.C. § 3231.........................................................................................................3

21 U.S.C. § U.S.C. 841(a)................................................................................ *passim*

21 U.S.C. 822(b) .................................................................................................11, 37

28 U.S.C. § 1291.........................................................................................................3

## **Other Authorities**

U.S. Const., amend. V..............................................................................................46

21 C.F.R. § 1306.04(a)...............................................................................11, 37, 42

Fed. R. Evid. 404(b) ........................................................................................ *passim*

Fed. R. Evid. 704(b) ........................................................................................ *passim*

49 Pa.Code § 16.92 .................................................................................................40

# INTRODUCTION

Who bears blame for the prescription opioid epidemic is a question with multifarious answers. Indeed, the government pilloried the pharmaceutical industry's marketing practices and "blood money" during this very trial. 5Appx.2385-2386, 2491. But in terms of criminal accountability, the government has focused on the person writing the prescription: individual doctors. This Court has seen many such cases in recent years, typically involving rogue pill-mill doctors trading prescriptions for cash or sex.[1] A doctor who does such things acts as a "'pusher' not as a physician," and may be prosecuted notwithstanding his general authorization to dispense controlled substances. *United States v. Moore*, 423 U.S. 122, 143 (1975).

This case is different. Dr. Martin Evers ran one of the medical offices of a nonprofit regional health system and was, around the time of the charged conduct, the president of the medical staff of a system hospital. He prescribed opioids to less than 7% of his patients. He never traded a prescription for a

---

[1]    *E.g., United States v. Esham*, 2022 WL 20718578 (3d Cir. 2022) (cash); *United States v. Shaker*, 827 F. App'x 204 (3d Cir. 2020) (sex); *United States v. Li*, 819 F. App'x 111 (3d Cir. 2020) (cash and sex); *United States v. Bado*, 764 F. App'x 284 (3d Cir. 2019) (cash); *United States v. McKinney*, 445 F. App'x 605 (3d Cir. 2011) (cash); *United States v. Maynard*, 278 F. App'x 214 (3d Cir. 2008) (cash); *United States v. Rottschaefer*, 178 F. App'x 145 (3d Cir. 2006) (sex).

personal benefit—for cash, sex, or anything else.  Instead, the government's theory was that Dr. Evers unlawfully dispensed controlled substances by "moving [three] difficult patients along with his prescription pad," ignoring that they were (or had become) addicted to the opioids he was prescribing and providing them little or no proper medical care.  5Appx.2371.

These atypical circumstances provide essential context for assessing several serious errors that infected Dr. Evers's trial.  This is a case of first impression in this Court.  That is true in a legal sense—on the key question of whether a physician's knowing violation of the prevailing standard of medical care makes his prescribing a federal crime—and, to counsel's knowledge, in a factual one.

Before a doctor with a *bona fide* medical practice treating longstanding patients with documented medical conditions may be condemned as a drug dealer and sentenced to 22 years—life, effectively—in prison, he is entitled to a fair trial.  Dr. Evers did not receive one.

## <u>STATEMENT OF JURISDICTION</u>

The district court entered Judgment (1Appx.3-9[2]) on February 9, 2024; Appellant Evers filed a timely Notice of Appeal (1Appx.1) on February 13, 2024.  The district court had jurisdiction under 18 U.S.C. §3231.  This Court has jurisdiction under 28 U.S.C. §1291.

---

[2]    "Appx." refers to the Joint Appendix; the volume number precedes it.

## **RELATED CASES AND PROCEEDINGS**

Appellant Evers was indicted in No. 19-cr-250 (M.D. Pa.) and convicted after a fourteen-day trial in November and December 2022.  Counsel knows of no other cases or proceedings related to this appeal.

## STATEMENT OF THE ISSUES
## WITH STATEMENT OF PLACES RAISED AND RULED

I.     Whether the jury was improperly instructed to convict Dr. Evers of

unlawfully dispensing a controlled substance if it found that he knowingly

deviated from the generally accepted standard of medical care, requiring a

new trial.

Raised:

5Appx.2343-2359 (charge conference); District Court Docket Entry

("DDE") 222 at 2-3 (proposed instruction) (2Appx.71-72)

Ruled:

5Appx.2359 (charge conference); 5Appx.2518-2519 (instruction).

II.     Whether the standard for criminal liability instructed and argued to the

jury—knowingly deviating from the generally accepted standard of medical

care—is unconstitutionally vague as applied to Dr. Evers, who prescribed to

*bona fide* patients with serious medical conditions.

Raised:  DDE 53 (motion to dismiss), 68 (supporting memorandum of

law).  1Appx.10-24.

Ruled:

DDE 135 (memorandum opinion), 136 (order) (1Appx.10-24).

III.    Whether admitting the testimony of government expert Stephen

Thomas that Dr. Evers knowingly deviated from the standard of medical

practice violated Federal Rule of Evidence 704(b), requiring a new trial.

Raised:

4Appx.1346.

Ruled:

4Appx.1346.

IV.    Whether excluding the testimony of defense expert Richard Rauck that

trading prescriptions for personal benefits is an important criterion for

determining whether the prescription is legitimate was an abuse of discretion,

requiring a new trial.

Raised:

4Appx.1495, 1499; 5Appx.2147 (testimony offered).

Ruled:

4Appx.1495-1496; 5Appx.2147-2148.

V.      Whether admitting the testimony of local pharmacists that they

expressed concern to Dr. Evers that he was overprescribing controlled

substances to patients who were not subjects of the charges in the indictment

violated Federal Rule of Evidence 404(b), requiring a new trial.

Raised:

DDE 212 at 11-13 (pretrial).
2Appx.118-130 (pretrial).
2Appx.498-514 (trial).

Ruled:

2Appx.513-514.

## STATEMENT OF THE CASE

### A.    Dr. Evers's practice and the government's evidence of substandard medical care with respect to the three patients named in the indictment

Appellant Martin Evers was a primary care doctor employed by the Bon Secours Charity Health System (and its predecessor) from 2003 until his indictment in 2019.  2Appx.469-471.  He ran Bon Secours's primary care office in Milford, Pennsylvania, and was the president of the medical staff at Bon Secours Community Hospital.  2Appx.471-490.  He was a salaried employee receiving no money from patients, with his compensation affected by various factors including complexity of services rendered, administrative duties, and to some extent patient volume—capped at the 90th percentile of other primary care doctors.  2Appx.472-477, 484-489, 492.  Dr. Evers prescribed opioids to less than 7% of his patients.  4Appx.1875.

The charges involve care Dr. Evers provided to three people:  Kristina Dame, Robert Konikowski, and Michelle Clancy.  2Appx.55-65.[3]  Each was an longstanding patient of his:  Ms. Dame for two years, Mr. Konikowski for seven, and Ms. Clancy for six.  3Appx.907; 4Appx.1250-1251; 3Appx.1073-

---

[3]    These patients were typically identified by their initials in the district court filings, but they were named at trial so are named here.

1074.  All were deceased by the time of trial, but the government accused Dr.
Evers of causing only Ms. Clancy's death—when she took fentanyl and
oxycodone far in excess of prescribed amounts and overdosed.  2Appx.201,
218, 239, 299, 307; 5Appx.2517-2518.[4]

It was undisputed that all three patients had serious medical conditions
that caused pain:  Ms. Dame an inoperable spinal tumor; Mr. Konikowski
spinal radiculitis and disc disease; Ms. Clancy multiple sclerosis, disc disease,
and myelopathy (spinal-cord compression).  2Appx.204, 211-213, 231-233;
4Appx.1507, 1515-1516, 1530-1533.  It was also undisputed that Dr. Evers
treated each for their general medical conditions not directly related to pain—
for example, referring Ms. Dame to a surgeon regarding complications from
gastric bypass surgery, managing Mr. Konikowski's diabetes and referring him
to a kidney specialist, and referring Ms. Clancy to a neurologist regarding her
multiple sclerosis.  3Appx.1025; 2Appx.231; 3Appx.1189; 4Appx.1416.

At the same time, substantial evidence supported the inference that Dr.
Evers failed to follow basic safeguards for prescribing opioids to these

---

[4]     Dr. Evers was initially accused of causing Ms. Dame's death, but that
accusation was withdrawn before trial.  DDE 246.  Dr. Evers was never
accused of causing Mr. Konikowski's death, which occurred three years after
Dr. Evers stopped treating him for pain.  2Appx.218; 4Appx.1342.

patients.[5]  While medical charts were kept for each patient showing virtually every prescription issued, the charts documented little or no counseling about the risks of opioids, assessing the efficacy of opioids prescribed, establishing goals for pain treatment, or monitoring medication compliance via urine drug screens or pill counts.  *E.g.*, 3Appx.951-952, 958; 3Appx.1123.  The charts sometimes reflected identical descriptions of physical examinations from month to month, early refills, and seeming acquiescence in the patients' requests for specific opioids or high dosages.  *E.g.*  3Appx.955, 1033; 4Appx.1328.  Moreover, the opioid prescribing continued notwithstanding Dr. Evers being aware of numerous signs of addiction, including drug-seeking behavior, overdoses, detoxifications, suicidality, medication noncompliance, and warnings from the patients' family and other doctors.  *E.g.* 2Appx.252-253; 3Appx.950, 983, 1038, 1056, 1165-1167.

---

[5]    At trial the defense disputed much of this evidence and the inference to be drawn from it, but for purposes of appeal Dr. Evers acknowledges the permissible inference.  He does not raise a sufficiency claim.

**B.    Government expert Stephen Thomas testifies Dr. Evers knowingly breached the standard of care, while defense expert Richard Rauck is barred from testifying about the import of lack of trading for prescriptions.**

Given the atypical circumstances, trial centered on a battle of experts over whether the particular prescriptions charged in the indictment were "outside the usual course of professional medical practice and not for a legitimate medical purpose," and therefore "unauthorized" under the Controlled Substances Act (CSA).[6]  21 U.S.C. § 841(a); 21 U.S.C. §822(b); 21 C.F.R. §1306.04(a).

The parties agreed that is the standard governing a doctor's "authorization" to prescribe controlled substances (although they disagreed on what that standard means), and both sides agreed the government had to prove Dr. Evers knowingly or intentionally breached the standard—the holding of the then-recent *Ruan v. United States*, 597 U.S. 450 (2022). 1Appx.75-76; 1Appx.71, 73.

---

[6]    Though experts generally are not allowed to define legal standards, courts have recognized that "outside the usual course of professional medical practice and not for a legitimate medical purpose" is both a medical and legal standard, so experts may opine on its meaning and on whether it has been breached.  *See, e.g.*, *United States v. McIver*, 470 F.3d 550, 561-62 (4th Cir. 2006).

### 1.    Dr. Thomas

The government's expert was Dr. Stephen Thomas.  He began his three-plus days of testimony by offering the jury a definition of "outside the usual course of professional medical practice and not for a legitimate medical purpose" rooted in the standard of care generally accepted by the medical community.  3Appx.840-876.  Dr. Thomas's definition weaved together Hippocrates ("first, do no harm"); medieval physician Paracelsus ("every substance is both a remedy and a poison, the difference is the dose"); twentieth-century physician Francis Peabody ("the secret of the care of the patient is to care for the patient"); the standard medical model (history, examination, testing, diagnosis, treatment, consent); Pennsylvania rules for administering controlled substances (history, examination, documentation, reevaluation); and professional guidelines (sound clinical judgment, current best practices, diagnosis, documentation, monitoring, benefit to the patient).  3Appx.840-876.[7]

The government apparently allowed Dr. Thomas's opinion to effectively determine which of Dr. Evers's prescriptions would be charged criminally;

---

[7]    Dr. Thomas's testimony on this topic was presented in an unorthodox and problematic way:  a PowerPoint-illustrated monologue spanning 27 transcript pages with virtually no questioning by the prosecutor.  3Appx.840-

prescriptions he deemed "substandard" were not charged, and those he

deemed "substandard" *and* "not legitimate" were.  *E.g.*:

> [PROSECUTOR]:  In your opinion, Dr. Thomas, in light of Robert Konikowski's underlying health condition, do you have an opinion as to . . . whether those [uncharged] prescriptions were for the legitimate purpose of medical treatment?
>
> [THOMAS]:  They were substandard.  I would not—at this point, I did not make an assessment that this was not for a medically legitimate purpose in the usual course of professional practice. The fact is, I don't know … what's happening with the patient because there's no history … there is just an increase in medication.  That is substandard practice.  But, at this point, I did not find the practice to be not for a medically legitimate purpose.
>
> …
>
> [PROSECUTOR]:  So are you aware, Dr. Thomas, of the individual prescriptions that we have charged in the indictment, with respect to Robert Konikowski?
>
> [THOMAS]:  I am.
>
> [PROSECUTOR]:  So if we were to begin with the date August 14th, 2017 and thereafter with prescriptions, do you have an appreciation of why that is the date that we started charging the Defendant with?
>
> [THOMAS]:  Because that was the date of the second unexpected urine drug screen, which meant that Dr. Evers was, either, aware or could have been aware that the patient was non-compliant in the way that he was taking his medication, and when you combine that with the substandard practice … while knowing that he's not taking the medication but supplying it to him, in my opinion,

---

876. As there was no objection to this method of testimony, it is not challenged on appeal.

made the prescribing not for a legitimate purpose in the usual
course of professional practice.

4Appx.1264, 1345-1346.

The government and the district court recognized that Federal Rule of
Evidence 704(b) barred Dr. Thomas from directly opining on *mens rea* for the
charged offenses—*i.e.*, from testifying that Dr. Evers knew the prescriptions at
issue were written outside the usual course of professional medical practice
and not for a legitimate medical purpose.  3Appx.855, 859.  And when Dr.
Thomas attempted to do just that, a defense objection was sustained.
3Appx.1072.

But Dr. Thomas was permitted to testify—over defense objection—that
knowledge is what makes a prescription "outside the usual course of
professional medical practice and not for a legitimate medical purpose"; that
is, knowledge is embedded in that standard:

> So the distinction between substandard practice, or you're just
> not doing it right, and not for a medically legitimate purpose in
> the usual course of practice is when you're not doing it right **and
> you know it.**

> [DEFENSE COUNSEL]:    Objection, Your Honor.

> [COURT]:    Overruled.

4Appx.1346 (emphasis added).  Later, Dr. Thomas again defined knowledge as

the line between authorized and criminal, this time suggesting that negligence

also suffices for criminality:

> [PROSECUTOR]:  [W]hen you review records, such as the ones you reviewed in this case, do you have—based upon your training and experience—a threshold above which or below which you make decisions [about criminality]?
>
> [THOMAS]:  Absolutely.
>
> [PROSECUTOR]:  Can you explain that threshold?
>
> [THOMAS]:  The issues of practice, some people do it this way, some people do it that way, are not subject to the criterion of being for a medically legitimate purpose in the usual course of professional practice.  ...  So it is only ... **when there is clear information that the physician knows or should know that the medication should not be prescribed, in the manner that it's being prescribed, it is, at that point, that we are no longer talking about tomato, tomato, we're talking about rocks and apples.**

4Appx.1398-1399 (emphasis added).

Dr. Thomas's testimony as to each of Ms. Dame, Mr. Konikowski, and Ms.

Clancy ended with his opinion that each of the prescriptions charged in the

indictment met his definition of the authorization standard, which subsumed

knowledge.  3Appx.1062, 1071, 1238-1295; 4Appx.1347-1352.

### 2.    Dr. Rauck

The defense's expert was Dr. Richard Rauck, who held a different view of what "outside the usual course of professional medical practice and not for a legitimate medical purpose" means.  According to Dr. Rauck, an opioid prescription for pain crosses that line if either (1) the doctor is not registered with the U.S. Drug Enforcement Administration (DEA) to dispense controlled substances; (2) the patient is not reporting pain; (3) the patient, though reporting pain, lacks a medical condition supporting the report; or (4) the prescription had an improper purpose, as when the doctor exchanged it for a personal benefit like cash or sex.  4Appx.1495-1498, 1637; 5Appx.2147. Absent any of that, other shortcomings—like deviations from medical adages, poor clinical judgment, inattention to risk, lack of monitoring, etc.—show only that a doctor has breached the medical standard of care, not that he has ceased acting as a doctor altogether.  *E.g.*, 4Appx.1493, 1504-1505, 1521, 1537, 1652-1653, 1670, 1832; 5Appx.2159, 2169, 2309-2310.

Sustaining the government's objection, the district court prohibited Dr. Rauck from articulating his fourth criterion:  that a DEA-registered doctor's prescription written for a medically-grounded report of pain is illegitimate— and therefore "unauthorized," and criminal—only if it has an improper purpose, such as barter for cash or sex.  4Appx.1495-1496, 1499; 5Appx.2148.

16

Specifically, the court sustained government objections to three defense

questions:

> Is there anything else you would look for in reviewing the records
> to determine in your opinion whether the medication was for a
> legitimate medical purpose and within the usual course of
> professional practice?

> We have heard testimony [that] there was no evidence in this case
> that there were large sums of cash that were passed to Dr. Evers
> in exchange for prescriptions.  Would that be something you
> would be looking for?

> When you are looking at the records [in this case] and seeing if
> the medications are to address complaints of pain, are you looking
> if the medications were given for some other reason?

4Appx.1495-1496, 1499.  In addition, when the government cross-examined

Dr. Rauck with a series of questions about a particular prescription, the court

precluded him from explaining that the absence of improper trading was one

basis for his opinion that it was legitimate.  5Appx.2147-2148.

The district court excluded all of this under Rule 704(b) and because

lack of trading "is not of record in this case."  4Appx.1495-1496, 1499;

5Appx.2148.  The court overlooked that DEA Diversion Investigator Gary

Derr, the case agent, had testified to lack of trading:

> [DEFENSE COUNSEL]:  There's no evidence in this case of Dr.
> Evers engaging in sexual misconduct to provide illegal
> prescriptions; correct?

> [DERR]:  Not for that, no.

[DEFENSE COUNSEL]:  No evidence, whatsoever, of Dr. Evers receiving cash or some monetary exchange for an illegal prescription; correct?

[DERR]:  No.

3Appx.702.  Defense counsel reminded the court of Agent Derr's lack-of-trading testimony when resisting a government objection during Dr. Rauck's direct examination, to no avail.  4Appx.1495.

### C.     The government presents testimony that local pharmacists expressed concern to Dr. Evers that he was overprescribing opioids to patients not named in the indictment.

The government proffered testimony of several local pharmacists that they expressed concern to Dr. Evers that he was overprescribing opioids to various patients not named in the indictment.  DDE 212 at 11-13 & Ex. A; DDE 231 at 15-19; 2Appx. 118-130, 497-514.  The government offered this as other-acts evidence under Federal Rule of Evidence 404(b), ostensibly to prove Dr. Evers's knowledge that his prescribing to Ms. Dame, Mr. Konikowski, and Ms. Clancy was unauthorized as outside the usual course of professional medical practice and not for a legitimate medical purpose. 2Appx.121, 498-499, 503-506.[8]

---

[8]     In a pretrial filing, the government suggested the pharmacists' testimony might be intrinsic evidence not subject to Rule 404(b), a position it

### 1. Defense's objection, government's response, and district court's ruling

The defense objected to the pharmacists' testimony as, *inter alia*, barred by Rule 404(b).  2Appx.122-125, 498-499, 501-503, 509-512.  The defense asserted the evidence was being used to show propensity, and was not relevant to knowledge that the prescriptions for Ms. Dame, Mr. Konikowski, or Ms. Clancy were unauthorized—because there was no evidence the prescribing to the unnamed patients was improper and, even if there were, that would say nothing beyond propensity about the propriety of the charged prescriptions.  2Appx.122-124, 501-503, 509-510.

The government admitted the pharmacists' testimony would not prove anything directly about the charged prescriptions, but maintained that "there does not have to be a direct link to [the three named partients]."  2Appx.503.  The government said the purpose of the testimony was to show "knowledge of [Dr. Evers] during the relevant time period" about "the same kind of prescribing that [occurred] with [Ms. Dame, Mr. Konikowski, and Ms. Clancy]."  2Appx.121.  Or as the government also put it, to show "knowledge of the fact

---

later abandoned once it acknowledged the prescriptions at issue were not for Ms. Dame, Mr. Konikowski, or Ms. Clancy.  DDE 234 at 12-14; 2Appx.129-130, 510.

that the defendant was prescribing opioids in a manner that caught the attention of pharmacists."  2Appx.504.

The government did not articulate a chain of inferences between the pharmacists' testimony and Dr. Evers's knowledge that the charged prescriptions were unauthorized.  2Appx.505, 508-509.  The closest it came was saying Dr. Evers's "attitude towards prescribing" for other patients "flows over" to Ms. Dame, Mr. Konikowski, and Ms. Clancy.  2Appx.503.  The government's only other comment on this point was that Dr. Evers told one pharmacist he was weaning some patients off opioids.  2Appx.505, 508-509.

The government reiterated the indirect-proof point twice more.  First, in proposing a limiting instruction, it said the jury should be told to consider the pharmacists' testimony only regarding Dr. Evers's knowledge as to prescriptions in general, not regarding his knowledge as to the charged prescriptions:

> [COURT]:  What would the limiting instruction be?
>
> [PROSECUTOR]:  That the evidence offered by the pharmacist who testified in this case can be considered for the defendant's knowledge with respect to prescribing practices and/or his willful blindness because the government is going to ask for a willful blindness instruction.
>
> [COURT]:  But it can cannot be—I assume you agree—to show that with respect to [Ms. Dame, Mr. Konikowski, and Ms. Clancy] whose treatment is at issue as an indication of culpability there?

[PROSECUTOR]:  I agree with that, Your Honor.

2Appx.505-506.  The defense supported that limiting instruction in the event

its Rule 404(b) objection were overruled.  2Appx.512.

Second, the government acknowledged the jury should be instructed

that the prescriptions the pharmacists would testify about were not for Ms.

Dame, Mr. Konikowski, or Ms. Clancy—though it noted that the pharmacists

could not testify to that themselves:

> [DEFENSE COUNSEL]:  Are we going to disclose to the jury that
> the specific patients were not Michelle Clancy, Kristina Dame or
> Robert Konikowski?
>
> [COURT]:  Certainly.  That's my understanding. Correct me if I'm
> wrong.
>
> [PROSECUTOR]:  That would be fine, Your Honor, to do that.  It's
> just that these pharmacists can't say for sure either way.  So . . .
> they're not going to talk about patients in particular.

2Appx.510.

The district court ruled the pharmacists' testimony admissible under

Rule 404(b), but did not articulate a non-propensity chain of inferences

between the proffered testimony and Dr. Evers's knowledge the charged

prescriptions were unauthorized.  2Appx.513-514.  Instead, the court cited a

Third Circuit panel's decision that rejected a Rule 404(b) challenge to

pharmacist testimony in an unlawful dispensing case—*United States v. Li*, 819 F. App'x 111, 116-17 (3d Cir. 2020) (not precedential).  2Appx.514.

### 2. Pharmacists' testimony

Several local pharmacists proceeded to testify that they were concerned by some of Dr. Evers's prescriptions.  With respect to one prescription, Janice Vicaretti said she had "never seen anywhere near that [amount of methadone] being prescribed ever in my career."  3Appx.680.  Jason Williams said he noticed "a pattern . . . of high-dose opioids and benzodiazepines."  3Appx.699.  Michelle Kaneski talked about prescriptions for "very high doses," for "drugs with opposite effects," and for "drug combination cocktails."  3Appx.708.  And Gary Snedeker described prescriptions indicating only a general diagnosis of "pain."  3Appx.725-726.

The pharmacists testified that they conveyed their concerns to Dr. Evers directly, or to his office.  3Appx.679, 688-689, 700, 708-709, 719-720, 726-729, 732-733.  Most testified they were rudely rebuffed, and declined to fill the prescription.  3Appx.680, 689-690, 700, 709-710, 727, 729.  Snedeker went further, explaining that he once had a "good conversation" with Dr. Evers about weaning patients off opioids and initially saw his opioid prescriptions decline, but months later saw an uptick and chose to stop filling Dr. Evers's prescriptions altogether.  3Appx.728-731.  He testified that Dr.

Evers responded to that decision angrily, threatening to report him to regulatory authorities for unprofessional conduct.  3Appx.732-733.

Through cross-examination, the defense tried to establish that none of the prescriptions the pharmacists testified about was for Ms. Dame, Mr. Konikowski, or Ms. Clancy.  It did so by representing that regulatory records do not show that their pharmacies filled prescriptions for the three, and asking the pharmacists if they had any reason to doubt the accuracy of the records.  The pharmacists said they did not recall filling prescriptions for any of the three, and/or had no reason to doubt the records.  3Appx.682-683, 692-694, 703-704, 714-715.

Though the government had acknowledged outside the jury's presence that the prescriptions were not for Ms. Dame, Mr. Konikowski, or Ms. Clancy, it neutralized this cross-examination by eliciting testimony that invited an inference that they were:  *i.e.*, pointing out that regulatory records would not reflect prescriptions the pharmacists declined to fill:

> [PROSECUTOR]:  If you refused to fill a prescription, can you tell us whether or not that prescription ends up [i]n the [regulatory records]?
>
> [KANESKI]:  No, because I didn't fill the prescription.

3Appx.710.

### 3.    Limiting Instruction

The district court provided the following limiting instruction at the

conclusion of the pharmacists' testimony and again in the final charge:

> You received information and heard testimony from each of these
> pharmacists about Dr. Evers's prescribing of controlled
> substances.  You should consider this information and testimony
> only as to the knowledge of Dr. Evers as to his prescribing
> practices generally and not as knowledge as to his prescribing
> practices or his treatment of Robert Konikowski, Michelle Clancy
> or Kristina Dame.

3Appx.737-738; 5Appx.2514.  The court did not otherwise instruct the jury

that the prescriptions the pharmacists testified about were not for Ms. Dame,

Mr. Konikowski, or Ms. Clancy.

### D.    The jury is permitted to convict if it finds Dr. Evers knowingly breached the medical standard of care.

Given the evidence about the three patients named in the indictment,

the experts' divergent views, and the pharmacists' testimony, the jury

instruction defining "outside the usual course of professional medical practice

and not for a legitimate medical purpose" was crucial, and hotly contested.

5Appx.2343-2359.

The government sought an instruction equating "outside the usual

course of professional medical practice and not for a legitimate medical

purpose" with the medical standard of care:

The term "a legitimate purpose in the usual course of his
professional practice" is defined by reference to the standard of
medical practice generally recognized and accepted by the
medical profession in the Commonwealth of Pennsylvania.

2Appx.78.

The defense sought an instruction that recognized the standard of care

as relevant to, but not determinative of, "outside the usual course of

professional medical practice and not for a legitimate medical purpose":

There are no specific guidelines in the law defining "usual course
of professional practice or legitimate medical purpose."
Therefore, in determining whether the Defendant acted outside
the usual course of professional practice, **you may consider the
standards to which medical professionals generally hold
themselves, including accepted standards of care among
medical professionals. However, any finding of criminal
liability** must ultimately depend on the mental state of the
defendant himself and **may not be based upon what a
hypothetical "reasonable" medical practitioner would do or
intend**. Because of the need for the Government to prove the
defendant's criminal intent, this case is different from a medical
malpractice action. **Even a finding that the Defendant
intentionally committed medical malpractice is insufficient
to find the Defendant guilty of this crime.** Rather, as previously
stated, in order to find the Defendant guilty, you must find that the
Defendant knowingly or intentionally issued the prescription for
no legitimate medical purpose and outside of the usual course of
professional practice.

2Appx.71-72 (emphasis added).

At the charge conference, the defense emphasized the important but

limited role of the standard of care:

> [W]e certainly understand that the jury can consider the standard
> of care and objective criteria but only to measure how far outside
> of that the Defendant has gone and not to say that the Defendant's
> conduct must be inside of that to be within the usual course of
> professional practice.

5Appx.2344.  The defense pointed out that going further to equate "outside

the usual course of professional medical practice and not for a legitimate

medical purpose" with the standard of care, as the government proposed,

would permit conviction for being a bad doctor rather than for ceasing to act

as a doctor altogether—explaining that the *Ruan* concurrence makes the same

point:

> [T]here's additional language in *Ruan*, I think, in the concurring
> opinion, which is also supportive of our position.  ...  "For a
> practitioner to 'practice medicine,' he or she must act for a
> medical purpose, which means aiming to prevent, cure or alleviate
> the symptoms of a disease or injury and must believe that the
> treatment is a medically legitimate means of treating the relevant
> disease or injury.  But acting 'as a physician' does not invariably
> mean acting as a *good* physician, as an objective understanding of
> 'in the course of professional practice' standard would suggest.  A
> doctor who makes negligent or even reckless mistakes in
> prescribing drugs is still 'acting as a doctor'—he or she is simply
> acting as a *bad* doctor."

5Appx.2346 (quoting 597 U.S. at 478-79 (cleaned up)).

The defense also maintained that, at the very least, the government's

proposed instruction equating "outside the usual course of professional

medical practice and not for a legitimate medical purpose" with the standard

of care must be replaced with the defense's proposed evidence-only language:

> In determining whether the Defendant acted outside the usual
> course of professional practice you may consider the standards to
> which medical professionals generally hold themselves, including
> accepted standards of care among medical professionals.

5Appx.2358 (quotation cleaned up).

The district court sided with the government, using the government-

proposed equating instruction and adding (instead of substituting) the

defense-proposed language quoted immediately above.  5Appx.2359.  The jury

was thus instructed as follows:

> The question of whether a physician acted outside the usual
> course of his professional practice and not for a legitimate medical
> purpose is defined, by reference, to the standard of medical
> practice generally recognized and accepted in the Commonwealth
> of Pennsylvania.  Therefore, in determining whether the
> Defendant acted outside the usual course of professional practice,
> you may consider the standards to which medical professionals
> generally hold themselves, including accepted standards of care
> among medical professionals.  ….
>
> [A] finding of criminal liability must be based on a finding that Dr.
> Evers knowingly or intentionally distributed or dispensed the
> controlled substances outside the usual course of professional
> practice and without a legitimate medical purpose.  In other
> words, criminal liability must be based on the required state of
> mind, that is, that Dr. Evers acted knowingly or intentionally.  This
> requirement distinguishes this case from a civil action for
> negligence or medical malpractice, where liability can be based on
> what a reasonable medical practitioner would do or intend.

5Appx.2518.

## E.    Government's summation

The government emphasized during summation its view of the authorization standard, the purported gap in Dr. Rauck's authorization criteria, and the propensity inference to be drawn from the pharmacists' testimony.

### 1.    Authorization standard

The government began by framing this case as Dr. Evers not "car[ing] for the patient":

> As Dr. Thomas told all of you, one of the most critical principles of medicine harkens back to Sir Francis Peabody in the early 1900's, when he said that **the secret of caring for a patient is to care for the patient.  So simple, yet, so profound and so critical in the practice of medicine.**
>
> **Kristina, Michelle and Robert deserved that care, but they didn't get it from the Defendant.**  From the Defendant, they got their drugs of choice for their addictions.  ....
>
> It is never a legitimate medical purpose to give drug addicts their drug of choice.  Never.

5Appx.2370-2371 (emphasis added).  Over seven transcript pages, the government detailed how Dr. Thomas "taught all of us about the principles involved in the practice of medicine," from Hippocrates through modern professional guidelines.  5Appx.2399-2405.

The government compared Dr. Evers's care to the thorough, well-documented care the three patients received from other doctors, telling the jury that his deviation from their standard showed that Dr. Evers practiced "no medicine"—that he was acting as a drug dealer, not a doctor. 5Appx.2373-2376, 2379, 2381-2383, 2398, 2488.  At bottom, the government emphasized that authorization turns on what doctors "usually" do:

> Think about those words that you have been hearing for the past three weeks.  Usual course of professional practice.  Usual.  I mean, these words, they're not complicated words.  What's usual?  What was usual about the Defendant's prescribing habits?
>
> Think about what their expert testified, about what he would do, what he taught.  What's usual?  Was it anything like what the Defendant did?  What's usual?  What's in the usual course of professional practice?

5Appx.2486.

### 2.    The excluded Rauck criterion

The government ridiculed Dr. Rauck's definition of "outside the usual course of professional medical practice and not for a legitimate medical purpose" as obviously inadequate—targeting the truncated form he was limited him to describing:

> Dr. Rauck, essentially, told you that, as long as a patient has a pain complaint and there is a doctor-patient relationship, then, we need not look for anything else in the prescribing of opioids.  That is a troubling opinion, ladies and gentlemen, and an opinion that, in the Government's view, makes him part of the problem.

5Appx.2386.  And directly addressing the criterion Dr. Rauck was not allowed to explain, the government told the jury that the absence of improper trading for prescriptions is not only irrelevant to authorization, but a deceptive ploy by the defense:

> **Defense mentioned, There's no sex involved, there's no cash exchanged.  I have three words for you.  Smoke and mirrors**.  Smoke and mirrors.  They want you to focus on, Oh, wow, there was no sex, he didn't give a prescription for sex or, you know, he didn't take cash under the table to get a prescription, so it must have been legal.  That had to have been legal, because he has a license to write the prescription, he has a very professional office that we saw many pictures of, and there was a complaint of pain.
>
> The Government isn't required to show sex or money exchanged. …  We're not required to prove it, and **that has absolutely no bearing on whether or not these prescriptions were written in the usual course of professional practice for a legitimate medical purpose**.

5Appx.2485-2486 (emphasis added).

### 3.    Pharmacists' testimony

The government urged the jury to use the pharmacists' testimony not just to find that Dr. Evers knew the charged prescriptions were unauthorized, but also to make the propensity finding that Dr. Evers was not a "legitimate, caring doctor" to other patients:

> We needed to show you **what the Defendant knew and when he knew it and his pattern of ignoring danger signs everywhere**, danger signs everywhere, with [Ms. Dame, Mr. Konikowski, and

Ms. Clancy], as he blindly continued to deliver the customer's drug of choice, and in his dose and prescribing practices that caught the attention of so many pharmacists and, indeed, an entire global pharmacy chain.

And all of that testimony, ladies and gentlemen, was intended to show you that **other professionals were bringing their concerns to the Defendant's attention and how he made himself willfully blind** to those concerns, most likely, due to simple arrogance on his part.

Like when he told Janice Vicaretti . . . it was none of her business and that he was the doctor, you're just a pharmacist. **Is that what a legitimate doctor would do, prescribing for legitimate medical purposes?** ....

Or when he threatened to report Gary Snedeker to his employer and to the Pennsylvania Pharmacy Board, when the pharmacist ... refused to fill any longer the Defendant's prescriptions for opioids .... **Does that sound like a legitimate, caring doctor engaged in the legitimate prescribing for patients who legitimately needed the drugs?**

Or when he refused to provide diagnosis codes to Michelle Kaneski ....[or to] Renee Dougherty from Family Pharmacy... **and those patients went without their drugs, those drugs that he wants you to believe were so legitimately necessary.** ....

And all of that information was intended to show you how other professionals who share a corresponding responsibility under the law were reaching out to the Defendant, such that he knew, he knew that was a warning sign to him that he ignored. ....

When pharmacists refused to fill opioid prescriptions and asked for diagnosis codes, and the Defendant threatened to report them to the employer, and his arrogance to the pharmacist is very telling. **It's just mind-boggling, because what legitimate doctor would not want to work with another professional in**

**the best care for that patient?**  That knowledge, knowledge not inference, knowledge was met with willful blindness.

5Appx.2376-2377, 2426 (emphasis added).

The government focused exclusively on the bad-doctor theme in rebuttal—while also inviting the jury to infer that the bad-doctoring prescriptions the pharmacists testified about may in fact have been for Ms. Dame, Mr. Konikowski, or Ms. Clancy:

> **The purpose of the testimony of the pharmacist[s] was to exemplify the prescribing practices of the Defendant, because those practices that were noted by these pharmacists were the same practices that he was using with these three patients.** ….
>
> Remember Laura Wolfe who testified, the pharmacist, she testified she had a patient come into her pharmacy with a prescription for an opioid cough syrup, and it alarmed her because of the other medications that this patient was on, so she called Dr. Evers.  What did Dr. Evers say?  Well, he came into my office with a bottle from the 90's of cough syrup and said, Well, this worked last time.  **So you don't have to give it to him, you can give him something over the counter.  Where was his medical decision-making for that patient?**
>
> The pharmacist[s] came in and testified about **the pattern of prescribing** that they observed that caused them to refuse to fill the Defendant's prescriptions, that caused them to globally refuse to fill Dr. Evers' prescriptions at any Wal-Mart and Sam's club.
>
> Defense counsel brought up [the regulatory records] for Michelle Clancy and said,  ["]There's no pending medications due.["]  …  **We don't know that, because if it's not filled, it's not [in the records].  So showing the [record] doesn't mean anything.**

**Just because a prescription wasn't filled that day, it's not going to be there.**

5Appx.2493-2494 (emphasis added).

### F.   Conviction, sentence, and appeal

The jury convicted Dr. Evers on all seventy-one counts of the superseding indictment:  two counts of unlawfully dispensing a controlled substance to Ms. Dame (three prescriptions, one each for fentanyl, methadone, and valium); thirty-two counts of unlawful dispensing to Mr. Konikowski (seventeen fentanyl prescriptions, fifteen oxycodone prescriptions); thirty-six counts of unlawful dispensing to Ms. Clancy (fifteen fentanyl prescriptions twenty-one oxycodone prescriptions); and one count of unlawful dispensing to Ms. Clancy resulting in her death (three fentanyl prescriptions, four oxycodone prescriptions).  2Appx.50-67.

Dr. Evers, 66 years old, was sentenced to 264 months'—22 years'—imprisonment and a $50,000 fine.  1Appx.4, 8.  The custodial sentence consisted of concurrent statutory-maximum terms (20 years) on each of the seventy unlawful-dispensing counts, and a concurrent 22 years on the death-results count—two years above the 20-year statutory minimum term. 1Appx.4.

This appeal followed.

## SUMMARY OF THE ARGUMENT

Distributing controlled substances is a federal crime unless "authorized by" the Controlled Substances Act.  Doctors registered with the DEA to prescribe controlled substances are "authorized," but only when their prescriptions are "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."

The jury that convicted Dr. Evers was told, at the government's request and over defense objection, that that authorization standard is "defined by" the standard of medical care prevailing in Pennsylvania, which governs civil liability for malpractice.  The parties and the court agreed that the government had to prove that Dr. Evers "knowingly or intentionally" breached the authorization standard.  But defining authorization by the standard of care permitted conviction for knowingly breaching the civil standard.

Supreme Court precedent, statutory interpretation, and constitutional principles show that that was error.  Though this Court has not yet addressed the question, it should be persuaded by the well-reasoned opinions of sister circuits that so hold.

Moreover, the standard the district court defined for the jury is unconstitutionally vague as applied to Dr. Evers.  The danger of delegating to law enforcement—and here, the prosecution's expert witness—the authority

to define the line between criminal and noncriminal conduct is patent on these facts.

Three evidentiary errors went to the heart of both the government and defense cases, to Dr. Evers's unfair detriment.  The government's expert was allowed to opine that the charged prescriptions breached the authorization standard as he defined it—and he defined it to subsume the defendant's knowledge, thereby rendering an opinion on *mens rea* that violated Rule 704(b).  Yet the district court also invoked Rule 704(b) to bar the defense expert from testifying to a topic that did not even approach opining on *mens rea*:  a key criterion in his definition of "usual course of professional practice and for a legitimate medical purpose," which was central to the defense.  And finally, the court's erroneous admission of propensity evidence—and the government's misuse of it—under Rule 404(b) denied Dr. Evers a fair opportunity to defend against the particular charges the grand jury brought.

These errors warrant dismissing the superseding indictment (for vagueness as-applied), or at a minimum remanding with instructions to grant Dr. Evers a new trial.

## ARGUMENT

I.  **The jury was improperly allowed to convict Dr. Evers of unlawfully dispensing a controlled substance if it found that he knowingly deviated from the prevailing standard of medical care.**

### Standard of Review

Claims that a jury instruction misstates the law are reviewed *de novo*. *E.g.*, *United States v. Piekarsky*, 687 F.3d 134, 142 (3d Cir. 2012).

### Discussion

"The potential for juries to confuse the civil standard of care applied in medical malpractice cases and the criminal standard of proof applied in [21 U.S.C.] § 841(a)(1) prosecutions [of doctors] requires courts to exercise care in setting out the governing standard in the latter circumstance." *United States v. McIver*, 470 F.3d 550, 558 (4th Cir. 2006). That is especially important because a breach of the civil standard of care is often the primary evidence of criminal liability, and expert witnesses are permitted to offer medical opinions in terminology that matches the standard for criminal liability—both of which held true at Dr. Evers's trial. *Id.* 560-62.

The error here was not limited to inadequately distinguishing the civil and criminal standards. The district court affirmatively told the jury it may

convict Dr. Evers if it found he knowingly breached the civil standard. That was error, requiring a new trial.

## A. Conviction requires a finding that the prescriptions had no legitimate medical purpose, not just that Dr. Evers knowingly breached the standard of care.

To convict a DEA-registered doctor for unlawfully dispensing controlled substances, the government must prove the doctor ceased acting as a physician—not just that the doctor knowingly breached the medical standard of care. This is an issue of first impression in this Court, but the answer is controlled by Supreme Court precedent, statutory interpretation, and constitutional principles.

### 1. The criminal standard: knowingly acting as a drug dealer rather than as a physician

Federal law prohibits the distribution of controlled substances "[e]xcept as authorized by" the CSA. 21 U.S.C. 841(a). The CSA authorizes doctors who register with the DEA to dispense controlled substances, but only "to the extent authorized by their registration and in conformity with [the CSA]." 21 U.S.C. 822(b). To conform with the CSA, a doctor's prescription for a controlled substance "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a).

Accordingly, doctors may be prosecuted under Section 841(a) for actions unauthorized by the CSA.  *United States v. Moore*, 423 U.S. 122, 131-38 (1975).  In *Moore*, the Supreme Court upheld the Section 841(a) conviction of a doctor who prescribed 800,000 methadone pills over five months, wrote over 100 prescriptions a day, and charged his "patients" a sliding-scale fee based on the number of pills "prescribed."  *Id.* 126.  The doctor also violated specific statutory limits on the prescribing of methadone, conducted perfunctory or no physical examinations, kept inaccurate records of his prescribing, and "did not regulate the dosage at all" but instead "prescribed" as much as his "patients" wished to buy.  *Id.* 126-27, 142-44.

The Supreme Court summarized these acts as "fall[ing] outside the usual course of professional practice" and "s[elling] drugs not for legitimate purposes, but primarily for the profits to be derived therefrom."  423 U.S. at 135.  A doctor who does such things "in practical effect [] act[s] as a large-scale 'pusher' not as a physician," exposing himself to prosecution under Section 841(a)—just like "street pushers with no claim to legitimacy."  *Id.* 143, 139.  The Court distinguished "the significantly greater offense of acting as a drug 'pusher,'" prosecutable under Section 841(a), from the lesser one of failing to record and maintain prescriptions in writing, prosecutable under Section 842(a)(1) of the CSA.  *Id.* 136 & n.12.

Significantly, the Court also recounted with implicit approval the jury instructions given at Moore's trial.  423 U.S. at 138-39.[9]  They required the jury to find two things as to *actus reus* in order to convict:  that the prescribing was not "in the usual course of a professional practice," *and* that the prescribing was not "in accordance with a standard of medical practice generally recognized and accepted in the United States."  *Id*.  As to *mens rea*, the instructions required a finding of knowing or intentional dispensing, and lack of "good faith" as to authorization.  *Id*.

The Supreme Court recently settled the *mens rea* requirement, in its only post-*Moore* case addressing the prosecution of doctors under Section 841(a):  the government must prove the doctor not only knowingly or intentionally dispensed, but also knowingly or intentionally did so in an unauthorized manner.  *Ruan v. United States*, 597 U.S. 450, 457-61 (2022). The Court did not revisit or elaborate on *Moore*'s articulation of the *actus reus*. Instead, it assumed without deciding that a prescription is authorized if it is "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."  *Id.* 455.  The Court described

---

[9]    The Court's holding was limited to whether DEA-registered doctors may be prosecuted under Section 841(a) and, if so, whether the evidence was sufficient to convict Moore.  The propriety of the jury instructions was not before the Court.  423 U.S. at 131-38, 138-43.

these as "objective criteria," albeit "ambiguous [ones] written in generalities susceptible to more precise definition and open to varying constructions." *Id.* 467, 459.

### 2. A knowing breach of the standard of care does not suffice.

*Moore* and *Ruan* may leave open some finer points as to *actus reus*, but this much is certain: a jury may not be instructed to convict based merely on a breach of the medical standard of care—even a knowing breach.

That is so for at least three reasons. First, it would be inconsistent with *Moore*'s threshold for criminal liability: a doctor acting as "a 'pusher' not as a physician." 423 U.S. at 143. That is an objective standard that takes all circumstances into account to determine if a doctor is prescribing to treat the patient or instead to, *e.g.*, facilitate drug abuse or improperly profit. *Cf. Ruan*, 597 U.S. at 479 (Alito, J., concurring) (facilitating abuse); *Moore*, 423 U.S. at 135 (improper profit). Second, because the standard of care requires maintaining prescription records (3Appx.0860-0861; 49 Pa. Code § 16.92), permitting conviction for knowingly breaching that standard would erase Congress's distinction between the lesser Section 842(a)(1) and the greater Section 841(a) offense, as *Moore* recognized. 423 U.S. at 136 & n.12. And third, permitting conviction for knowingly breaching the standard of care

would criminalize any doctor whose judgment differs from the mainstream medical community's, even if the doctor is still acting as a physician—though a dissenting physician.

Numerous courts of appeals have so held.  The Ninth Circuit, for instance, recognizes that—under *Moore*—even intentional malpractice does not prove an act "outside the usual course of professional medical practice and not for a legitimate medical purpose."  The prescribing must "completely betray any semblance of legitimate medical treatment":

> [This] appeal [] presents the question of whether a practitioner's conviction under 21 U.S.C. § 841(a) is valid if it rests only on a finding of intentional malpractice, or whether a jury must find that the doctor intentionally engaged in even more egregious conduct.  ...
>
> [T]he *Moore* Court based its decision not merely on the fact that the doctor had committed malpractice, or even intentional malpractice, but rather on the fact that his actions completely betrayed any semblance of legitimate medical treatment.

*United States v. Feingold*, 454 F.3d 1001, 1010 (9th Cir. 2006).  The court held that the jury instructions must require a finding that the doctor acted both "outside the usual course of professional medical practice" and "not for a legitimate medical purpose," *with only the former being tied to the medical standard of care.  Id.* 1006, 1012.

Similarly, the Fourth Circuit has approved jury instructions, focused on the "not for a legitimate medical purpose" prong, that require the government to prove a prescription was written to facilitate drug abuse or for improper profit, and prohibit conviction for a breach of the standard of care:

> [The government must prove] that the defendant was acting outside the bounds of professional medical practice, as his authority to prescribe controlled substances was being used not for treatment of a patient, but for the purpose of assisting another in the maintenance of a drug habit or dispensing controlled substances for . . . the personal profit of the physician. ...
>
> There has been some mention in this case from time to time of the standard of care. ....  Those words relate to civil actions.  ...  We're not talking about this physician acting better or worse than other physicians.  We're talking about whether or not this physician prescribed a controlled substance outside the bounds of his professional medical practice.

*McIver*, 470 F.3d at 556 n.9.  The court held those instructions "properly defined the scope of unlawful conduct under § 841(a)(1)" and "set the proper threshold for conviction, mandating application of a criminal standard of proof and precluding conviction on a lower civil standard."  *Id.* 559, 560.[10]

---

[10]    The Fourth Circuit referred to the "not for a legitimate medical purpose" prong as "arguably" a higher burden than required because *Moore* does not specifically mention it (470 F.3d at 559), but it simply overlooked 21 C.F.R. § 1306.04(a) and *Moore*'s reference to "s[elling] drugs not for legitimate purposes, but primarily for the profits to be derived therefrom" (423 U.S. at 135).  The court also overlooked that the jury instructions in *Moore* distinguished "in the usual course of a professional practice" from the standard of care, requiring both for conviction (*id.* 138-39).

Finally, the Seventh Circuit is in accord.  It likewise approved jury instructions requiring the government to prove conduct both "outside the usual course of professional medical practice" and "not for a legitimate medical purpose," with only the former being tied to the standard of care. *United States v. Kohli*, 847 F.3d 483, 488-89, 494 (7th Cir. 2017).  The court held that those instructions "correctly spell[] out each of the elements of the [Section 841(a)] offense," and "clearly articulate[] the appropriate burden of proof governing criminal liability."  *Id.* 494.[11]

### B.    The jury was allowed to convict based only on a knowing breach of the medical standard of care.

Dr. Evers's jury was properly instructed on mens rea post-*Ruan*:  that to convict it would have to find Dr. Evers knowingly or intentionally prescribed

---

[11]    Several courts have held that proving *either* "outside the usual course of professional medical practice" *or* "not for a legitimate medical purpose" proves lack-of-authorization; therefore, a knowing breach of the standard of care suffices for conviction.  *See United States v. Armstrong*, 550 F.3d 382, 396-400 (5th Cir. 2008); *United States v. Nelson*, 383 F.3d 1227, 1231-33 (10th Cir. 2004); *United States v. Heaton*, 59 F.4th 1226, 1239-40 (11th Cir. 2023).  Those courts misapprehend the standard for criminal liability under *Moore*.

This Court need not decide the conjunctive/disjunctive question here, because the jury instructions—like the indictment—stated the prongs conjunctively, requiring proof of both to convict.  5Appx.2516-2517; 2Appx.56, 58, 61, 63.  *See Shaker*, 827 F. App'x at 207 n.4 ("[W]e have never opined on the [conjunctive/disjunctive] issue, and we need not do so now, as the jury was instructed that, to convict Shaker, it needed to find both [prongs proven]").

outside the usual course of professional practice and without a legitimate medical purpose.  5Appx.2516-2517.  And the defense has never disputed that evidence of a breach of the medical standard of care is relevant in determining whether those authorization criteria are met—it proposed a jury instruction saying so.  2Appx.71-72; 5Appx.2344, 2346, 2358.

Instead, the error is with the jury instruction defining the *actus reus* as breaching the standard of care.  5Appx.2516, 2518 (lack-of-authorization as second element, defined "by reference" to Pennsylvania standard of care); *see* 27, above.  With a finding that the breach was knowing (5Appx.2516-2517), the jury was permitted to convict.  That is error under *Moore*, and under the *Feingold*, *McIver*, and *Kohli* opinions that adhere to it.

The error was prejudicial, requiring a new trial.  To avoid reversal on a preserved claim that the jury instructions misstated an element of the offense, the government must show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."  *United States v. Boyd*, 999 F.3d 171, 179 (3d Cir. 2021) (quoting *Neder v. United States*, 527 U.S. 1, 15 (1999)).  The inquiry addresses impact, not sufficiency:  "whether the guilty verdict actually rendered . . . was surely unattributable to the error." *United States v. Elonis*, 841 F.3d 589, 598 (3d Cir. 2016) (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993)).  *See also Virgin Islands v. Martinez*, 620

F.3d 321, 338 (3d Cir. 2010) ("... not merely a review of whether the jury

'could have' returned a verdict" absent the error).  Put simply, the Court must

reverse if "there [is] a reasonable possibility that the error contributed to the

jury's decision."  *United States v. Edwards*, 792 F.3d 355, 358 (3d Cir. 2015)

(quotations omitted).

The government cannot come close to clearing that high bar here; the

record shows prejudice, not harmlessness.  The substantial evidence that the

standard of care was breached is precisely what made it so crucial to the

defense that the jury be properly instructed on the standard for criminal

liability.  That standard was hotly contested because the outcome essentially

turned on it.  5Appx.2343-2359.  That was evidenced by the centrality of the

experts' testimony at trial, the prominence of Dr. Thomas's lengthy

PowerPoint presentation defining the standard for the jury, and the

government's insistence on limiting Dr. Rauck's testimony about the relevance

of the absence of trading for prescriptions.  3Appx.840-876; 4Appx.1495-

1496, 1499; 5Appx.2148.

The government leveraged the erroneous standard-of-care instruction

to maximum effect.  The prosecutor began summation by claiming Dr. Evers

violated "one of the most critical principles of medicine, . . . [s]o simple, yet, so

profound":  "care for the patient."  5Appx.2370.  Over seven transcript pages,

the prosecutor detailed what Dr. Thomas "taught all of us about the principles involved in the practice of medicine," from Hippocrates through modern professional guidelines. 5Appx.2399-2405. Over pages more, the prosecutor highlighted the high-quality care the three named patients received from other doctors in arguing for Dr. Evers's guilt, and told the jury that authorization turns on what doctors "usually" do. 5Appx.2373-2376, 2379, 2381-2383, 2398, 2486, 2488. A new trial is required.

## II.   The standard for criminal liability instructed and argued to the jury—knowingly deviating from the generally-accepted standard of medical care—is unconstitutionally vague as applied to Dr. Evers, who prescribed to *bona fide* patients with serious medical conditions.

### Standard of Review

Claims that a criminal statute is unconstitutionally vague as applied are reviewed *de novo*. *United States v. John-Baptiste*, 747 F.3d 186, 199-200 (3d Cir. 2014).

### Discussion

Vague criminal statutes violate the Fifth Amendment's Due Process Clause. *Johnson v. United States*, 576 U.S. 591, 595 (2015). "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to

provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement."  *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

Fair-notice concerns are eliminated by a scienter requirement.  *Gonzales v. Carhart*, 550 U.S. 124, 149-50 (2007).  But the Supreme Court emphasizes that protecting against arbitrary enforcement is the "more important" underpinning of the vagueness doctrine, because the need to set guardrails for law enforcement is ever-present.  *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983); *Pringle v. Court of Common Pleas*, 778 F.2d 998, 1001 (3d Cir. 1985) (citing *Kolender*, 461 U.S. at 358).

Our constitution tasks Congress with defining the line between criminal and non-criminal conduct.  But a statute with a "standardless sweep allows policemen, prosecutors, and juries to pursue their personal predilections" instead.  *Kolender*, 461 U.S. at 358 (alteration omitted).  The Supreme Court warned against that 150 years ago:

> It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large.  This would, to some extent, substitute the judicial for the legislative department of government.

*United States v. Reese*, 92 U.S. 214, 221 (1875).

47

As discussed in Point I, the Supreme Court has interpreted Section 841(a) to criminalize prescribing of controlled substances by a doctor who acts as a "'pusher' not as a physician," placing his conduct outside the usual course of professional practice. *Moore*, 423 U.S. at 142-43. Dr. Evers does not challenge the *actus reus* standard articulated in *Moore*; he challenges the standard the jury was instructed on here: the generally accepted standard of medical care. 5Appx.2516-2518. That standard may be adequate to guide juries in awarding civil damages, but criminal statutes must meet a higher standard of clarity. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc*., 455 U.S. 489, 498-99 (1982); *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1135 (3d Cir. 1992).

The government's expert, Dr. Thomas, stitched together the liability standard used against Dr. Evers from an assortment of medical adages, the standard medical model, Pennsylvania rules for administering controlled substances, and professional guidelines requiring—among other things—"sound clinical judgment." 3Appx.840-876. And again, the government took full advantage of that diffuse and amorphous standard, reviewing the "so simple, yet so profound" rules Dr. Thomas had "taught" them and urging conviction because doctors do not "usually" do what Dr. Evers did.

5Appx.2373-2376, 2379, 2381-2383, 2398-2405, 2486, 2488; *see* 28-29, above.

The danger animating the arbitrary-enforcement prong, of prosecutors and juries—and here, a prosecution expert—defining the boundary between criminal and noncriminal conduct, was on full display.  Dr. Thomas not only literally defined the boundary for the jury in his lengthy PowerPoint presentation (3Appx.840-876), he effectively determined which of Dr. Evers's prescriptions would be charged as a crime—based on his views of just how illegitimate each prescription was.  4Appx.1264, 1345-1346.

Worse, those views were applied arbitrarily.  For instance, Dr. Thomas testified that certain prerequisites to prescribing opioids are "imperative to the completion of the legitimate practice, in the usual course of professional practice."  3Appx.893.  He deemed certain prescriptions unauthorized because they lacked those indicia of legitimacy.  *E.g.*, 3Appx.1150.  Yet when asked whether another prescription lacking the same indicia was unauthorized, he said the opposite:

> The fact is, I don't know what [Dr. Evers is] treating, I don't know why it's worse, I don't know what makes it worse, I don't know what's happening with the patient because there's no history, there's no physical examination of the affected part, there's no risk assessment, there is just an increase in medication.  That is substandard practice.  But, at this point, I did not find the practice to be not for a medically legitimate purpose.

4Appx.1264. "Leav[ing] it to [Dr. Thomas] to step inside and say who could be rightfully [convicted]" is certainly "dangerous"—it violates due process. *Reese*, 92 U.S. at 221.

To be sure, several courts of appeals have rejected vagueness challenges in Section 841(a) prosecutions of doctors. *See United States v. Birbragher*, 603 F.3d 478, 489 (8th Cir. 2010); *United States v. Rosenberg*, 515 F.2d 190, 197-98 (9th Cir. 1975); *United States v. MacKay*, 715 F.3d 807, 823-25 (10th Cir. 2013); *Heaton*, 59 F.4th at 1245-47.

Those rulings have no bearing here. First, they largely focus on the fair-notice prong of vagueness and either ignore arbitrary enforcement or address it only summarily. *Birbragher*, 603 F.3d at 485-89; *Rosenberg*, 515 F.2d at 197-98; *MacKay*, 715 F.3d at 823-25; *Heaton*, 59 F.4th at 1246-47.

More importantly, "vagueness challenges . . . must be examined in the light of the facts of the case at hand." *United States v. Mazurie*, 419 U.S. 544, 550 (1975). Dr. Evers was a salaried employee running a primary care office of a nonprofit health system, who prescribed opioids to less than 7% of his patients and never bartered a prescription for his personal benefit. 2Appx.469-477, 484-489, 492; 4Appx.1875. He was prosecuted on a theory that he "mov[ed] [three] difficult patients"—each a longstanding patient with

serious medical conditions causing pain—"along with his prescription pad,".

5Appx.2371; 2Appx.204, 211-213, 231-23; 4Appx.1507, 1515-1516, 1530-1533.  That is a far cry from the conduct at issue in cases that reject vagueness challenges.  *Birbragher*, 603 F.3d at 481-82 (selling over 14 million controlled substances through "buymeds.com" without verifying customer identity or requiring medical records); *Rosenberg*, 515 F.2d at 192 (exchanging prescriptions for cash and fabricating diagnosis when agent posing as patient said she "just like[s] taking" drugs); *MacKay*, 715 F.3d at 813 (opening pill mill seeing 80-100 patients per day for 2-5 minutes each); *Heaton*, 59 F.4th at 1230-32 (*inter alia*, exchanging prescriptions for money and sex).  The superseding indictment must be dismissed.

## III.   Admitting the testimony of government expert Stephen Thomas that Dr. Evers knowingly deviated from the standard of medical practice violated Rule 704(b).

### Standard of Review

Rule 704(b) rulings are reviewed for abuse of discretion.  *United States v. Watson*, 260 F.3d 301, 306 (3d Cir. 2001).  A district court abuses its discretion when its decision  "rests upon a clearly erroneous finding of fact, an

errant conclusion of law or an improper application of law to fact." *United States v. Fattah*, 914 F.3d 112, 175 (3d Cir. 2019).

## Discussion

Federal Rule of Evidence 704(b) prohibits expert witnesses from testifying to any mental state that constitutes an element of the charged offense.  Fed. R. Evid. 704(b).  The rule bars not just testimony directly opining on *mens rea* ("defendant knew x"), but any "testimony from which it necessarily follows, if the testimony is credited, that the defendant did or did not possess the requisite *mens rea*." *United States v. Bennett*, 161 F.3d 171, 182-83 (3d Cir. 1998).  Expert testimony merely supporting an inference of *mens rea* is permitted, of course, if the conclusion does not "necessarily follow." *Id.* 183.  *Accord Diaz v. United States*, 602 U.S. 526, 534-37 (2024).

Rule 704(b)'s bright-line prohibition was violated here.  The government's evidence of unlawful dispensing was straightforward:  Dr. Thomas defined "outside the usual course of professional medical practice and not for a legitimate medical purpose," testified at length about medical records, and then opined that each charged prescription was unauthorized under the standard as he defined it.  3Appx.840-876, 1062, 1071, 1238-1245; 4Appx.1346-1352, 1398-1399.

Both the government and the district court recognized that Rule 704(b) barred Dr. Thomas from *directly* opining that Dr. Evers knew the charged prescriptions were unauthorized.  3Appx.855, 859.  Indeed, when Dr. Thomas attempted to do just that, a defense objection was sustained.  3Appx.1072.

But the district court failed to recognize Rule 704(b)'s necessarily-follows bar.  Thus, Dr. Thomas was permitted to testify that knowledge is inherent—indeed, the controlling factor—in the definition of "outside the usual course of professional medical practice and not for a legitimate medical purpose," and then testify that each of the charged prescriptions met that standard:

> So the distinction between substandard practice, or you're just not doing it right, and not for a medically legitimate purpose in the usual course of practice is **when you're not doing it right *and you know it.***

> [DEFENSE COUNSEL]:   Objection, Your Honor.

> [COURT]:   Overruled.

4Appx.1346 (emphasis added).

Courts rightly prohibit the definitional two-step the district court permitted here.  *E.g.*, *United States v. Wood*, 207 F.3d 1222, 1235-36 (10th Cir. 2000) (704(b) violated when expert defined "homicide" as requiring intent and then testified defendant's conduct was homicide).  Defining the

authorization standard as requiring knowledge and then testifying that Dr. Evers's conduct met the standard obviously violates Rule 704(b).  There can be no clearer example of "necessarily follows."  *Bennett*, 161 F.3d at 182-83.

The error was prejudicial, requiring a new trial.  Nonconstitutional error requires reversal unless the government shows "it is highly probable that the error did not contribute to the judgment," meaning this Court has a "sure conviction that the error did not prejudice the defendant."  *United States v. Dispoz-O-Plastics*, Inc., 172 F.3d 275, 286 (3d Cir. 1999); *United States v. Cammarata*, 129 F.4th 193, 226 (3d Cir. 2025) (government's burden).  Rule 704(b) errors are prejudicial when the wrongly admitted testimony "[goes] to the heart of the government's case."  *Watson*, 260 F.3d at 310.

Knowledge was certainly the heart of the government's case, as there was substantial evidence Dr. Evers breached the standard of care.  The government embraced Dr. Thomas's theory that knowledge supplies the dividing line between civil malpractice and criminal conduct.  It centered that theme in both its opening statement and its summation:

> Dr. Thomas reviewed thousands and thousands of pages of medical records ... [and] additional information that informed him of the Defendant's knowledge, about his unlawful prescribing, and he will tell you about that.  ...

He will tell you and he will show you what the Defendant knew, when he knew it, and how he ignored all of the hallmarks of addiction.  ...

**He will tell you that, in his opinion, the Defendant's conduct in this case far exceeded the thresholds of bad medicine for these three patients, because the Defendant knew what he shouldn't do, and he did it, anyway**.  ...  He will tell you, in his opinion, the Defendant did not engage in the practice of medicine with each of these three patients, and that lawfully prescribing these types of drugs requires the practice of medicine.

2Appx.178-179 (opening) (emphasis added).

The government's summation was likewise replete with argument about Dr. Evers's knowledge (which includes "willful blindness"), declaring its theme at the outset:

Ladies and gentlemen, justice is what the Government has been fighting for over the last three weeks.  Justice for Kristina Dame, for Michelle Clancy, and for Robert Konikowski who were so, so harmed by the Defendant.  **It was the Defendant's willful blindness to their physical safety that harmed them, and it was his willful blindness to the standards and guidelines and laws in place for the prescribing of controlled substances to prevent the harms that he caused them.**  ...

5Appx.2369-2370 (emphasis added).  A new trial is required.

**IV.  Excluding the testimony of defense expert Richard Rauck that improper trading for a prescription is an important criterion for determining its legitimacy was an abuse of discretion.**

<u>Standard of Review</u>

Same as Point III.

<u>Discussion</u>

A second Rule 704(b) error infected this record.  After wrongly admitting government expert Dr. Thomas's testimony as to *mens rea* (Point III), the district court wrongly excluded under Rule 704(b) defense expert Dr. Rauck's opinion that a DEA-registered doctor's prescription for a medically-grounded report of pain is outside the usual course of professional medical practice and not for a legitimate medical purpose if it has an illegitimate purpose, such as when it is traded for cash or sex.  4Appx.1495-1496, 1499; 5Appx.2148.

That was error for three reasons.  First, Rule 704(b) does not apply to the excluded testimony at all.  Dr. Rauck did not address, expressly or by necessary implication, whether Dr. Evers knew his prescribing was unauthorized (mens rea).  He attempted to opine only that improper trading

for prescriptions is a criterion for determining whether a prescription is unauthorized (*actus reus*).  4Appx.1495-1496, 1499; 5Appx.2147-2148.[12]

In that regard, it was no different than the criteria to which Dr. Thomas testified.  3Appx.840-876.  Tellingly, Dr. Thomas himself has testified that improper trading for prescriptions renders them illegitimate—under questioning from the same prosecutor whose objections to Dr. Rauck's testimony were sustained here, where the criterion helps the government because improper trading took place.  *Li*, 819 F. App'x at 114-15 ("[Dr. Thomas] discussed . . . the evidence of medically illegitimate prescribing practices . . . .  He noted that Li . . . engaged in sexual activity and other sexually inappropriate conduct with at least three patients for whom he wrote prescriptions."); *see also Shaker*, 827 F. App'x  at 207 ("Dr. Thomas [testified] that, once sex entered the picture, any prescriptions Shaker wrote for TS would have been outside the usual course of professional practice.").

---

[12]     The three objected-to questions are set forth in the Statement of the Case (at 17), as is the testimony precluded on cross-examination.  That Dr. Rauck used the word "motive" in beginning to answer one of the questions (4Appx.1495) is irrelevant—motive is not *mens rea* and is not an element of Section 841(a).  *United States v. Baroni*, 909 F.3d 550, 584 (3d Cir. 2018); *United States v. Johnson*, 27 F.3d 1186, 1193 (6th Cir. 1994).  Moreover, Dr. Rauck was referring to motive for writing a prescription, not any "motive" regarding the authorization element of Section 841(a).

Second, even if the excluded testimony were somehow related to *mens rea*, it did not even approach "stat[ing] an opinion about whether [Dr. Evers] did or did not have [the requisite] mental state." Fed. R. Evid. 704(b). Nor would that inference "necessarily follow." At the very most Dr. Rauck's opinion may have helped to dispel an inference of *mens rea*—which is just as permissible as testimony that supports one. *See Bennett*, 161 F.3d at 183.

Third, the district court clearly erred when it stated that lack of trading for prescriptions "is not of record in this case." 4Appx.1495-1496, 1499; 5Appx.2148. As the defense reminded the court to no avail (4Appx.1495), the case agent testified that the investigation uncovered no evidence that Dr. Evers had ever traded a prescription for cash, sex, or anything else. 3Appx.702.

A new trial is required because the government cannot show a high probability the error did not contribute to the judgment. *Dispoz-O-Plastics*, 172 F.3d at 286; *Cammarata*, 129 F.4th at 226. To the contrary, prejudice is manifest.

As explained in Point I, the standard for "authorization"—Congress's line between criminal and non-criminal conduct—was the heart of the defense. And the defense's evidentiary centerpiece was the absence of trading

for prescriptions—the crucial criterion, which the court prohibited the defense expert from explaining.

Again the government fully leveraged the error.  In summation, the prosecutor attacked Dr. Rauck's credibility and painted him as "part of the problem"—purporting that a complaint of pain is his sole criterion for legitimate prescribing:

> Dr. Rauck, essentially, told you that, as long as a patient has a pain complaint and there is a doctor-patient relationship, then, we need not look for anything else in the prescribing of opioids.  That is a troubling opinion, ladies and gentlemen, and an opinion that, in the Government's view, makes him part of the problem.

5Appx.2386.  The prosecutor then leveraged that inaccurate picture against the defense in rebuttal summation, telling the jurors the defense was trying to deceive them by arguing that the absence of improper trading matters:

> **Defense mentioned, There's no sex involved, there's no cash exchanged.  I have three words for you.  Smoke and mirrors.**
> ...
>
> The Government isn't required to show sex or money exchanged. ... **that has absolutely no bearing on whether or not these prescriptions were written in the usual course of professional practice for a legitimate medical purpose.**

5Appx.2485-2486 (emphasis added); *see* 30 above.  Yet the defense had no expert testimony to support its argument only because the court improperly sustained the government's objection to it.  A new trial is required.

## V. Admitting the testimony of local pharmacists that they expressed concern to Dr. Evers that he was overprescribing controlled substances to patients not named in the indictment violated Rule 404(b).

### Standard of Review

Rule 404(b) rulings are normally reviewed for abuse of discretion. *Fattah*, 914 F.3d at 175.  But review is *de novo* where, as here, the district court failed either to identify a non-propensity purpose for the evidence or to articulate a chain of non-propensity inferences between the evidence and its ostensible purpose.  *United States v. Bailey*, 840 F.3d 99, 127 (3d Cir. 2016).

### Discussion

"Although the government will hardly admit it, the reasons proffered to admit [other acts] evidence may often be [a P]otemkin [V]illage, because the motive, we suspect, is often mixed between an urge to show some other consequential fact as well as to impugn the defendant's character."  *United States v. Sampson*, 980 F.2d 883, 886 (3d Cir. 1992).  Such mixed motives are patent here, where the government proffered knowledge as the purpose for admitting damning other-acts evidence, but argued propensity to the jury.  A new trial is required.

## A.    Requirements for admission

Federal Rule of Evidence 404(b) "is generally a rule of exclusion," excluding other-acts evidence unless the proponent demonstrates its use for a "non-propensity purpose," *i.e.* a purpose other than conformity with a bad character trait.  *United States v. Caldwell*, 760 F.3d 267, 276 (3d Cir. 2014).

"Rule 404(b) must be applied with careful precision."  *Caldwell*, 760 F.3d at 274.  That is because "logically speaking, . . . antecedent bad character would form quite [a] reasonable a ground for the presumption and probability of guilt," and "weigh[s] too much with the jury and [] so overpersuade[s] them as to prejudice [the defendant] with a bad general record and deny him a fair opportunity to defend against a particular charge."  *Sampson*, 980 F.2d at 886, 887 & n.2 (3d Cir. 1992) (quoting *Michelson v. United States*, 335 U.S. 469, 475-76 & n.9 (1948)).  "The government knows this, and [this Court] do[es] too."  *Id.* 886.

Four distinct requirements must be met before evidence is admitted under Rule 404(b):  (1) the proponent must identify a permissible, non-propensity purpose that is at issue in the case; (2) the proponent must explain how the evidence is relevant to the permissible purpose, *i.e.* how it makes the fact to be proved more or less probable; (3) the court must weigh the evidence's probative value against its prejudicial nature; and (4) the court

must give a proper limiting instruction if the defendant wishes. *Caldwell*, 760 F.3d at 277-78; *see United States v. Huddleston*, 485 U.S. 681, 691-92 (1988).

The second requirement is "crucial," and the most exacting. *Caldwell*, 760 F.3d at 276. Because evidence may be relevant to a permissible purpose "only in some impermissible way," this Court requires both the proponent and the judge "to articulate, with precision, a chain of inferences [between the evidence and the fact to be proved] that does not contain a propensity link." *Id.* 277, 281. The Court has been "emphatic" on this point, because it "must [en]sure that the evidence is not susceptible to being used improperly by the jury." *Id.* 277, 282. And the Court has decried the fact that, "despite our repeated instructions in this area, some proponents of Rule 404(b) evidence still fail to follow this course." *Id.* 277.

When the non-propensity chain of inferences is not articulated or apparent from the record, reversal is appropriate:

> To be sure, the proffered evidence must be excluded if the proponent neglects or is unable to articulate this chain of inferences, and failure to exclude such evidence constitutes reversible error.

*Caldwell*, 760 F.3d at 277. And Rule 404(b) reversals are not rare. *See, e.g.*, *Caldwell*, 760 F.3d at 290; *Sampson*, 980 F.2d at 889; *United States v. Brown*,

765 F.3d 278, 297 (3d Cir. 2014); *United States v. Smith*, 725 F.3d 340, 348 (3d Cir. 2013); *United States v. Davis*, 726 F.3d 434, 447 (3d Cir. 2013).

### B.    The first and second requirements were not met.

Several local pharmacists testified that they expressed concern to Dr. Evers that he was overprescribing opioids to patients not named in the indictment and that they declined to fill Dr. Evers's prescriptions.  3Appx.679, 688-689, 700, 708-709, 719-720, 726-729, 732-733.  Most went on to testify that Dr. Evers rudely or angrily rebuffed them, with one claiming Dr. Evers threatened to report him to regulatory authorities.  3Appx.680, 689-690, 700, 709-710, 727, 729, 732-733.  The first and second requirements for admitting this evidence under Rule 404(b) were not met.

### 1.    Permissible purpose

There was a permissible purpose for the pharmacists' testimony:  to show, indirectly, that Dr. Evers knew the charged prescriptions were unauthorized.  Knowledge is an element of Section 841(a), *Ruan*, 597 U.S. at 4557-61, and that element was very much at issue.

Yet the government did not limit itself to that purpose.  Instead, it used the evidence to suggest that the prescriptions the pharmacists testified about were for Ms. Dame, Mr. Konikowski, and Ms. Clancy—after admitting to the

district court that they were not, and agreeing that the jury should be told that (2Appx.510). That rendered the testimony direct evidence of Dr. Evers's guilt.

The proffered purpose for the pharmacists' testimony was to indirectly prove Dr. Evers's knowledge that the charged prescriptions were unauthorized, because—as the government admitted to the district court— the prescriptions the pharmacists would testify about were not for Ms. Dame, Mr. Konikowski, or Ms. Clancy. 2Appx.121, 129-130, 503-504, 510. After the government said the pharmacists did not recall the patients involved, the defense tried to use regulatory records to show that the patients were none of those three. 2Appx.510; 3Appx.682-683, 692-694, 703-704, 714-715.

The government responded by eliciting testimony that the regulatory records would not reflect prescriptions the pharmacists declined to fill— implying that the prescriptions may well have been for one or more of them:

> [PROSECUTOR]: If you refused to fill a prescription, can you tell us whether or not that prescription ends up [i]n the [regulatory records]?
>
> [KANESKI]: No, because I didn't fill the prescription.

3Appx.710. And in summation, the government asked the jury to make precisely that inference:

> Defense counsel brought up [the regulatory records] for Michelle Clancy and said, ["]There's no pending medications due.["] … **We don't know that, because if it's not filled, it's not [in the**

**records].  So showing the [record] doesn't mean anything.
Just because a prescription wasn't filled that day, it's not
going to be there.**

5Appx.2493-2494. (emphasis added).  Far from a permissible purpose, that

was an improper use of the pharmacists' testimony.

### 2.    Relevance

Right off the bat, reversal is appropriate because the government did

not articulate a non-propensity chain of inferences between the pharmacists'

testimony and Dr. Evers's knowledge the charged prescriptions were

unauthorized.  *Caldwell*, 760 F.3d at 277.  It does not suffice to say Dr. Evers's

"attitude towards prescribing" for other patients "flows over" to Ms. Dame,

Mr. Konikowski, and Ms. Clancy.  2Appx.503.  *Cf. Brown*, 765 F.3d at 292 ("We

reject out of hand the government's suggestion that [evidence of defendant's

prior straw purchase of firearm] was admissible to show that [he] 'knows

what firearms are.'").

The government's nebulous proffer left plenty of room for abuse, which

came to pass at summation.  While stating the ostensible purpose of proving

knowledge, the government quickly pivoted to the exact propensity inference

Rule 404(b) prohibits when it emphasized how the pharmacists' testimony

showed Dr. Evers was not being a "legitimate, caring doctor" in those

instances, just as presently charged:

Like when he told Janice Vicaretti . . . it was none of her business and that he was the doctor, you're just a pharmacist. **Is that what a legitimate doctor would do, prescribing for legitimate medical purposes?** ....

Or when he threatened to report Gary Snedeker to his employer and to the Pennsylvania Pharmacy Board . . . . **Does that sound like a legitimate, caring doctor engaged in the legitimate prescribing for patients who legitimately needed the drugs?** ....

**It's just mind-boggling, because what legitimate doctor would not want to work with another professional in the best care for that patient?** That knowledge, knowledge not inference, knowledge was met with willful blindness.

5Appx.2376-2378, 2426 (emphasis added); additional quotations at 30-31,

above.

By the time of rebuttal summation, knowledge dropped out altogether,

leaving a bare appeal to propensity:

**The purpose of the testimony of the pharmacist[s] was to exemplify the prescribing practices of the Defendant, because those practices that were noted by these pharmacists were the same practices that he was using with these three patients**. ....

Remember Laura Wolfe who testified, the pharmacist, she testified she had a patient come into her pharmacy with a prescription for an opioid cough syrup, and it alarmed her  .... **Where was his medical decision-making for that patient?**

The pharmacist[s] came in **and testified about the pattern of prescribing that they observed that caused them to refuse to fill the Defendant's prescriptions**, that caused them to globally

refuse to fill Dr. Evers' prescriptions at any Wal-Mart and Sam's club.

5Appx.2493-2494 (emphasis added); additional quotations at 30-33, above.

## C.    The error was prejudicial, requiring a new trial.

A new trial is required because the government cannot show a high probability the error did not contribute to the judgment. *Dispoz-O-Plastics*, 172 F.3d at 286; *Cammarata*, 129 F.4th at 226.

The prejudice to Dr. Evers can hardly be overstated.  In admitting the pharmacists' testimony, the district court determined that the proper response to the evidence was cross-examination, not exclusion:

> Aren't all your arguments, [defense counsel], which I think are good arguments, aren't they all arguments for cross-examination to show that this had nothing to do with these particular three individuals who are the subject of the indictment rather than having me [exclude the testimony]?  Because, at least, on its face, it is relevant to what Dr. Evers' knowledge was.  Now, you may destroy those people on cross-examination by establishing exactly what you just told me, but I don't think it makes it inadmissible.

2Appx.123.  That cross-examination—the "good arguments" that might have "destroy[ed]" the value of the evidence—was thwarted by the government's improper use of the testimony.  That improper use also converted the testimony into something it never should have been:  direct evidence of Dr. Evers's guilt.

As to propensity, little need be added to what courts have long recognized:  propensity evidence is extremely prejudicial and "den[ies the defendant] a fair opportunity to defend against a particular charge." *Sampson*, 980 F.2d at 886 (quoting *Michelson*, 335 U.S. 469, 475-76).  Dr. Evers's case arose in the context of a *bona fide* medical practice and longstanding patients with documented medical conditions—not the typical scenario of a rogue pill-mill doctor trading prescriptions for cash or sex.  The trial centered on a battle of the experts, and the damning testimony of local pharmacists that they thought Dr. Evers was an overprescribing bully may well have tipped the result—especially given the government's use of that testimony to paint Dr. Evers as an arrogant, uncaring doctor.

This Court has frequently ordered new trials for Rule 404(b) error that admitted far less prejudicial evidence.  *See, e.g.*, *Caldwell*, 760 F.3d at 271, 285 (new trial in gun-possession case despite two detectives' testimony that defendant was holding gun); *Brown*, 765 F.3d at  295 (new trial in gun-possession case despite four detectives' testimony that defendant removed something from waistband and placed it under car seat, where gun found).  A new trial is required.

## **CONCLUSION**

For the foregoing reasons, the judgment should be vacated and the case remanded with instructions to dismiss the superseding indictment or, alternatively, to order a new trial on all counts of the superseding indictment, as amended (2Appx.68-69).

Respectfully submitted,

 */s/ Lisa A. Mathewson*
LISA A. MATHEWSON
Mathewson Law LLC
1617 John F. Kennedy Blvd., Suite 2027
Philadelphia, PA 19103
215-399-9592
lam@mathewson-law.com

*Counsel for Appellant Martin Evers*

April 25, 2025

## <u>REQUIRED CERTIFICATIONS</u>

A.  Type-Volume.  Pursuant to Rule 32(a)(7)(B)(i) of the Federal Rules of Appellate Procedure, I certify that, according to the word-counting function of my word processing system (Word 2016), this Brief contains 13,863 words, including footnotes, and employs 14-Point Cambria font.  A motion to exceed the word limit will accompany the Brief.

B.  Bar Membership.  Pursuant to Rules 28.3(d) & 46.1(e) of the Local Appellate Rules, I certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

C.  Electronic Filing.  Pursuant to Rule 31.1(c) of the Local Appellate Rules, I certify that the text of the electronically filed Brief is identical to the text in the paper copies of this Brief as filed with the Clerk. The electronic (PDF) version of this Brief has been checked for viruses using Trend Micro Security Agent, an antivirus program, with all current updates, and no virus was detected.

*/s/  Lisa A. Mathewson*

April 25, 2025

## **CERTIFICATION OF SERVICE**

I certify that on this date, I served a copy of the foregoing brief via this Court's CM/ECF system upon parties of record.

_/s/ Lisa A. Mathewson_

April 25, 2025