No. 24-1280

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

UNITED STATES OF AMERICA,
Appellee

v.

**MARTIN EVERS,**
**Appellant**

---

ON APPEAL FROM JUDGMENT ENTERED IN
THE UNITED STATES DISTRICT COURT FOR THE MIDDLE
DISTRICT OF PENNSYLVANIA ON FEBRUARY 8, 2024,
AT NO. 3:19-CR-00250

---

BRIEF FOR APPELLEE UNITED STATES OF AMERICA

---

JOHN C. GURGANUS
Acting United States Attorney

*/s/ Jeffery St John*
JEFFERY ST JOHN
Assistant U.S. Attorney
Attorney I.D. No. PA 203213
United States Attorney's Office
Middle District of Pennsylvania
235 N. Washington Ave.
P.O. Box 309, Suite 311
Scranton, PA 18503
Tel: (570) 348-2800
jeffery.st.john@usdoj.gov

June 24, 2025

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ............................................................. 1

STATEMENT OF THE ISSUES .............................................................. 2

STATEMENT OF RELATED CASES AND PROCEEDINGS ................. 5

STATEMENT OF THE CASE ................................................................ 6

    I.    Evers is charged with 71 counts of unlawful distribution of controlled substances, including one count resulting in a patient's death, is convicted on all counts following a 14-day jury trial, and is sentenced to 264 months' imprisonment .... 6

    II.    The trial evidence establishes beyond a reasonable doubt that Evers knowingly prescribed controlled substances in an unauthorized manner causing the death of one patient and placing the life and health of two others at significant, unwarranted risk ................................................................. 8

    III.    The trial evidence includes testimony of several local pharmacists who contacted Evers and expressed concerns about his overprescribing, as admitted under Rule 404(b) as probative of Evers's "knowledge" that he was prescribing in an unauthorized manner ....................................................... 14

    IV.    The government's pain medication expert opines that Evers prescribed in an unauthorized manner with respect to each of the prescriptions charged in the superseding indictment; the defense expert opines that Evers acted in an authorized manner treating patient pain complaints ........................... 18

    V.    In its final instructions, the district court charges the jury on the criminal burden of proof and applicable criminal *mens rea,* does not equate either of the two conjunctively charged sub-elements of the *actus reus* with a civil standard of care, and otherwise instructs the jury that it should not convict Evers for mere negligence, recklessness, or for failing to act as a "reasonable" doctor. ....................................................... 23

SUMMARY OF ARGUMENT ............................................................... 26

STANDARD OF REVIEW ................................................................... 31

ARGUMENT ...................................................................................... 33

i

I.     The district court did not err in instructing the jury on the second (*actus reus*) element of the charged offenses or otherwise err in jury instructions that made clear that Evers should not be convicted based on a violation of a civil standard of care. .................................................................. 33

II.    The drug distribution offenses for which Evers was convicted are not unconstitutionally vague as-applied. ........................ 41

III.   The district court did not abuse its discretion by overruling a defense objection made pursuant to Rule 704(b), permitting the government expert to offer limited testimony that used the words "know" and "knowing" with reference to certain factual patient information about which Evers would have been aware. ............................................................................ 48

IV.   Any error in the district court's exclusion under Rule 704(b) of the portion of the defense expert's opinion that a consideration in determining whether a prescription is authorized is the absence of an illicit profit motive was harmless. ................................................................................ 55

V.    The district court did not err by admitting under Rule 404(b) as probative of Evers's "knowledge" that he was prescribing in an unauthorized manner the testimony of several local pharmacists who expressed concerns to Evers that he was overprescribing opiids. ........................................................ 58

CONCLUSION ........................................................................ 70

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Copeland v. Vance,*
  893 F.3d 101 (2d Cir. 2018) ................................................. 45

*Diaz v. United States,*
  602 U.S. 526 (2024) ............................................................. 49

*Gonzales v. Carhart,*
  550 U.S. 124 (2007) ............................................................. 42

*Hill v. Colorado,*
  530 U.S. 703 (2000) ............................................................. 41

*Keyishian v. Board of Regents,*
  385 U.S. 589 (1967) ............................................................. 45

*Maynard v. Cartwright,*
  486 U.S. 356 (1988) ............................................................. 41

*Ruan v. United States,*
  597 U.S. 450 (2022) .................................................... passim

*San Filippo v. Bongiovanni,*
  961 F.2d 1125 (3d Cir. 1992) .............................................. 41

*United States v. Abovyan,*
  988 F.3d 1288 (11th Cir. 2021) ........................................... 43

*United States v. Amirnazmi,*
  645 F.3d 564 (3d Cir. 2011) ................................................ 57

*United States v. Andrews,*
  681 F.3d 509 (3d Cir. 2012) ................................................ 40

*United States v. Bailey,*
  840 F.3d 99 (3d Cir. 2016) .................................................. 32

*United States v. Bennett,*
  161 F.3d 171 (3d Cir. 1998) ................................... 48, 49, 53

*United States v. Brennan,*
  326 F.3d 176 (3d Cir. 2003) ................................................ 68

*United States v. Brosnan,*
   484 F. App'x 167 (9th Cir. 2012)..................................................67

*United States v. Brown,*
   765 F.3d 278 (3d Cir. 2014) ........................................................60, 62

*United States v. Caldwell,*
   760 F.3d 267 (3d Cir. 2014) ........................................................58, 60

*United States v. Collier,*
   478 F.2d 268 (5th Cir. 1973).......................................................42

*United States v. Coyle,*
   63 F.3d 1239 (3d Cir. 1995) ........................................................31, 38

*United States v. Cross,*
   308 F.3d 308 (3d Cir. 2002) ........................................................54, 58

*United States v. Cruz,*
   326 F.3d 392 (3d Cir. 2003) ........................................................32

*United States v. Darji,*
   609 F. App'x 320 (6th Cir. 2015)..................................................42

*United States v. Davis,*
   726 F.3d 434 (3d Cir. 2013) ........................................................59, 60

*United States v. Dimitrov,*
   546 F.3d 409 (7th Cir. 2008).......................................................46

*United States v. Feingold,*
   454 F.3d 1001 (9th Cir. 2006)......................................................36, 37

*United States v. Fullmer,*
   584 F.3d 132 (3d Cir. 2009) ........................................................41

*United States v. Heinrich,*
   971 F.3d 160 (3d Cir. 2020) ........................................................31

*United States v. Katz,*
   445 F.3d 1023 (8th Cir. 2006)......................................................37

*United States v. Kohli,*
   847 F.3d 483 (7th Cir. 2017).......................................................44

*United States v. Li,*
   819 F. App'x 111 (3d Cir. 2020) ..................................................60

*United States v. MacKay,*
   715 F.3d 807 (10th Cir. 2013) ................................................. 44

*United States v. Marr,*
   760 F.3d 733 (7th Cir. 2014) .................................................. 67

*United States v. Mazurie,*
   419 U.S. 544 (1975) ............................................................. 31

*United States v. McIver,*
   470 F.3d 550 (4th Cir. 2006) ................................... 39, 40, 58

*United States v. Merrill,*
   513 F.3d 1293 (11th Cir. 2008) ............................................ 36

*United States v. Moore,*
   375 F.3d 259 (3d Cir. 2004) ................................................. 68

*United States v. Moore,*
   423 U.S. 122 (1975) ................................................... 26, 35, 36

*United States v. Moyer,*
   674 F.3d 192 (3d Cir. 2012) ................................................. 31

*United States v. Norris,*
   780 F.2d 1207 (5th Cir. 1986) .............................................. 36

*United States v. Orta-Rosario,*
   469 F. App'x 140 (4th Cir. 2012) ......................................... 42

*United States v. Richards,*
   719 F.3d 746 (7th Cir. 2013) ................................................ 69

*United States v. Rosen,*
   582 F.2d 1032 (5th Cir. 1978) .............................................. 46

*United States v. Sabean,*
   885 F.3d 27 (1st Cir. 2018) .................................................. 37

*United States v. Sampson,*
   980 F.2d 883 (3d Cir. 1992) ................................................. 59

*United States v. Simpson,*
   479 F.3d 492 (7th Cir. 2007) ................................................ 69

*United States v. Singh,*
   54 F.3d 1182 (4th Cir. 1995) ................................................ 43

*United States v. Smith,*
  573 F.3d 639 (8th Cir. 2009) ...................................................... 36

*United States v. Steiner,*
  847 F.3d 103 (3d Cir. 2017) ...................................................... 31

*United States v. Stevens,*
  533 F.3d 218 (3d Cir. 2008) ...................................................... 41

*United States v. Tran Trong Cuong,*
  18 F.3d 1132 (4th Cir. 1994) .................................................... 37

*United States v. Volkman,*
  797 F.3d 377 (6th Cir. 2015) .................................................... 37

*United States v. Wexler,*
  522 F.3d 194 (2d Cir. 2008) ..................................................... 37

**Statutes**

18 U.S.C. § 3231 ...................................................................... 1

21 U.S.C. § 841 .......................................................... 6, 33, 46

28 U.S.C. § 1291 ..................................................................... 1

**Rules**

Fed. R. App. P. 32(a)(7)(B) ................................................... 71

Fed. R. Evid. 404(b) ................................................................ 4

Fed. R. Evid. 704(b) ................................................................ 3

## JURISDICTIONAL STATEMENT

Defendant Martin Evers appeals from a judgment of conviction in a criminal case. The district court (Mariani, J.) had subject-matter jurisdiction under 18 U.S.C. § 3231. The court entered judgment on February 9, 2024, Appx3, and Evers filed a notice of appeal on February 13, 2024. Appx1.[1] This Court has jurisdiction under 28 U.S.C. § 1291.

---

[1] "Appx" refers to the joint appendix. "PSR" refers to the presentence investigation report. "Doc." refers to the district court docket. "Br." refers to Evers's opening brief.

# STATEMENT OF THE ISSUES

I.    Whether the district court did not err in instructing the jury on the second (*actus reus*) element of the charged offenses (acting "outside the usual course of professional practice" and "not for a legitimate medical purpose"), where the district court did not instruct the jury that it could find either of this element's conjunctively charged sub-elements satisfied based upon a mere finding that Evers had acted in violation of a civil standard of care, and where the jury instructions, considered as a whole, clearly conveyed that Evers should not be convicted based upon mere negligence or recklessness in his prescribing, but only upon a finding, beyond a reasonable doubt, that Evers prescribed in a manner that he knew was unauthorized. Appx2343-2359; Appx2500-2523.

II.    Whether the drug distribution offenses for which Evers was convicted were not unconstitutionally vague as applied to him, where prosecutions of medical professionals like Evers who knowingly prescribe dangerous amounts and combinations of controlled substances for illegitimate purposes, including to placate severely addicted, drug-seeking patients, have been upheld by courts in the face

2

of as-applied constitutional challenges, and where the trial evidence clearly established that Evers knew that he was prescribing in an unauthorized, illegitimate manner.  Doc. 53; Appx10-24.

III.   Whether the district court did not abuse its discretion by overruling a defense objection, made pursuant to Fed. R. Evid. 704(b), to a limited portion of the opinion testimony of the government's pain medication expert, where the government's expert did not opine as to Evers's "knowledge" in the critical, ultimate-issue sense of whether Evers knowingly or intentionally prescribed in an unauthorized manner, but only used the words "know" and "knowing" in his testimony with reference to the factual information about a patient's course of treatment of which Evers would have been aware at the time of the prescribing, which informed the expert's opinion, not on Evers's mental state, but only on whether certain of Evers's prescriptions were unauthorized.  Appx1346; Appx1346.

IV.   Whether any error in the district court's exclusion, under Rule 704(b), of the defense expert's opinion that one factor in determining whether a prescription is authorized is the absence of an illicit profit motive on the part of the prescriber (as shown by a direct

*quid pro quo* exchange of cash or sex for the prescription) was harmless, where despite the district court's ruling, the defense expert nonetheless went on to articulate, without objection or exclusion, this part of his opinion several times during cross examination. Appx1495; Appx1496.

V.    Whether the district court did not err by admitting, pursuant to Fed. R. Evid. 404(b), the testimony of several pharmacists who expressed concern to Evers that he was overprescribing controlled substances and who declined to fill some of his prescriptions, where this evidence was highly probative of Evers's "knowledge" (including in the sense of "willful blindness") that the comparable prescriptions charged in the superseding indictment were unauthorized, a valid, non-propensity purpose. Doc. 231; Appx128, 501-516.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not previously been before the Court, and counsel is aware of no case or proceeding that is related to this case.

## STATEMENT OF THE CASE

I. **Evers is charged with 71 counts of unlawful distribution of controlled substances, including one count resulting in a patient's death, is convicted on all counts following a 14-day jury trial, and is sentenced to 264 months' imprisonment**

On March 8, 2022, Defendant-Appellant Martin Evers, a former physician licensed to practice medicine in Pennsylvania,[2] was charged in a superseding indictment with 71 counts of the unlawful distribution and dispensing of one or more controlled substances, including oxycodone, fentanyl, methadone and diazepam, in violation of 21 U.S.C. § 841, with two of those counts charging distributions resulting in patient deaths.[3]  PSR ¶ 3.

---

[2] At all times relevant to this appeal, Evers practiced as a primary care physician in Milford, PA, for Bon Secours health system.  Appx471, 481. Although Evers was paid a base salary, his overall compensation was a function of his productivity.  Not only was his "monthly production compensation" based upon the number of patients seen but even his base salary was partly a function of his prior year's productivity. Appx473-476.

[3] Although the superseding indictment, as originally returned, charged Evers in connection with the deaths of patient Kristina Dame (count 2) and patient Michelle Clancy (count 39), on November 8, 2022, in advance of trial, upon motion of the government, the unlawful distribution offense charged in count 2 was amended to remove the resulting in death allegation.  PSR ¶ 5.

On November 14, 2022, a 14-day jury trial commenced, PSR ¶ 6, during which the government called 20 witnesses, including law enforcement officers, Appx296-335, 516-552, 564-591, 650-675, medical personnel, Appx282-289, 744-809, toxicologists and a forensic pathologist, Appx336-464, an expert in pain medicine, Appx816-1352, several pharmacists, Appx675-740, and family and friends of the three severely drug-addicted, deceased patients to whom Evers knowingly prescribed extraordinarily high quantities and doses of dangerous opioids in violation of federal criminal law.  Appx199-234, 237-281.  On December 5, 2022, the jury returned guilty verdicts on all 71 counts. PSR ¶ 6.

On February 8, 2024, the district court sentenced Evers to a total period of imprisonment of 264 months, consisting of a term of 240 months' imprisonment on counts 1 through 38 and 40 through 71, to run concurrently with a term of 264 months' imprisonment on count 39. Appx3-4.

**II.    The trial evidence establishes beyond a reasonable doubt that Evers knowingly prescribed controlled substances in an unauthorized manner causing the death of one patient and placing the life and health of two others at significant, unwarranted risk**

The trial evidence focused on Evers's relationship with three patients, Kristina Dame, Appx199-216, 906-1073, Michelle Clancy, Appx237-289, 296-325, 336-464, 1073-1236, and Robert Konikowski Appx216-234, 744-809, 1251-1352, each of whom came to Evers with complaints of pain stemming from medical conditions, but who Evers came to understand were opioid-dependent, drug abusers, severely addicted to oxycodone, fentanyl, and/or methadone.  Evers prescribed these patients medically unjustifiable amounts of their controlled substances of choice, frequently based only upon their requests for higher doses and additional drugs, at times dangerously prescribing both high dose opioids and benzodiazepines (a combination well known to cause respiratory depression and greatly increase risk of fatal overdose).  Appx849, 866, 877-884.

Evers prescribed in this fashion for these patients, month-after-month, year-after-year, even in the face of clear evidence that these patients were abusing his prescriptions, as shown by the patients'

habitual requests for early refills, Appx1174, 1192-1193, 1223-1224, 1270-1274, 1280-1283, 1285-1288, the patients' patently untruthful claims to have lost their medications, Appx1192-1193, 1223-1224, 1309-1312, unaddressed failed patient drug screens, Appx942; 1165-1167, 1279-1280, 1291-1297, 1327-1328, and emergency room records reflecting patients' desperate, drug-seeking behaviors at local ERs. Appx976-977, 1013, 1099-1102, 1198-1199, 1216.  Evers also continued to prescribe in this fashion even after being informed by a global pharmacy chain that it would no longer fill any of his prescriptions based upon concerns of chronic overprescribing.  Appx723-740.

Specifically as to Kristina Dame, the trial evidence established: (1) that Dame came to Evers in October 2012, with a long history of substance abuse that included prior overdose, recently documented hospitalization for detoxification from opiates and benzodiazepines, and clear evidence of drug-seeking behaviors at local emergency rooms; Appx908-911, 929, 937-938; (2) that Evers administered to her an initial drug screen that yielded an unexpected (failed) result, and that Evers never screened her again; Appx942; (3) that early in the doctor-patient relationship, Dame's mother specifically told Evers about her daughter's

9

severe addiction; Appx950; PSR ¶ 8; (4) that Evers became aware that Dame was engaged in drug-seeking behaviors at local ERs and urgent care clinics but failed to document any of this conduct in the patient file; Appx976-977, 1013; PSR ¶ 8; (5) that in October 2013, Dame asked Evers to prescribe her methadone, and he complied with a high dose prescription; Appx1000-1001; (6) that on November 3, 2013, Dame suffered a nonfatal opioid overdose, Appx1002, and later attempted suicide by overdose on more than one occasion, resulting in her admission to psychiatric hospitals; Appx1034, 1045; (7) that other practitioners immediately recognized that Dame had opioid use disorder after she was hospitalized for suicide attempts and began to wean her from the methadone; Appx1038-1040, 1044, 1054; and (8) that throughout this entire period, even though Evers's own notes indicate that he knew Dame was abusing her medications and agreed with the methadone taper strategy and "[would] not restart," Evers continued to prescribe Dame high-dose opioids, including methadone, along with Xanax, a benzodiazepine.  Appx1055, 1057, 1058, 1061, 1070-1071. During Dame's most vulnerable period, post hospitalization, Evers also

prescribed Dame fentanyl for the first time, failing to document the prescription in any way in his records.  Appx1060-1061.

As to Michelle Clancy, the trial evidence established: (1) that Clancy was Evers's patient for approximately six years, beginning in 2013 and ending with her February 2019 fatal overdose on oxycodone and fentanyl prescribed by Evers; Appx1074, 1235-1236; (2) that Evers prescribed Clancy oxycodone on her first visit to him and, despite indicating in his own notes that he would only do so again at the request of a pain management specialist, continued to prescribe Clancy high dose opioids for the remainder of her life; Appx1081, 1084; (3) that Evers did this knowing that Clancy regularly engaged in desperate drug-seeking behaviors at local ERs (at least 18 visits during a two-year period), where she became notorious; Appx1099-1102, 1198-1199, 1216; PSR ¶ 9; (4) that Evers regularly wrote Clancy early prescriptions, often accepting Clancy's obvious false claims to have lost her pills or that her pills had been stolen; Appx1174, 1192-1193; PSR ¶ 9; (5) that during June 2017, following one of the few occasions that he administered Clancy a drug screen, Evers ignored an unexpected (failed) result that indicated that Clancy was not taking her medications as prescribed,

failed to counsel her on the issue, and instead simply prescribed her more oxycodone and fentanyl; Appx1165-1167; (6) that Evers ignored Clancy's partner of over 20 years who directly told Evers that he was prescribing Clancy—who would spend much of the day in a zombie-like state—too much medication; Appx252-253; (7) that contrary to his later claims to DEA Diversion Investigator Gary Derr, Evers never tried to wean Clancy down on her prescriptions; Appx543-544[4]; (8) that in fact Evers was so acceding to this obviously drug-addled woman's requests for more drugs that Clancy continued to use Evers as her primary care physician during a period of time in which she lived close to three hours away in Philadelphia; Appx250, 1140; and (9) that in February 2019, Clancy tragically died as a result of "mixed drug toxicity," with the oxycodone and fentanyl prescribed to Clancy by Evers the cause of her death.[5]  Appx284-309, 325, 355-356, 402-404, 460-461, 1235-1236.

---

[4] During this same August 6, 2019 interview, Evers admitted that if his opioid-addicted patients did not want to be weaned down on their prescriptions, he would continue to provide them opioids at current high levels to prevent them from "going to the streets" to obtain drugs from street dealers.  Appx544.

[5] Evers wrote his final prescription for Clancy—for 152 oxycodone (30 mgs)—on February 5, 2019.  Evers provided Clancy with this script even though he had just provided her prescriptions for 240 oxycodone

Finally, as to Robert Konikowski, the trial evidence established:
(1) that Konikowski was Evers's patient for approximately eight years
from 2012 to 2019; Appx1251; PSR ¶ 10; (2) that as time passed and
Konikowski's addiction to the oxycodone that he was prescribed by
Evers increased, Konikowski began to habitually seek early refills from
Evers, including weeks early, which Evers always accommodated;
Appx1270-1274, 1280-1283, 1285-1288; (3) that Evers accepted
Konikowski's claims to have lost his pills or that his pills were stolen;
Appx225-226, 1309-1312; (4) that Evers dangerously added Lorazepam,
a benzodiazepine, to Konikowski's prescribed medicines; Appx1296;
PSR ¶ 10; (5) that Evers only subjected Konikowski to a few drug
screens in eight years of prescribing and each returned unexpected
results, showing either the absence in Konikowski's system of a
prescribed drug (fentanyl) or the presence of an unprescribed drug, and
that Evers not only continued to prescribe Konikowski high dose

_____

(30mgs) and fentanyl on January 25, 2019.  Evers did this based solely
upon Clancy's unverified claim that her medications had been stolen
while traveling on a Greyhound bus.  Evers's notes indicate that he
initially refused to provide the early refill, telling Clancy "I can't do
anything."  After Evers reversed course and wrote Clancy the early
prescription, Evers failed to document it in any way in Clancy's medical
file.  Appx667-675, 1223-1226.

opioids, Evers incorrectly designated one of these failed drug screens as "passed"; Appx1279-1280, 1291-1297, 1327-1328, 1334; (6) that Evers acceded to Konikowski's request to stop prescribing him fentanyl and to instead increase his dosage of oxycodone (Konikowski's drug of choice), during the same period of time in which the patient was habitually seeking early refills and failing drug screens; Appx1328-1329; and (7) that immediately upon having his treatment transferred to a different doctor, Konikowski's prescriptions were lowered and, gradually, significantly lowered. Appx759, 777, 784, 788-789, 1342-1343.

### III. The trial evidence includes testimony of several local pharmacists who contacted Evers and expressed concerns about his overprescribing, as admitted under Rule 404(b) as probative of Evers's "knowledge" that he was prescribing in an unauthorized manner

The government's trial evidence also included the testimony of six local pharmacists, who contacted Evers during the same timeframe as his unlawful prescribing for Dame, Clancy and Konikowski, as charged in the superseding indictment, and who expressed to Evers concerns about the amounts and dosages of his opioid prescriptions and his combining of prescription opioids with benzodiazepines. Appx675-740.

For example, Medicine Shoppe pharmacist Janice Vicaretti testified that she contacted Evers concerning a prescription for 480 methadone tablets (10mgs), a dosage and quantity that she had never before seen prescribed in her career. Appx679-680. When Vicaretti inquired into the patient's condition, Evers responded that it was "none of [her] business, I'm the doctor, you are not." Appx680. Walmart pharmacy manager Gary Snedeker testified that after several prior attempts to try to work with Evers concerning the volume and nature of his prescriptions, Snedeker informed Evers that his store had decided to impose a "blanket refusal" and would no longer fill his opioid prescriptions. Appx724-731. Evers became upset and threatened to report Snedeker to the state pharmacy board. Appx732-733.

The pharmacist testimony was admitted under Rule 404(b) as probative of Evers's "knowledge" (including in the sense of "willful blindness") that he was prescribing opioids in an unauthorized manner, a key element in § 841(a) prosecutions of authorized prescribers post *Ruan v. United States*, 597 U.S. 450 (2022). Importantly, the government's proposed admission of this testimony was the subject of considerable pretrial argument by the parties and pretrial deliberation

and analysis by the court that significantly supplemented what is reflected in the trial record.

For example, in the government's pretrial brief, submitted to the court and opposing counsel on November 4, 2022, the government set forth a detailed justification for admission of this testimony under Rule 404(b), noting that the testimony is "offered to prove the defendant's knowledge that he knew he was engaged in a pattern of prescribing high-risk, highly addictive, and potentially deadly controlled substances (identical to the controlled substances charged in the superseding indictment) outside the usual course of professional practice and not for a legitimate medical purpose, or that he turned a blind eye to the warnings." Doc. 231 at 17. The government further noted that because it must prove that Evers "knew his distributions were not 'in the usual course of professional practice' and 'for a legitimate medical purpose,' the above evidence related to actions taken by pharmacists who share a corresponding legal responsibility . . . and the defendant's knowledge of such actions, is highly probative, relevant and admissible. It speaks to the defendant's state of mind and knowledge with respect to the charged patients and prescriptions." *Id.* at 17 n.10. "The evidence

16

rebuts any assertion that [Evers] reasonably believed he was engaged in a proper medical practice and is also evidence of the defendant's willful blindness." *Id.* at 18.

A few days later, at the November 8, 2022 pretrial conference, the district court took up the question of the admissibility under Rule 404(b) of the pharmacist testimony. Appx119-128.  The court noted it was inclined to allow the testimony in "as indicative of the knowledge as, at least, evidence that can be argued is indicative of the knowledge that the doctor had that he was prescribing outside the range of the usual course of professional practice . . . that's relevant evidence, ultimately, for the jury to decide."  Appx119.  At the same proceeding, the district court made at least a preliminary ruling, noting "I don't see [the pharmacist testimony] as expert testimony at this point.  The case law that I've read says it is not.  I think what they told Dr. Evers is relevant, and while it may be prejudicial, it's not unfairly prejudicial." Appx128.

On the third day of trial, prior to the testimony of the first pharmacist witness, the district court again considered the admissibility under Rule 404(b) of the proffered testimony.  Appx501-

516.  The government again articulated its knowledge/willful blindness justification for the evidence, albeit in more truncated form than in its pretrial brief.  Appx503-504.  After the district court made clear its intention to admit the evidence for the proffered purpose, Evers requested a limiting instruction and the verbiage specifically suggested by Evers was incorporated into the court's instruction, Appx512-514, which the court administered both at the conclusion of the pharmacist testimony and again during its final jury charge. Appx737, 2514.

**IV.  The government's pain medication expert opines that Evers prescribed in an unauthorized manner with respect to each of the prescriptions charged in the superseding indictment; the defense expert opines that Evers acted in an authorized manner treating patient pain complaints**

The government's evidence also included the testimony of Dr. Stephen Thomas, an expert in pain medicine.  Appx846.  Dr. Thomas reviewed thousands of medical records related to Evers's course of treatment of Kristina Dame, Michelle Clancy and Robert Konikowski, Appx904-906, and opined that the 71 high dose opioid prescriptions charged in the superseding indictment were not prescribed by Evers in the usual course of professional practice and were not prescribed for a legitimate medical purpose.  Appx816-1352.  The criterion utilized by

Dr. Thomas to reach these opinions was based upon the "standard medical model," which Dr. Thomas described in detail, Appx850-852, as well as accepted treatment principles among Pennsylvania physicians concerning the prescribing and dispending of highly addictive controlled substances. Appx860-864.

At no point during his testimony did Dr. Thomas opine on Evers's mental state as to the unauthorized prescriptions charged in the superseding indictment.[6] To the extent that Thomas used the words "know" or "knowing" in his testimony, it was with reference to what, based on Dr. Thomas's review of Evers's own patient files, Evers would have been aware of *factually* about the status of a given patient at the time of the prescribing.

For example, in support of his opinion that each prescription that Evers prescribed for Robert Konikowski following Konikowski's second failed drug screen was unauthorized, Dr. Thomas explained: by "the date of the second unexpected urine screen . . . Dr. Evers was, either,

---

[6] The opinions offered by Dr. Thomas at Appx955-956, 1062-1063, and 1118 are free of any reference, direct or indirect, to Evers's mental state and are representative of the opinions offered by Dr. Thomas throughout his testimony.

*aware or could have been aware* that [Konikowski] was non-compliant in the way that he was taking his medication, and when you combine that with the substandard practice that was already in the chart, that became less standard and more out of control, from that point forward, the absence of the practice of medicine, with the increasing risk to the patient, while *knowing* [i.e. being aware] that [Konikowski's] not taking the medication but supplying it to him, in my opinion, made the prescribing not for a legitimate purpose in the usual course of professional practice. So the distinction between substandard practice . . . and not for a medially legitimate purpose in the usual course of practice is when you're not doing it right and you *know* it," that is, the doctor knows, or should know, that the patient is consistently not taking the medication as prescribed (or is aware of other clear red flags) and still prescribes. Appx1346.

During the defense case, Evers presented the testimony of his own pain medicine expert, Dr. Richard Rauck. Dr. Rauck opined that each of the 71 high dose opioid prescriptions charged in the superseding indictment were prescribed by Evers in the usual course of professional practice and for a legitimate medical purpose. Appx1487-1544. Dr.

Rauck offered as the criteria upon which his opinions were based: (1) whether the prescription is written by an "authorized person," meaning any person with "a license from [the DEA] to be able to prescribe"; and (2) whether the person is "writing it for someone who is complaining of pain."[7]  Appx1493-1494.

After offering these two criteria, Dr. Rauck next attempted to testify to a third criterion, or as he expressed it, "there's probably one other thing that's a little different of how I think of for a legitimate medical purpose," namely, whether the circumstances surrounding the issuance of the prescription reflect a "motive" of personal gain on the part of the prescriber (as shown where there is a direct *quid pro quo* exchange of cash or sex for the prescription).  Appx1495.  However, the government objected to the articulation of this third criterion, and the district court sustained the objection pursuant to Rule 704(b)'s prohibition on an expert witness offering an opinion on the mental state of the accused.  Appx1495-1496.

---

[7] As to this second criterion, Dr. Rauck also remarked that if the doctor is writing the prescription in response to *any pain complaint* by a patient, then "to me that's for a legitimate medical purpose." Appx1494.

Although Dr. Rauck was not permitted to offer this "other motive" or "other illegitimate conduct" criterion at this time, Dr. Rauck nonetheless expressed this part of his opinion—that the absence of such misconduct evidence informs his ultimate opinion on whether the prescription is authorized—at numerous points during his cross examination. Appx1544-1545 ("it takes they have a complaint of pain and you *aren't doing other things* that would be outside of a legitimate medical purpose"); Appx1546 ("they are *not doing things outside the practice*"); Appx1637 ("and there *aren't things that are outside legitimate medical purposes* going on"); Appx1644 ("you can't go outside that physician-patient relationship. *An example might be where the patient knows they can come in and just pay for a prescription . . . That's not a legitimate patient relationship. Or if the doctor knows if he writes Oxycodone, the patient will let him have sex with them*").

**V.    In its final instructions, the district court charges the jury on the criminal burden of proof and applicable criminal *mens rea,* does not equate either of the two conjunctively charged sub-elements of the *actus reus* with a civil standard of care, and otherwise instructs the jury that it should not convict Evers for mere negligence, recklessness, or for failing to act as a "reasonable" doctor**

The district court's final jury instructions included, as relevant here, a charge on the criminal burden of proof, Appx2509-2510, and Charge 17—Elements of the Offenses Charged, which highlighted in several places the requirement that the jury must find that Evers acted "knowingly or intentionally"—the criminal *mens rea*—not only in distributing the prescribed controlled substances but in distributing them in an unauthorized manner, that is, outside the usual course of professional practice and not for a medically legitimate purpose. Appx2516-2521.  The district court also specifically distinguished this criminal prosecution from a civil negligence or malpractice action, where liability can be based upon the violation of a standard of care.[8]

_____

[8] *See* Appx2519 ("criminal liability must be based on a finding that Dr. Evers knowingly or intentionally distributed . . . .  In other words . . . be based on the required state of mind, that is, that Dr. Evers acted knowingly or intentionally.  This requirement distinguishes this case from a civil action for negligence or medical malpractice, where liability can be based on what a reasonable medical practitioner would do or intend").

The district court's instructions also charged a related theory of willful blindness. Appx2521-2523. This willful blindness charge likewise tied the criminal *mens rea*, not just to the fact of distribution, but to the requirement that the distributions be unauthorized, Appx2521-2522, and similarly emphasized that a finding that Evers merely acted recklessly or negligently was insufficient to support a guilty verdict in a criminal case. Appx2522-2523.

Finally, the district court's instructions charged the jury that it could only find the second element (or *actus reus*) of the charged offenses proven, if it found both of its sub-elements satisfied, that is, found that, in prescribing as charged, Evers acted both "outside the usual course of professional practice" and "not for a legitimate medical purpose." Appx2516-2517. In providing further guidance on those sub-elements, the district court first noted, as to both, that "[t]he question of whether a physician acted outside the usual course of his professional practice and not for a legitimate purpose is defined, by reference, to the standard of medical practice generally recognized and accepted in . . . Pennsylvania." Appx2518. Then, as to the first sub-element only, the district court further noted: "Therefore, in determining whether the

24

defendant acted outside the usual course of professional practice, you *may* consider the standards to which medical professionals generally hold themselves, including accepted *standards of care* among medical professionals." Appx2518-2519.[9]   At no point did the district court tie or equate either sub-element to the mere violation of a civil standard or duty of care.  Indeed, the district court's next instruction directed the jury to weigh all of the testimony it had heard concerning what constitutes prescribing controlled substances in the usual course of professional practice, as well as for a legitimate medical purpose. Appx2519.

---

[9] This verbiage—the only express reference in the charge to "standards of care" among doctors—was added at the specific request of Evers. Appx2345, 2350, 2358-2359.

## SUMMARY OF ARGUMENT

I.    The district court did not err in instructing the jury on the second (*actus reus*) element of the charged offenses.  The court did not instruct the jury that it could find either of this element's conjunctively charged sub-elements (acting "outside the usual course of professional practice" and "not for a legitimate medical purpose") satisfied based upon a mere finding that Evers had acted in violation of a civil standard of care.  Rather, as to the first sub-element only, the district court charged the jury that it *may* consider "accepted standards of care among medical professionals" among the standards to which medical professionals generally hold themselves, along with all of the other testimony in the case.  The district court did not tie the second sub-element—which the jury was instructed it must also independently find proved in order to convict—in any way to a civil standard of care.  Simply indicating that both sub-elements are defined by reference to generally recognized and accepted standards of medical practice, as the district court did here, is perfectly consistent with and permissible under the Supreme Court's decisions in *United States v. Moore*, 423 U.S. 122 (1975) and *Ruan v. United States*, 597 U.S. 450 (2022), which

each made clear that these concepts are defined by reference to objective, professional criterion.  Moreover, the final jury instructions in this case, when considered as a whole, clearly conveyed that Evers should not be convicted based upon mere negligence or recklessness but only upon a finding, beyond a reasonable doubt, that Evers knowingly or intentionally prescribed in an unauthorized, illegitimate manner.

II.    The drug distribution offenses for which Evers was convicted are not unconstitutionally vague as applied to him.  Prosecutions of medical professionals like Evers who knowingly prescribe dangerous amounts and combinations of controlled substances for illegitimate purposes, including to placate drug-seeking patients or to earn more money by increasing the volume of their practice, have been routinely upheld by federal courts in the face of as-applied constitutional challenges.  Moreover, particularly given that it is clear based upon the trial evidence that Evers knew that he was prescribing in an unauthorized, illegitimate manner, the concepts of "usual course of professional practice" and "not for a legitimate medical purpose" are not unconstitutionally vague as applied to him.

III.   The district court did not abuse its discretion by overruling a defense objection made pursuant to Rule 704(b) to a portion of the testimony of Dr. Stephen Thomas, the government's pain medication expert, where Dr. Thomas used the words "know" and "knowing" in reference to Evers.  This limited testimony was not part of a forbidden ultimate-issue opinion by Dr. Thomas on whether Evers knowingly or intentionally wrote unauthorized prescriptions.  Rather, Dr. Thomas used the words "know" or "knowing" in this testimony only with reference to factual information about a patient of which Evers would have been aware at the time of the prescribing.  This factual information, which Dr. Thomas gleaned from his review of Evers's own patient files, then informed Dr. Thomas's opinion, not on the ultimate issue of whether Evers knowingly or intentionally prescribed in an unauthorized fashion, but only on the issue of whether the charged prescriptions, regardless of Evers's mental state, were unauthorized.

IV.   Any error in the district court's exclusion under Rule 704(b) of the opinion of defense expert Dr. Richard Rauck that one factor in determining whether a prescription is authorized is the absence of an illicit profit motive on the part of the prescriber (as shown by evidence

28

of a direct *quid pro quo* exchange of cash or sex for the prescription) was harmless. Not only was Dr. Rauck able to articulate this part of his opinion numerous times without objection during his cross examination, but in the defense closing statement, Evers specifically tied the absence of direct *quid pro quo* evidence in the case, and his argument that this absence should be a significant factor in the jury's determination that Evers was not guilty, to his expert's opinion on the subject.

V.    The district court did not err by admitting, pursuant to Rule 404(b), the testimony of several local pharmacists who expressed concerns to Evers that he was overprescribing controlled substances and dangerously combining opioids and benzodiazepines and who declined to fill his prescriptions. This evidence was highly probative of Evers's "knowledge" (including in the sense of "willful blindness") that the comparable prescriptions charged in the superseding indictment were unauthorized, which is a valid, non-propensity purpose. Prior to the admission of this evidence, in both its pretrial brief and at other points of record, the government set out a detailed, permissible chain of inferences supporting admission, and the district court adopted this chain of inferences in its ruling that the evidence was admissible. The

district court also appropriately administered a limiting instruction both following the presentation of the evidence and during its final jury instructions. Finally, the government did not compound any Rule 404(b) error, either during the testimony itself (by suggesting that the pharmacists were testifying about prescriptions Evers wrote for the three patients whose prescriptions were the subject of the indictment) or during its closing statements (by using the pharmacist testimony to argue propensity).

## STANDARD OF REVIEW

I.      This Court reviews *de novo* whether the jury instructions stated the proper legal standard.  *United States v. Steiner*, 847 F.3d 103, 114 (3d Cir. 2017).  Whenever this Court considers jury instructions, it "consider[s] the totality of the instructions and not a particular sentence or paragraph in isolation."  *United States v. Coyle*, 63 F.3d 1239, 1245 (3d Cir. 1995).

II.     This Court reviews *de novo* a claim that a statute is unconstitutionally vague as applied.  *United States v. Moyer*, 674 F.3d 192, 211 (3d Cir. 2012).  Where the vagueness challenge to a statute does not involve First Amendment rights, courts examine the claim "in the light of the facts of the case at hand."  *United States v. Mazurie*, 419 U.S. 544, 550 (1975).

III.    This Court reviews a district court's evidentiary rulings, including those related to expert testimony under Rule 704(b), for abuse of discretion.  *United States v. Heinrich*, 971 F.3d 160, 163-165 (3d Cir. 2020).  A court abuses its discretion if it bases its ruling on an erroneous view of the law, or if its decision rests upon a clearly erroneous finding of fact or an improper application of law to fact.  *Id.*

IV.    Same as Point III

V.    This Court exercises plenary review over whether evidence falls within the scope of Rule 404(b).  *United States v. Bailey*, 840 F.3d 99, 126-127 (3d Cir. 2016).  However, once it determines that evidence falls within the scope of Rule 404(b), the Court reviews the district court's decision to admit the evidence for abuse of discretion.  *United States v. Cruz*, 326 F.3d 392, 394 (3d Cir. 2003).

# ARGUMENT

I. **The district court did not err in instructing the jury on the second (*actus reus*) element of the charged offenses or otherwise err in jury instructions that made clear that Evers should not be convicted based on a violation of a civil standard of care.**

In *Ruan v. United States*, the Supreme Court held that in physician prosecutions under 21 U.S.C. § 841, the government must prove beyond a reasonable doubt that the defendant "knowingly or intentionally" acted in an unauthorized manner.[10]  597 U.S. 450, 454 (2022).  Motivated in part by a stated desire to "diminish the risk . . . of punishing acceptable and beneficial conduct [by prescribing doctors] that lies close to, but on the permissible side of, the criminal line," in finding that § 841 includes a "strong scienter requirement" that requires the government to prove that a defendant-doctor knowingly or intentionally acted in a "wrongful" way in his or her prescribing, 597 U.S. at 459-460, the Supreme Court provided the strongest possible protection against the criminal conviction of defendant-doctors who

---

[10] As provided in the controlling regulation, a prescription for controlled substances is only "authorized" when a doctor issues it "for a legitimate medical purpose . . . acting in the usual course of his professional practice."  21 C.F.R. § 1306.04(a)(2021).

merely act negligently, recklessly or otherwise "unreasonably" in their prescribing.

Nonetheless, side-by-side with its imposition of the requirement that the government prove that the defendant *subjectively* intended to act in an unauthorized, illegitimate manner, *Ruan* simultaneously reaffirmed that *objective* standards continue to form the basis of what is considered "authorized" and "legitimate" prescribing. *See id.* at 467 (noting the regulation prescribing the scope of a doctor's prescribing authority does so by reference to "objective criteria" such as "legitimate medical purpose" and "usual course" of "professional practice").

Here, the district court's post-*Ruan* final jury charge appropriately instructed the jury on all aspects of the charged § 841 offenses, and in no sense conveyed to the jury that Evers could be criminally convicted based upon proof of a mere violation of a civil standard or duty of care.

As an initial matter, the district court did not err with respect to its instruction on the second (*actus reus*) element of the charged offenses, otherwise known as the authorization element.  Contrary to Evers's claim, the district court did not instruct the jury that it could find either of this element's conjunctively charged sub-elements (acting

34

"outside the usual course of professional practice" and "not for a legitimate medical purpose") satisfied based solely upon a violation of a civil "standard of care." Rather, as to the first sub-element only, the district court charged the jury only that it *may* consider "accepted standards of care among medical professionals," along with all of the other testimony in the case, when determining if Evers acted in the "usual course of professional practice." Appx2518-2519. The district court's charge did not tie the second sub-element—which the jury was instructed it must also independently find proved in order to convict—in any way to a civil standard of care.[11] Simply indicating that both sub-elements are "defined, by reference, to the standard of medical practice generally recognized and accepted in . . . Pennsylvania," Appx2518, is perfectly consistent not just with *Ruan*, which reaffirmed that these concepts are defined by reference to objective, professional criterion, but this language was the very language utilized by the trial judge in *United States v. Moore*, 423 U.S. 122, 138-139 (1975), the only prior

---

[11] By treating the authorization element as two conjunctively charged sub-elements, the district court further reduced the likelihood that Evers would be convicted for conduct falling short of knowingly or intentionally wrongful conduct.

Supreme Court case to consider physician prosecutions under § 841.
*Moore* upheld the defendant-doctor's conviction, concluding that the trial evidence was sufficient for the jury to find that the defendant's conduct "exceeded the bounds of professional practice" by failing even to make "an honest effort" at complying with accepted standards of medical practice. 423 U.S. at 142 n. 20. There, as here, the trial judge charged the jury that, in order to convict, it had to find the defendant failed to dispense the controlled substance (there, methadone) "in accordance with a *standard of medical practice generally recognized and accepted in* the United States."[12]  *Id.* at 139 (emphasis added). The

---

[12] The fact that this language was implicitly approved by the Supreme Court in *Moore* no doubt explains both its repeated use at the trial court level and its consistent approval by courts of appeal. *See, e.g., United States v. Norris*, 780 F.2d 1207, 1209 n. 2 (5th Cir. 1986) (finding proper district court's instruction that "[a] controlled substance is prescribed by a physician in the usual course of a professional practice . . . if the substance is prescribed . . . with a standard of medical practice generally recognized and accepted in the United States"); *United States v. Smith*, 573 F.3d 639, 647 (8th Cir. 2009) (defining "usual course of professional practice" as requiring "that the practitioner [have] acted in accordance with a standard of medical practice generally recognized and accepted in the United States"); *United States v. Feingold*, 454 F.3d 1001, 1011 n. 3 (9th Cir. 2006) (finding "standard of medical practice generally recognized and accepted in the country" language appropriate in light of court's other instructions); *United States v. Merrill*, 513 F.3d 1293, 1306 (11th Cir. 2008) (holding that a doctor acts outside the "usual scope professional practice" by prescribing controlled substances

word "care" and the phrases "duty of care" and "standard of care" appear nowhere in this widely upheld formulation.

Evers claims that this case presents this Court with the need to pick a side in a circuit split over whether a defendant-doctor can be convicted based solely upon a violation of the civil standard of care. Br. 34, 40-43. But no such split exists. Courts widely agree that while "usual course of professional practice" is defined with respect to objective, professional standards, it requires more than a departure from the civil standard of care. *See, e.g., United States v. Sabean,* 885 F.3d 27, 44-45 (1st Cir. 2018); *United States v. Wexler,* 522 F.3d 194, 204 (2d Cir. 2008); *United States v. Tran Trong Cuong,* 18 F.3d 1132, 1137 (4th Cir. 1994); *United States v. Volkman,* 797 F.3d 377, 388 (6th Cir. 2015); *United States v. Katz,* 445 F.3d 1023, 1032 (8th Cir. 2006); *United States v. Feingold,* 454 F.3d 1001, 1007 (9th Cir. 2006).

A circuit split exists only with respect to whether the two sub-elements of the *actus reus* are to be charged (and proven) conjunctively or disjunctively. Here, the jury was charged that it was required to find

---

not "in accordance with a standard of medical practice generally recognized and accepted in the United States.") (overruled on other grounds).

both sub-elements proved in order to convict.  Therefore, as to all 71 counts of the superseding indictment, the jury not only found that Evers prescribed "outside the usual course of professional practice" (with applicable "standards of care" being a *part* of what the jury was instructed it could properly consider) but also found that Evers prescribed for "no legitimate medical purpose" (which was not linked at all in the jury charge to applicable "standards of care").[13]

Finally, when assessing a claim of error arising from the jury charge, this Court properly "consider[s] the totality of the instructions." *United States v. Coyle*, 63 F.3d 1239, 1245 (3d Cir. 1995).  Here, the

---

[13] In a broader sense, Evers's claim that, within certain circuits at least, defendant-doctors like him are being criminally convicted based upon mere violations of the "standard of care" approaches the incoherent in a post-*Ruan* environment.  For what does holding someone to account for a violation of a "standard of care" mean, if not holding them to account for their careless, unreasonable, negligent, or (perhaps) reckless conduct.  But *Ruan*'s requirement that the government prove that the defendant-doctor knowingly or intentionally prescribed in a wrongful way—which now binds all circuits and bound the government here—locates these cases totally and obviously afield of negligence principles (to the extent that they were not already).  Even within Tort, a requirement that the plaintiff prove intent makes negligence principles like duty, breach, and "standard of care" irrelevant to the outcome.  The plaintiff must prove an intentional harm.  Likewise, post-*Ruan*, the government must prove knowing or intentional wrongful conduct.  It proved that here.

district court's jury instructions clearly conveyed that Evers should not be convicted based upon mere carelessness, negligence, or recklessness, but only upon a finding, beyond a reasonable doubt, that Evers knowingly or intentionally prescribed in a manner that he knew was wrongful.  It did so: (1) by clearly and repeatedly conveying the appropriate criminal burden of proof, including in its recitation of the elements of the charged offenses; Appx2509-2510, 2512, 2516-2518, 2520-2521, 2524-2525; (2) by properly instructing on the post-*Ruan* "strong scienter requirement"; Appx2516-2523; (3) by distinguishing the sort of knowing and intentional conduct necessary to support a criminal conviction from civil actions for negligence or malpractice, where liability can be based upon "unreasonable" conduct; Appx2519; and (4) by requiring the government to prove both sub-elements of the *actus reus*, including that Evers acted "for other than a legitimate medical purpose."[14]  Appx2516-2519.

---

[14] By doing so, the district court arguably imposed a higher burden on the government than that set forth by the Supreme Court in *Moore*, which did not specifically treat "without a legitimate medical purpose" as a separate sub-element of the offense.  *See United States v. McIver, 470 F.3d 550, 558 (4th Cir. 2006)*.

Set against all of this, Evers essentially protests that the phrase "standard of medical practice generally recognized and accepted in . . . Pennsylvania" sounds like it could be a civil standard of care. But as the Fourth Circuit perceptively noted in *United States v. McIver*, "[t]he fact that the district court may have invoked language, taken in isolation, suggestive of a civil standard, would not alone lower the government's burden of proof. Indeed, it would be difficult, if not impossible, to purge an instruction under § 841(a)(1) of all references to permissible standards or norms of care, since the [second] element of § 841(a)(1) requires a determination of whether the defendant's conduct is outside the course of professional conduct." 470 F.3d 550, 560 (4th Cir. 2006).[15]

The district court did not err in its jury instructions.

---

[15] Lastly and relatedly, given that the only portion of the district court's charge that did actually utilize the phrase "standard of care" was added to the charge at the specific request of Evers, Appx2350, 2358-2359, even if this Court were to find error in this aspect of the charge, it would be "invited error," which does not support reversal. *See United States v. Andrews*, 681 F.3d 509, 517 n4 (3d Cir. 2012) ("Under the 'invited error' doctrine, where a defendant makes a request in favor of certain instructions, he waives the right to complain of error in such instructions on appeal").

## II.    The drug distribution offenses for which Evers was convicted are not unconstitutionally vague as-applied.

"A statute is void on vagueness grounds if it: (1) 'fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits'; or (2) 'authorizes or encourages arbitrary and discriminatory enforcement.'" *United States v. Stevens*, 533 F.3d 218, 219 (3d Cir. 2008) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). The inquiry is case-by-case and a reviewing court must determine whether the statute is vague as-applied to the affected party. *United States v. Fullmer*, 584 F.3d 132, 152 (3d Cir. 2009). The Supreme Court has held that since, in the criminal context, vagueness attacks are based on lack of notice, "they may be overcome in any specific case where reasonable persons would know their conduct puts [them] at risk" of punishment under the statute. *Maynard v. Cartwright*, 486 U.S. 356, 372 (1988). For a criminal statue to be constitutional, the statute need only give fair warning that certain conduct is prohibited; "[s]imply because a criminal statute could have been written more precisely does not mean the statute as written is unconstitutionally vague." *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1136 (3d Cir. 1992) (citations omitted). In addition, the Supreme Court has held that a

41

scienter requirement in a criminal statute alleviates vagueness concerns by making it less likely that a defendant will be convicted for an action committed by mistake.  *See, e.g., Gonzales v. Carhart*, 550 U.S. 124, 149 (2007).

Here, Evers challenges § 841 as unconstitutionally vague as applied to him.  It is not.

As an initial matter, numerous courts have considered vagueness challenges like Evers's and have concluded that § 841 is not vague as applied to health care professionals.  *See, e.g., United States v. Collier*, 478 F.2d 268, 270 (5th Cir. 1973) (rejecting "contention . . . that § 841(a)(1), as applied to physicians, is unconstitutionally vague"); *United States v. Darji*, 609 F. App'x 320, 334 (6th Cir. 2015) ("this Court has rejected the claim that § 841 and § 1306.04(a) are void for vagueness"); *United States v. Orta-Rosario*, 469 F. App'x 140, 143 (4th Cir.), *cert. denied,* 568 U.S. 902 (2012) (rejecting argument of medical doctor that § 841 is impermissibly vague as applied to him because "there is no statutory definition of 'legitimate medical purpose' or 'usual course of professional practice.'").

Moreover, much as Evers attempts to cast himself and his conduct as uniquely benign among prosecuted defendant-doctors, in fact, prosecutions of medical professionals like Evers who knowingly prescribe dangerous amounts and combinations of controlled substances for non-medical purposes, including to earn more money by increasing patient volume[16] or to placate drug-seeking patients, are not unusual. *See, e.g.,* United States v. Singh, 54 F.3d 1182, 1188 (4th Cir. 1995) (noting that although the presence of a "malicious motive" on the part of the prescribing doctor, or the desire to make a profit, are common features of some § 841 prosecutions, these sorts of motivations are not required to convict); United States v. Abovyan, 988 F.3d 1288, 1308 (11th Cir. 2021) (affirming district court's refusal to give requested jury charge that government must prove defendant was acting as a "drug dealer, not a doctor" since "the law requires only that the jury find the doctor prescribed a drug . . . not for a legitimate medical purpose or . . . not in the usual course of professional practice.") (overruled on other

---

[16] Evers is quick to emphasize that he was a "salaried employee" of Bon Secours.  Br. 50.  But what the trial evidence also showed is that although he was paid a base salary, his overall compensation was a function of his productivity, including number of patients seen. Appx473-476.

grounds); *United States v. MacKay*, 715 F.3d 807, 823-826 (10th Cir. 2013) (rejecting as-applied void for vagueness challenge where defendant claimed that all of the prescriptions at issue were written for his actual patients in the context of regular office visits, that there was no evidence suggesting that he had charged based on the number of prescriptions or quantity of medication, and where the defendant claimed that his patients were all legitimately experiencing pain); *United States v. Kohli*, 847 F.3d 483, 487 (7th Cir. 2017) ("the [evidence] showed . . . that Dr. Kohli routinely prescribed addictive opioids to patients who had a history of drug addiction . . . . He also prescribed early refills, anywhere from a day to several weeks before the refills were due, to patients who repeatedly claimed that their narcotics medications had run out or were lost or stolen. These same patients often had irregular toxicology screens in which they tested negative for drugs that Dr. Kohli had prescribed, but positive for other drugs . . . Dr. Kohli's office also received phone calls from the [VA] and a certain patient's family members reporting that one of his patients was actively abusing drugs. Despite these troubling developments, Dr. Kohli

continued to prescribe highly addictive Schedule II opioids, such as oxycodone . . . on a regular basis").

Acknowledging that numerous courts have already rejected comparable as-applied vagueness challenges brought by defendant-doctors, Evers argues that these holdings have largely focused on the "notice" prong of the void for vagueness test and that, in fact, § 841 is unconstitutionally vague as applied to him because it "authorizes or encourages arbitrary and discriminatory enforcement," by prosecutors, by juries or, as he claims occurred here, by a government expert.

But as noted, the Supreme Court in *Ruan* recently reaffirmed that, while not precisely defined, "legitimate medical purpose" and "usual course" of "professional practice" are all ultimately "objective criteria." 597 U.S. at 467. And courts considering void for vagueness challenges based upon claims of arbitrary enforcement consistently reject such challenges, except where the law is "wholly lacking in terms susceptible to objective measurement," *Keyishian v. Board of Regents*, 385 U.S. 589, 604 (1967) (cleaned-up), such that interpretation turns exclusively on a law enforcement officer's (or other decision-maker's) "unguided and subjective judgment." *Copeland v. Vance*, 893 F.3d 101,

120 (2d Cir. 2018); *see also United States v. Dimitrov*, 546 F.3d 409, 415 (7th Cir. 2008) ("[t]he *objective criteria* also satisfy us that the ordinance is not so broad that it invites arbitrary or discriminatory enforcement. Unlike the vagrancy and loitering statutes struck down by the Supreme Court § 1960 *objectively* defines the illegal conduct") (emphasis added).

Here, the "objective criteria" that define the circumstances under which a prescription is authorized under § 841 cabined the discretion of the jury, the prosecution, and the prosecution's pain expert, and successfully mitigated against any arbitrary and discriminatory enforcement. The government's expert, for example, was not simply free to impose his own subjective views about what was (and was not) legitimate prescribing; rather, the government was obliged to prove, through expert testimony or otherwise,[17] and the jury was constrained

---

[17] Evers's attempt to paint the government's pain expert as the key "arbitrary and discriminatory" decisionmaker here is particularly misguided, given that there is no requirement that the government even utilize expert testimony in a § 841 prescriber prosecution. *See United States v. Rosen*, 582 F.2d 1032 (5th Cir. 1978). Here, the government *chose* to utilize a pain medication expert, and it *chose* to charge as counts of the superseding indictment only those prescriptions that had expert testimony support. This was not the government allowing an expert to dictate its charging decisions. It was a conservative charging approach that was, in turn, affirmed by the jury with guilty verdicts on 71 of 71 counts.

to determine, based upon a range of testimony and exhibits, how the *medical profession as a whole* would understand and approach the relevant circumstances.

Ultimately, not only did Evers have "fair notice" that he was subject to potential criminal prosecution for unauthorized prescribing, the trial evidence clearly showed that Evers *knew* that he was prescribing in a wrongful way, including evidence that Evers: (1) rarely drug-tested patients and, on the few occasions that he did, ignored patients' unexpected (failed) results; Appx942; 1165-1167, 1279-1280, 1291-1297, 1327-1328; (2) accepted patients' obvious lies about having lost their medications in order to justify writing them early prescriptions; Appx1174, 1192-1193, 1223-1224, 1270-1274, 1280-1283, 1285-1288, 1309-1312; (3) entirely failed to document certain particularly unjustifiable prescriptions; Appx667-675, 976-977, 1013, 1223-1226; (4) strategically left out reference in his files to obvious drug-seeking behaviors of patients at local ERs; Appx976-977, 1013, 1099-1102, 1198-1199, 1216; (5) was informed by a major pharmacy chain that it would no longer fill any of his prescriptions based upon concerns of chronic overprescribing; Appx723-740; and (6) outright

47

admitted to the DEA that he would continue to prescribe high-dose opioids for opioid-addicted patients (rather than wean them down contrary to their wishes) to prevent them from "going to the streets." Appx544.

Section 841 is not unconstitutionally vague as to Evers.

### III. The district court did not abuse its discretion by overruling a defense objection made pursuant to Rule 704(b), permitting the government expert to offer limited testimony that used the words "know" and "knowing" with reference to certain factual patient information about which Evers would have been aware.

Federal Rule of Evidence 704(b) provides an exception to the general rule that expert opinions on so-called ultimate issues are permissible, providing that "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.  Those matters are for the trier of fact alone."

An earlier version of this rule, which was the version interpreted by this Court in *United States v. Bennett*, 161 F.3d 171 (3d Cir. 1998) and in other cases relied upon by Evers in his brief, included broader language that prohibited an expert from stating "an opinion *or inference* as to whether the defendant did or did not have the mental state or

condition constituting an element of the crime charged . . . ." *See Bennett*, 161 F.3d at 182. But as the Supreme Court recently emphasized in *Diaz v. United States*, in its current form, Rule 704(b) only targets "opinions," and only "opinions" in the form of actual "conclusions" about a defendant's final mental state. 602 U.S. 526, 536-537 (2024). So not only is the text of Rule 704(b) no longer addressed to inferences, but the Rule "does not [even] prohibit all testimony 'about' mental-state ultimate issues in the abstract," only "opinions" that reach a "conclusion." *Id.* As the Supreme Court summarized: "The Rule as a whole makes clear that an opinion is 'about' the ultimate issue of the defendant's mental state only if it includes a conclusion on that precise topic, *not merely if it concerns or refers to that topic*." *Id.* at 537 (emphasis added).

Evers argues that the district court erred by not striking certain testimony of Dr. Stephen Thomas, the government's pain medication expert, in which Dr. Thomas used the words "know" and "knowing" with reference to Evers.[18] Appx1346. Although Evers acknowledges that Dr.

---

[18] In support of his opinion that each prescription that Evers wrote for Robert Konikowski following the patient's second failed drug screen was unauthorized, Dr. Thomas testified: by "the date of the second

Thomas did not directly opine on Evers's ultimate issue mental state here, Evers maintains that this testimony was nonetheless error because it "necessarily follows" from this testimony that Evers was knowingly or intentionally prescribing in a wrongful manner. It does not, and the district court's permitting this testimony was not error.

As an initial matter, as noted, in the wake of the Supreme Court's recent decision in *Diaz*, which offered a very narrow interpretation of Rule 704(b) and its limitations even on expert opinion directly addressed to a defendant's ultimate issue mental-state, Rule 704(b) would not prohibit an expert opinion in the nature of the one offered by Dr. Thomas here, even if it did "necessarily follow" from that opinion that a defendant acted with a particular mental state.

---

unexpected urine screen . . . Evers was, either, *aware or could have been aware* that the patient was non-compliant in . . . taking his medication, and when you combine that with the substandard practice that was already in the chart . . . from that point forward, the absence of the practice of medicine, with the increasing risk to the patient, while *knowing* that he's not taking the medication but supplying it to him, in my opinion, made the prescribing not for a legitimate purpose in the usual course of professional practice. So the distinction between substandard practice . . . and not for a medially legitimate purpose in the usual course of practice is when you're not doing it right and you *know* it." Appx1346.

But even assuming that Rule 704(b) would still prohibit such an opinion, Evers's claim of error here fails for several other reasons. First, Evers is simply incorrect that what Dr. Thomas did in this testimony was to sweepingly "testify that knowledge is inherent . . . in the definition of 'outside the usual course of professional medical practice and not for a legitimate medical purpose' . . . [and] that each of the charged prescriptions met that standard." Br. 53. Rather, as the trial record makes clear, the criterion utilized by Dr. Thomas to reach his opinions was based upon the "standard medical model," which Dr. Thomas described in detail, Appx850-852, as well as accepted treatment principles among Pennsylvania physicians concerning the prescribing and dispensing of highly addictive controlled substances. Appx860-864. At no point during his lengthy testimony did Dr. Thomas define "outside the usual course of professional practice . . ." with reference to a "knowledge" criterion, and certainly not in the ultimate issue mental-state sense of that word. Nor did Dr. Thomas ever opine, directly or indirectly, on Evers's mental state as to any prescription. He never used the word "intent" or "intentionally" as to Evers, and when he used the words "know" and "knowing" in the contested testimony, it was with

reference to what, based on Dr. Thomas's review of Evers's own medical files, Evers would have been aware of *factually* about the status of the patient at the time of the prescribing, specifically, that Konikowski had now twice failed drug screens and so was very likely not taking his medications as prescribed.[19]

Second, as noted, it does not "necessarily follow" from the contested testimony—that is, from Dr. Thomas's testimony that Evers "knew" that Konikowski had failed two drug screens and was not taking his medications as prescribed—that Evers likewise "knew" that any prescriptions that he wrote for Konikowski going forward were

---

[19] Dr. Thomas's testimony here basically amounts to an uncontroversial, common sense claim that what a doctor is aware of factually (or should be aware of factually) about a patient's course of treatment is an important consideration in assessing whether the doctor is prescribing in an authorized fashion. The "it" that Dr. Thomas is referring to in the statement "so the distinction between substandard practice . . . and not for a medically legitimate purpose in the usual course of practice is when you're not doing right and you *know it*," Appx1346, is not a doctor's knowledge that he is prescribing in a wrongful way, but a doctor's knowledge of the existence of particular red flags in a patient's course of treatment. Per Dr. Thomas, when Evers acted (prescribed) in the face of these red flags, he acted in an unauthorized fashion.  Or, as Dr. Thomas noted during his redirect testimony, "when there is clear information [about the patient] that the physician knows or should know that the medication should not be prescribed, in the manner that its being prescribed, it is, at that point, an unauthorized prescription." Appx1398-1399.

unauthorized (the impermissible ultimate issue mental state).  *See*

*Bennett*, 161 F.3d at 183 ("expert testimony is admissible if it merely

supports an inference or conclusion that the defendant did or did not

have the requisite mens rea, so long as the expert does not draw the

ultimate inference or conclusion for the jury and the ultimate inference

or conclusion does not necessarily follow from the testimony") (cleaned-

up).  It is certainly conceivable that a doctor could be aware of failed

patient drug screens (or other problematic patient behavior) and

continue to prescribe for the patient, and yet not subjectively believe

that he is prescribing wrongfully, as where the doctor honestly believes

that the patient's conditions are causing him or her pain and that pain

is what is to be addressed by the continued prescribing.  Indeed, this

was essentially the defense theory of the case here—that despite all

that Evers knew about the desperate, drug-seeking behaviors of Dame,

Clancy and Konikowski, Evers nonetheless believed he was writing

them valid scripts for pain.  This was a coherent theory, albeit one

soundly rejected by the jury.

　　　　For all of these reasons, the district court did not abuse its

discretion in permitting the contested testimony in the face of Rule

704(b). However, even if this Court were to find error in the district court's evidentiary ruling, any error was harmless, in view of the significant evidence in this case showing that Evers did indeed know that he was prescribing in an unauthorized, illegitimate fashion.[20] *See United States v. Cross*, 308 F.3d 308, 317 (3d Cir. 2002) (An error is harmless when it is "highly probable that it did not prejudice the outcome"). Lastly, because the specific opinion testimony of Dr. Thomas at issue here relates only to prescriptions written by Evers for Robert Konikowski, even if this Court were to except Evers's claim of error *and* find that it was not harmless, at most this conclusion would jeopardize only those counts of conviction (counts 40 to 71 of the superseding indictment) that relate to the prescriptions that Evers wrote for

---

[20] As noted, this evidence includes evidence that Evers rarely drug-tested patients and ignored patients' failed results; Appx942; 1165-1167, 1279-1280, 1291-1297, 1327-1328; accepted patients' obvious lies about having lost their medications in order to justify writing them early prescriptions; Appx1174, 1192-1193, 1223-1224, 1270-1274, 1280-1283, 1285-1288, 1309-1312; entirely failed to document certain particularly unjustifiable prescriptions; Appx667-675, 976-977, 1013, 1223-1226; strategically left out reference in his files to the desperate, drug-seeking behaviors of patients at local ERs; Appx976-977, 1013, 1099-1102, 1198-1199, 1216; and admitted to the DEA that he would continue to prescribe high-dose opioids for opioid-addicted patients just to prevent them from "going to the streets." Appx544.

Konikowski following the patient's second failed drug screen.  Appx63-64.

**IV. Any error in the district court's exclusion under Rule 704(b) of the portion of the defense expert's opinion that a consideration in determining whether a prescription is authorized is the absence of an illicit profit motive was harmless.**

The district court did, pursuant to Rule 704(b), exclude a portion of defense expert Dr. Richard Rauck's opinion testimony that an important consideration in determining that a prescription is authorized is the absence of an illicit profit motive on the part of the prescriber (as shown where there is evidence of a direct *quid pro quo* exchange of cash or sex for the prescription).  Appx1495-1496.  This was likely error, given that at least some form of this opinion was permissible under Rule 704(b).[21]

Nonetheless, any error here was harmless for several reasons, most notably, because Dr. Rauck was able to express this part of his opinion numerous times without objection during his cross-

---

[21] A version of this opinion in which this criterion is simply presented as one of several considerations that inform the expert's ultimate opinion on whether the prescription is authorized, as opposed to being presented as a necessary condition for a finding that a prescription is unauthorized, would appear to be permissible under the Rule.

examination.  Appx1544-1545, 1546, 1637, 1644.  Dr. Rauck did so most clearly and fully when in response to a question about whether he agreed with the Federation of State Medical Boards' policy on what constitutes usual course of professional practice, he answered: "Well, there's parts of it I certainly agree with.  There has to be a legitimate patient-physician relationship, right, you can't go outside that physician-patient relationship.  *An example might be where the patient knows they can come in and just pay for a prescription . . . That's not a legitimate patient relationship.  Or if the doctor knows if he writes Oxycodone, the patient will let him have sex with them.  That's not a legitimate patient-physician relationship*."  Appx1644.

Moreover, during the defense closing argument, the defense not only argued, correctly, that there was no evidence in this case of any direct *quid pro quo* exchange of cash or sex for any of the charged prescriptions, but also specifically tied the absence of this sort of evidence, and the defense argument that its absence should be a significant factor in the jury's determination that Evers was not guilty, to Dr. Rauck's expert testimony on this point.

The defense argued:

> "So what do you look for, if you're Dr. Rauck?
> What do you look for, if you're the Government?
> You look for some other explanation that would
> take [Evers's prescribing] completely out of the
> realm of what is legitimate medical practice.
> Normally, what you look for is the same things you
> would look for as a drug dealer.  Cash.  Big
> amounts of it.  Dr. Evers exploiting the power
> relationship he had with his patients and coercing
> them into sex . . . in exchange for drugs.  The
> Government has unlimited resources . . . unlimited
> power . . . . If you have luxury automobiles, five-
> star foreign travel, if you have a boat, they'll find
> it.  And believe me . . . if there was one shred of
> that evidence in this case, you would have heard
> about it for three weeks . . . What about the cash?
> What about the time you coerced her into sex?
> Nothing like that.  *Dr. Rauck said, that's what I
> look for*. . . So, ladies and gentlemen, it's not just
> Dr. Rauck who is looking for this evidence, it's the
> Government looking for this evidence, with all of
> their resources, for months, months, and there's
> nothing."

Appx2433-2435.

The district court's Rule 704(b) ruling notwithstanding, the jury

heard Dr. Rauck's opinion in full.  Then, it heard Evers amplify Dr.

Rauck's opinion during the defense closing statement.  This Court will

reverse only if the error in question "affected the outcome of the district

court proceedings."  *United States v. Amirnazmi*, 645 F.3d 564, 594 (3d

Cir. 2011) (citations omitted).  An error is harmless when it is "highly probable that it did not prejudice the outcome."  *United States v. Cross, 308 F.3d 308, 317 (3d Cir. 2002).*  In view of the foregoing—and in view of the significant trial evidence demonstrating that while Evers may not have received illicit cash or sex for his prescriptions, Evers nonetheless knowingly prescribed in an unauthorized manner—any error occasioned by the district court's Rule 704(b) exclusion of a small portion of the defense expert's testimony was harmless.  *See McIver,* 470 F.3d at 562-563 (finding any error in the initial exclusion of expert testimony harmless where later-elicited testimony was substantially identical).

## V.  The district court did not err by admitting under Rule 404(b) as probative of Evers's "knowledge" that he was prescribing in an unauthorized manner the testimony of several local pharmacists who expressed concerns to Evers that he was overprescribing opioids.

Federal Rule of Evidence 404(b) and the prior rulings of this Court provide that in order for prior bad acts evidence to be admissible at trial: (1) the evidence must be offered for a valid non-propensity purpose that is at issue in the case; (2) it must be relevant to that purpose; (3) its probative value must not be outweighed by the danger of unfair prejudice; and (4) it must be accompanied by a limiting instruction, if

one is requested by the defense. *United States v. Caldwell,* 760 F.3d 267, 276-278 (3d Cir. 2014). As to the first requirement, this Court has emphasized that the proffered, non-propensity purpose must be truly "at issue" in the case, directing lower courts to consider "the material issues and facts the government must prove to obtain a conviction." *United States v. Sampson,* 980 F.2d 883, 888 (3d Cir. 1992). In order to show that the second, "relevance" requirement is met, the proponent of the evidence (usually, the government) "must explain how [the evidence] fits into a chain of inferences—a chain that connects the evidence to a proper purpose, no link of which is a forbidden propensity inference." *United States v. Davis,* 726 F.3d 434, 442 (3d Cir. 2013).

Here, with respect to the admission at trial of the so-called pharmacist testimony[22], the district court (and the government) fully

---

[22] As noted, the government's evidence here consisted of the relatively short testimony of six local pharmacists, who each contacted Evers during the same timeframe as his unlawful prescribing as charged in the superseding indictment and who each expressed to Evers concerns about the amounts and dosages of his opioid prescriptions and/or his combining of prescription opioids with benzodiazepines. Appx675-740. All told, this part of the government's case took up less than one half of one day of trial.

complied with each of the above four requirements including, as particularly disputed by Evers, the critical second step.

Evers does not dispute that the non-propensity purpose for which the evidence was admitted—to show that Evers had "knowledge" that he was prescribing in an unauthorized manner—was a theoretically valid one that was very much at issue in the case.[23] Br. 63. Instead, Evers argues both that a non-propensity chain of inferences justifying the admission of the evidence was not adequately set out on the record and that, at least in part as a result of that failure, the government did not limit itself to using the testimony to show Evers's "knowledge" in permissible 404(b) fashion, but instead used the testimony to suggest

---

[23] This is not surprising since the introduction under Rule 404(b) of precisely this type of testimony in precisely this type of prosecution has been specifically approved by a panel of this Court. *See United States v. Li*, 819 F. App'x 111, 116-117 (3d Cir. 2020) (not precedential) ("There is no question [the pharmacists'] testimony was introduced for a non-propensity purpose. The Government used the pharmacists' testimony that they had repeatedly called Li to question his prescriptions to show he knew he was prescribing pills outside the course of professional practice"). But more critically, the fact that this is uncontested here immediately distinguishes this case from most if not all of the precedents of this Court that Evers cites for the proposition that "Rule 404(b) reversals are not rare," including *Caldwell*, 760 F.3d at 279, *Sampson*, 980 F.3d at 888, *Davis*, 726 F.3d at 444, and *United States v. Brown*, 765 F.3d 278, 290 (3d Cir. 2014).

that the pharmacists were calling about the three patients whose course of treatment were the subject of the superseding indictment, thereby "render[ing] the testimony direct evidence of Dr. Evers's guilt." Br. 62-64. Finally, Evers argues that the government compounded these Rule 404(b) errors by using the pharmacist testimony to make invalid, propensity-based arguments during its closing statements.

None of these allegations of error have merit, and certainly, even if this Court were to find error in any of these alleged missteps, any error was harmless in view of the other significant evidence in this case showing that Evers knew that he was prescribing in an unauthorized, illegitimate fashion.

First, while Evers argues that the government gave only a "nebulous proffer" at trial on the relevance of the pharmacist testimony, in fact, the government's proposed admission of the testimony was the subject of considerable pretrial argument by the parties and pretrial deliberation and analysis by the court that significantly supplements what is in the trial record. Most notably, in its pretrial brief, the government set forth a detailed, propensity-free justification for admission of this testimony under Rule 404(b) that satisfies the

precedents of this Court.[24]  Doc. 231 at 17.  The district court later adopted this detailed justification through its decision to admit the testimony.[25]

A complete and fair review of the record likewise makes clear both that the government never used (or even attempted to use) the pharmacist testimony as substantive evidence of Evers's guilt by suggesting that the 404(b) pharmacists were calling about Dame,

---

[24] The government explained that the testimony is "offered to prove the defendant's knowledge that he knew he was engaged in a pattern of prescribing high-risk, highly addictive, and potentially deadly controlled substances (identical to [those] charged in the superseding indictment) outside the usual course of professional practice and not for a legitimate medical purpose, or that he turned a blind eye to the warnings."  Doc. 231 at 17.  The government further explained that because it must prove that Evers "knew his distributions were not [authorized], the above evidence related to actions taken by pharmacists who share a corresponding legal responsibility . . . and the defendant's knowledge of such actions, is highly probative, relevant and admissible.  It speaks to the defendant's state of mind and knowledge with respect to the charged patients and prescriptions.  *Id.* at n. 10.  "The evidence [also] rebuts any assertion that [Evers] reasonably believed he was engaged in a proper medical practice and is also evidence of the defendant's willful blindness."  *Id.* at 18.

[25] The district court made preliminary rulings on the matter at a pretrial conference, in addition to its final ruling at trial.  Appx119, 128, 501-516.

Clancy, or Konikowski, and that the jury could not have realistically gone to deliberations believing that.

During his cross examination of the various pharmacist witnesses, Evers was able to repeatedly establish that the high-dose prescriptions about which the pharmacists were alarmed were not prescribed by Evers to Dame, Clancy, or Konikowski. Appx683-684, 703-704, 715. The government never suggested otherwise.

Evers complains that the jury heard testimony that, because prescriptions that are not filled by a pharmacist are not tracked in the PDMP database,[26] it could not be known to a complete *certainty* whether any *unfilled* prescription that the 404(b) pharmacists were calling about were not prescribed by Evers to Dame, Clancy or Konikowski; however, this practical reality came out through *Evers's cross examination* of one of the pharmacists. Appx692-695. Then, later

---

[26] The Prescription Drug Monitoring Program (PDMP) is an electronic database that tracks controlled substance prescriptions within a state. Pharmacies are required by law to enter relevant information for each prescription that they fill into this system to include the patient's name, address, and date of birth, the name of the prescribing doctor, the pharmacy where the prescription was filled, the date the prescription was written and the drug, dosage and number of days for which the drug was prescribed. Appx523-524.

on redirect, the government simply clarified the ultimate import of this somewhat confusing testimony.  Appx696.

Moreover, during Evers's closing argument, defense counsel pointed out, correctly, that "not one of those pharmacists" who testified "said anything about Kristina Dame, Michelle Clancy or Robert Konikowski," and likewise emphasized that each of the prescriptions charged in the superseding indictment, as to Dame, Clancy and Konikowski, were filled by licensed pharmacists.  Appx2459.  During its closing argument, the government never suggested otherwise or, in its rebuttal closing, sought to contradict these comments in any other way.

Relatedly, as part of his argument that the government sought to create the misimpression that the 404(b) pharmacist evidence was substantive evidence of guilt, Evers points to the government's comments in rebuttal closing concerning an episode on November 12, 2018 when a pharmacist called Evers's office concerning a prescription for Michelle Clancy.  Appx2494.  However, not only were the government's comments here in response to misleading comments made by Evers in his closing, Appx2494, but the subject evidence, although it did involve a pharmacist, was *not part of the 404(b) pharmacist*

*evidence.* Rather, the government's comments in rebuttal here (and Evers's comments which the government was rebutting) related to a notation in Michelle Clancy's medical file, which was of course admitted into evidence, not as 404(b) evidence, but as substantive evidence. In these rebuttal comments about which Evers now complains, the government simply pointed out, again, that merely because the PDMP did not reflect that Evers had written a prescription for Clancy at or around the date that the office received a call from this pharmacist did not mean that the pharmacist was not calling with concerns about a high-dose prescription for Clancy, since any prescription that the pharmacist refused to fill would not be listed in the PDMP.

Lastly, the government did not make invalid, propensity-based arguments during its closing statements. The particular comments that Evers points to as problematic—which add up to only a small fraction of much larger arguments—all related to the element of the charged offenses for which the pharmacist testimony was admitted, namely, the key, post-*Ruan* element requiring the government to prove that Evers *knowingly* prescribed *outside of the usual course of professional practice* and *not for a legitimate medical purpose.*

65

When, for example, the government suggested that the dismissive and even agitated way in which Evers reacted to being questioned by the likes of pharmacists Janice Vicaretti and Gary Snedeker might support the inference that Evers was not acting, in his prescribing, as a "legitimate doctor," Appx2377, this was fair comment, tying the content of the 404(b) testimony to an argument about how Evers was *knowingly* prescribing for *not legitimate* medical purposes.  Moreover, when these arguments are read in context with the comments that immediately preceded them, it becomes even clearer that the government located these comments within a discussion of Evers's "knowledge" that he was prescribing in an unauthorized way.[27]  Appx2376.

Similarly, the contested comments in the government's rebuttal closing, though they did not specifically use the word "knowledge," were

---

[27] The prosecutor prefaced these arguments by noting: "We needed to show you what the Defendant knew and when he knew it and his pattern of ignoring danger signs everywhere . . . as he blindly continued to deliver the customer's drug of choice, and in his dose and prescribing practices that caught the attention of so many pharmacists and, indeed, an entire global pharmacy chain.  And all of that testimony . . . was intended to show you that other professionals were bringing their concerns to the Defendant's attention and how he made himself willfully blind to those concerns . . . ."  Appx2376-2377.

still arguments tying the pharmacist testimony, not to allegations of Evers's bad character or propensity to violate the law, but to Evers's "prescribing practices" and "pattern of prescribing."  Appx2493-2494. This was appropriate, given that the pharmacist evidence was admitted precisely to show that Evers *knowingly* engaged in "prescribing practices" or a "pattern of prescribing" that was unauthorized and illegitimate.  *Cf. United States v. Marr,* 760 F.3d 733, 742-743 (7th Cir. 2014) (finding no impermissible propensity argument in government's closing statement in wire fraud prosecution where the government referenced 404(b) evidence of the defendant's potential, concurrent tax fraud by remarking "what legitimate business does that?  What legitimate business writes $1.3 million to cash?" and where these comments were aimed at rebutting defendant's claim that he lacked a culpable mental state); *United States v. Brosnan,* 484 F. App'x 167, 168 (9th Cir. 2012) (finding no invalid propensity argument in government's closing statement in wire fraud prosecution where prosecutor compared defendant's questionable actions in a prior civil lawsuit to his actions in the instant criminal prosecution, properly rebutting defendant's claim that he had no intent to defraud the court by filing a false document).

However, even if this Court were to conclude that one or more of these comments drifted into an invalid, propensity-based argument, any error in the government's comments was cured by the court's jury instructions, which were administered right after the summations. These instructions included a restatement of the court's 404(b) limiting instruction (which included verbiage specifically requested by Evers). Appx512-514, 2514.  The instructions also reminded the jurors two times that the arguments of the lawyers are not evidence and "are not binding on [them]."  Appx2503, 2505.

Finally, again to the extent that this Court finds error in any comments made by the government in closing, two additional points bear noting.  First, as Evers did not object at trial to these comments, this Court should review this allegation of error for plain error.  *See United States v. Brennan,* 326 F.3d 176, 182 (3d Cir. 2003) (non-contemporaneous objections to alleged prosecutorial misconduct based on comments in closing subject to plain error review).  Second, even if viewed as error, none of the contested comments here are the sort of naked, inflammatory propensity arguments that have significantly contributed to circuit courts reversing convictions.  *See, e.g., United*

*States v. Moore*, 375 F.3d 259, 264 (3d Cir. 2004) (reversing conviction in arson prosecution where the prosecutor called defendant a "terrorist" not totally unlike the 9-11 hijackers because part of his 404(b) prior offense involved him "terrorizing" children into dealing drugs); *United States v. Simpson*, 479 F.3d 492, 503-504 (7th Cir. 2007) (reversing where prosecutor referenced 404(b) evidence of prior drug dealing by arguing that defendant had done so many drug deals he could not even remember conducting the instant one); *United States v. Richards*, 719 F.3d 746, 764-765 (7th Cir. 2013) (reversing where prosecutor repeatedly called defendant a drug dealer and made the explicit propensity argument: "[c]learly, the defendant's drug dealing is not limited to California.  It happens here too.").[28]

The district court did not err in its application of Rule 404(b).

---

[28] It also bears noting that, unlike in these cases and in all of the cases cited by Evers in which this Court has reversed based on error in the admission of 404(b) evidence, the underlying 404(b) evidence here was neither a prior criminal conviction nor other evidence related to prior criminal conduct.  Instead, the pharmacist testimony amounts to other "bad acts" evidence, showing that Evers disregarded, sometimes impolitely, concerns of pharmacists regarding his prescribing practices.  This is not *nearly* as prejudicial as a jury hearing about, say, a prior drug dealing conviction during a current drug dealing trial.

# CONCLUSION

The Court should affirm the district court's judgment.

June 24, 2025

Respectfully submitted,

JOHN C. GURGANUS
Acting United States Attorney

/s/ Jeffery St John
JEFFERY ST JOHN
Assistant U.S. Attorney
Attorney I.D. No. PA 203213
United States Attorney's Office
Middle District of Pennsylvania
235 N. Washington Ave.
P.O. Box 309, Suite 311
Scranton, PA 18503
Tel: (570) 348-2800
jeffery.st.john@usdoj.gov

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     Although this brief exceeds the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 13,851 words, the United States sought and obtained the Court's permission to exceed the word limit by filing a brief containing up to 14,000 words.

2.     The text of this electronic brief is identical to the text in the paper copies.

3.     A virus scan using Trellix Endpoint Security was performed on this file, and no virus was detected.

<u>/s/ Jeffery St John</u>
Jeffery St John
Assistant U.S. Attorney

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on June 24, 2025, I served the attached Brief For

Appellee by electronic service using the Court's CM/ECF system on:

Lisa A. Mathewson, Esq.
lam@mathewson-law.com

<u>/s/ Jeffery St John</u>
Jeffery St John
Assistant U.S. Attorney