**No. 24-1280**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**
_____

**UNITED STATES OF AMERICA**

**v.**

**MARTIN EVERS,**

**Appellant.**

_____

On Appeal from Judgment in the
United States District Court for the Middle District of Pennsylvania
No. 19-CR-250 (Mariani, J.)
_____

**REPLY BRIEF FOR APPELLANT**

_____

LISA A. MATHEWSON
Mathewson Law LLC
1617 John F. Kennedy Blvd., Suite 2027
Philadelphia, PA 19103
    215-399-9592
lam@mathewson-law.com

*Counsel for Appellant Martin Evers*

# **TABLE OF CONTENTS**

Table of Authorities.................................................................................................iii

Argument in Reply.................................................................................................. 1

I.    The jury was improperly allowed to convict Dr. Evers of unlawfully dispensing a controlled substance if it found that he knowingly deviated from the prevailing standard of medical care. .................................. 1

    A.    The government's subjective *mens rea*/objective *actus reus* discussion is beside the point......................................................... 3

    B.    On the actual issue, the government's only argument is waived and fails on the merits in any event. ........................................... 5

        1.    The argument is waived........................................................ 6

        2.    The argument fails on the merits in any event. ......................... 9

II.    The standard for criminal liability instructed and argued to the jury—knowingly deviating from the generally-accepted standard of medical care—is unconstitutionally vague as applied to Dr. Evers, who prescribed to *bona fide* patients with serious medical conditions. ................................................................................................15

III.    Admitting the testimony of government expert Stephen Thomas that Dr. Evers knowingly deviated from the standard of medical practice violated Rule 704(b).....................................................................19

    A.    *Bennett* has not been superseded. ............................................20

    B.    In the challenged testimony, Dr. Thomas referred to knowledge of unauthorized prescribing, not knowledge of facts in patients' charts....................................................................23

    C.    The error was prejudicial as to all counts. ...............................25

IV.   Excluding the testimony of defense expert Richard Rauck that improper trading for a prescription is an important criterion for determining its legitimacy was an abuse of discretion.................................26

V.    Admitting the testimony of local pharmacists that they expressed concern to Dr. Evers that he was overprescribing controlled substances to patients not named in the indictment violated Rule 404(b)......................................................................................................................30

    A.    The testimony was used falsely as direct evidence.............................30

    B.    A non-propensity inference was never articulated, and propensity was argued. ...................................................................................32

    C.    The error was prejudicial................................................................................33

Conclusion.............................................................................................................................35

Required Certifications....................................................................................... attached

Certificate Of Service ........................................................................................ attached

# TABLE OF AUTHORITIES

## Cases

*Brady v. Urbas*, 111 A.3d 1155, 1161 (Pa. 2015) ............................................................11

*Diaz v. United States*, 602 U.S. 526 (2024) .........................................................................22

*Francis v. Franklin*, 471 U.S. 307, 322 (1985) ...................................................................14

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ............................................................16

*Holk v. Snapple Beverage Corp.*, 575 F.3d 329 (3d Cir. 2009) .................................... 6

*Kolender v. Lawson*, 461 U.S. 352, 358 (1983) .................................................................17

*Maynard v. Cartwright*, 486 U.S. 356 (1988) ....................................................................17

*Ruan v. United States*, 597 U.S. 450 (2022) ............................................................. passim

*Robinson v. First State Community Action Agency*, 920 F.3d 182
      (3d Cir. 2019) .........................................................................................................6, 7, 9

*Smith v. Goguen*, 415 U.S. 566 (1974) ..............................................................................16

*United States v. Abovyan*, 988 F.3d 1288 (11th Cir. 2021) ........................................16

*United States v. Bennett*, 161 F.3d 171 (3d Cir. 1998) ..........................................20-22

*United States v. Brito*, 979 F.3d 185 (3d Cir. 2020) ........................................................ 6

*United States v. Davis*, 726 F.3d 434 (3d Cir. 2013) .......................................................22

*United States v. Feingold*, 454 F.3d 1001 (9th Cir. 2006) .....................................2, 12

*United States v. James*, 955 F.3d 336 (3d Cir. 2020) ....................................................6, 7

*United States v. Kohli*, 847 F.3d 483 (7th Cir. 2017) ..................................................... 2

*United States v. L. Cohen Grocery Co.*, 255 U.S. 81 (1921) ........................................16

*United States v. Li*, 819 F. App'x 111 (3d Cir. 2020) ............................................... 16, 28

*United States v. MacKay*, 715 F.3d 807 (10th Cir. 2013) ............................................16

*United States v. McIver*, 470 F.3d 550 (4th Cir. 2006) .................................................... 2

*United States v. Moore*, 423 U.S. 122 (1975) .......................................................... passim

*United States v. Olano*, 507 U.S. 725 (1993) ........................................................ 6

*United States v. Reyeros*, 537 F.3d 270 (3d Cir. 2008) .................................................. 7

*United States v. Shaker*, 827 F. App'x 204 (3d Cir. 2020)............................................. 5

*United States v. Singh*, 54 F.3d 1182 (4th Cir. 1995) ..................................................15

*United States v. Watson*, 260 F.3d 301 (3d Cir. 2001)...................................................25

*United States v. Womack*, 55 F.4th 219 (3d Cir. 2022).................................................21

*Wood v. Milyard*, 566 U.S. 463 (2012)..................................................................................... 6

## Other Authorities

21 C.F.R. § 1306.04(a) ............................................................................................................12

Antonin Scalia & Bryan A. Garner, *Reading Law* 144 (2012)....................................24

Fed. R. Evid. 103(b) ............................................................................................................30-31

Fed. R. Evid. 404(b) ............................................................................................30, 32-33, 35

Fed. R. Evid. 704(b) ............................................................................................19-22, 25, 26

Fed. R. Evid. 704, Advisory Committee Note on 2011 Amendments ....................21

## ARGUMENT IN REPLY

The government's Brief ("GB") largely fails to engage with the arguments raised in the opening Brief ("AOB"). It appears to mistake Dr. Evers's challenge to the jury instruction on *actus reus* for a challenge to the instruction on *mens rea*, which is not at issue; its only response addressing *actus reus* is waived, and fails on the merits. The government counters Dr. Evers's as-applied vagueness challenge by pretending that landmark Supreme Court cases do not exist. And when addressing crucial evidentiary errors (one of which it concedes) and argument—which improperly swayed the jury, hamstrung the defense, or invited factually false and improper propensity inferences—the government misstates the governing law, the contents of the record, or both. Reversal is required.

## I.    The jury was improperly allowed to convict Dr. Evers of unlawfully dispensing a controlled substance if it found that he knowingly deviated from the prevailing standard of medical care.

As explained in the opening Brief (AOB 43-44), the district court instructed the jury—at the government's insistence—that the *actus reus*, or authorization, element of the Section 841 offense in this case is "defined by reference to" the medical standard of care:

> The question of whether a physician acted outside the usual course of his professional practice and not for a legitimate medical purpose is defined, by reference, to the standard of medical practice generally recognized and accepted in the Commonwealth of Pennsylvania.

5Appx.2518. And complying with *Ruan*, the court instructed the jury on *mens rea*: that criminal liability requires acting "knowingly or intentionally." *Id.* 2519.

These instructions allowed the jury to convict if it found that Dr. Evers knowingly breached the medical standard of care. Three courts of appeals recognize that as error, and it is a matter of first impression for this Court. AOB 41-43 (discussing *United States v. Feingold*, 454 F.3d 1001 (9th Cir. 2006); *United States v. McIver*, 470 F.3d 550 (4th Cir. 2006); *United States v. Kohli*, 847 F.3d 483 (7th Cir. 2017)). And although the Supreme Court has not spoken directly on this issue, allowing conviction for knowingly breaching the standard of care is inconsistent with *United States v. Moore*, 423 U.S. 122 (1975). AOB 40-41.

The government does not dispute that if instructional error occurred it requires a new trial. It argues only lack of error, making two primary points. First, it emphasizes that the instructions properly required a subjective *mens rea* and an objective *actus reus*, per *Ruan*. GB

33-34, 37-40.  Dr. Evers has never suggested otherwise; that is not at issue.  Second, turning to the actual issue (whether the objective *actus reus* was properly defined), the government downplays the definitional portion of the instruction to suggest a meaning completely at odds with its position in the district court.  GB 34-37.  That argument that is waived *and* fails on the merits.

### A.    The government's subjective *mens rea*/objective *actus reus* discussion is beside the point.

Most of the government's response addresses the fact that, consistent with *Ruan*, the jury instructions required a subjective *mens rea* and an objective *actus reus*.  We are told that is what *Ruan* requires (GB 33-34), there is no circuit split on that issue (GB 37-38), and the instructions as a whole precluded conviction for negligent or reckless conduct (GB 38-40).

All of that is beside the point.  Dr. Evers does not dispute it.  AOB 43-44 ("Dr. Evers's jury was properly instructed on *mens rea* post-*Ruan*"); 39-40 (acknowledging that "legitimate medical purpose" and "in the usual course of professional practice" are objective criteria).

The government's detour appears to stem from a misunderstanding of the issue on appeal.  The issue *is not*, as the government states, "whether a defendant-doctor can be convicted based solely upon the violation of the civil standard of care"; nor "[whether] the jury instructions clearly conveyed that Evers should not be convicted based on mere carelessness, negligence, or recklessness"; nor whether evidence of breaching the standard of care is admissible.  GB 37, 39, 40; *see also* GB 38 n.13.  Instead, the issue is whether a knowing

or intentional breach of the standard of care suffices to convict—in other words, whether the objective *actus reus* is breaching the standard of care or, instead, acting as a drug dealer by facilitating abuse and/or improperly profiting.  AOB 37-43.  *That* is what has divided the courts of appeals and is an issue of first impression for this Court.  AOB 37, 41-43.

### B.    On the actual issue, the government's only argument is waived and fails on the merits in any event.

Turning to the issue on appeal,[1] the government claims the instructions *did not* define the *actus reus* as breaching the medical standard of care, but instead confined consideration of the standard of care to only half the *actus reus*—"outside the usual course of professional practice"—while leaving "not for a legitimate medical purpose" apart from the standard of care.  GB 34-37.  That argument is waived and fails on the merits in any event.

---

[1]    The parties agree that the Court need not decide the precursor issue of whether "legitimate medical purpose" and "in the usual course of professional practice" are conjunctive or disjunctive requirements, because they were charged and instructed conjunctively here.  AOB 43 n.11; GB 37-38.  *Accord United States v. Shaker*, 827 F. App'x 204, 207 n.4 (3d Cir. 2020) (not precedential).

### 1.    The argument is waived.

Waived arguments cannot be entertained on appeal, whether asserted by appellants or appellees. *See, e.g.*, *United States v. James*, 955 F.3d 336, 344-45 (3d Cir. 2020) (appellant); *Robinson v. First State Community Action Agency,* 920 F.3d 182, 187-89 (3d Cir. 2019) (same); *Wood v. Milyard*, 566 U.S. 463, 473-74 (2012) (appellee); *Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 335-36 (3d Cir. 2009) (same).  In the case of appellees, that overrides the normal rule that an appellate court may affirm on any ground supported by the record.  *Holk*, 575 F.3d at 335-36. The prohibition on entertaining waived arguments on appeal properly "binds [parties] to their strategic choices." *James*, 955 F.3d at 345.

Waiver is the intentional relinquishment of a known right.  *United States v. Olano*, 507 U.S. 725, 733 (1993).  "The only way to assess [whether there is] a waiver is to review the whole record." *United States v. Brito*, 979 F.3d 185, 189 (3d Cir. 2020).  When the record reveals a party's extensive engagement with an issue below, knowledge and intent to advance the positions it takes are inferred; new or contrary appellate arguments are deemed waived.  *See, e.g.*, *Robinson*, 920 F.3d at 187-89 (waiver where conduct "evinced an intent to proceed under [disavowed-on-appeal] case theory" and "played along with [that

6

theory] throughout the litigation and ultimately endorsed the specific instruction embodying that theory"); *James*, 955 F.3d at 344 (waiver where party "not blindsided" by issue recurring throughout proceedings below); *United States v. Reyeros*, 537 F.3d 270, 287-89 (3d Cir. 2008) (waiver where party "played a direct role in developing" procedure challenged on appeal).

The government clearly waived the argument that the instructions did not define the *actus reus* as breaching the standard of care. The government does not contest that the role of the standard of care in defining the *actus reus* was a major—indeed, the central—point of contention throughout the proceedings below. AOB 24. The parties proposed divergent jury instructions on the point (2Appx.71-72, 78); argued it at length at the charge conference (5Appx.2343-2359); opened and closed on it (2Appx.157-158; 5Appx.2370-2371, 2399-2405); and presented expert testimony on it (3Appx.840-876; 4Appx.1495-1498, 1637; 5Appx.2147).

The government's extensive engagement with this central issue below shows that it intentionally advanced its position, waiving contrary arguments here. *Robinson*, 920 F.3d at 187-89; *James*, 955 F.3d at 344; *Reyeros*, 537 F.3d at 287-89. And the record shows that the government

argued below the opposite of what it argues on appeal:  that a breach of

the standard of care proves the entire *actus reus*—*both* that the

prescribing was not for a legitimate medical purpose *and* that it was

outside the usual course of professional practice—and that the jury

instructions properly conveyed that.  For instance, the government:

> ·    **elicited testimony from Dr. Thomas that the
> standard of care defines whether a doctor has
> prescribed both "for a legitimate medical purpose" and
> "in the usual course of professional practice"**
> (3Appx.863) (""What is a legitimate medical purpose[?]
> Sound clinical judgment, current best practices,
> appropriately-documented and of demonstrable benefit to
> the patient.  * * * Usual course of professional practice[:}
> patient-physician relationship, appropriate to the identified
> diagnosis.  * * * Careful follow-up and monitoring of the
> patient's response to treatment and their safe use of the
> prescribed medications.");
>
> ·    **recounted that testimony to the jury in summation**
> (5Appx.2404) ("Dr. Thomas provided you his opinion about
> what  legitimate medical purpose means.  He explained that
> . . . a legitimate medical purpose involves sound clinical
> judgment, current best practices, appropriately-
> documented care, and making sure that care is of
> demonstrable benefit to the patient.  * * * The usual course
> of professional practice, as opined by Dr. Thomas . . .
> involves a doctor-patient relationship, the controlled
> substance must be appropriate to the identified diagnosis,
> there must be careful follow-up, careful monitoring of the
> patient's response to the controlled substance and the
> patient's safe use of the prescribed medications.");
>
> ·    **successfully proffered an instruction that
> expressly defined both "for a legitimate medical**

**purpose" and "in the usual course of professional practice" as the standard of care** (5Appx.2518) ("The question of whether a physician acted outside the usual course of his professional practice and not for a legitimate medical purpose is defined, by reference, to the standard of medical practice generally recognized and accepted in the Commonwealth of Pennsylvania."); and

·    **at the charge conference, defended that instruction as accurate and Pennsylvania's standard of care as defining the entire *actus reus*** (5Appx.2351) ("[T]he Government would argue that the Pennsylvania standard . . . is what is at issue. So, again, I believe that [the] statement in the jury instruction that, when the jury is trying to figure out what is a usual course of professional practice and for legitimate medical purposes, it's defined by reference to the standard of medical practice generally . . . recognized and accepted within the Commonwealth of Pennsylvania.").  *See* 5Appx.2359 (acceding to final language).

In short, the government "evinced an intent to proceed under [*actus reus*-is-standard-of-care] case theory" and "played along with [that theory] throughout the litigation and ultimately [proffered] the specific instruction embodying that theory."  *Robinson*, 920 F.3d at 187-89.  Its contrary argument on appeal is waived.

## 2.    The argument fails on the merits in any event.

Regardless of waiver, the government is simply wrong that the jury instructions confined consideration of the standard of care to only half the *actus reus* (prescribing "outside the usual course of medical

practice"). Again, the instructions expressly defined the entire *actus reus*—prescribing both "for a legitimate medical purpose" and "in the usual course of professional practice"—by reference to the standard of care:

> The question of whether a physician acted *outside the usual course of his professional practice and not for a legitimate medical purpose* is defined, by reference, to the standard of medical practice generally recognized and accepted in the Commonwealth of Pennsylvania.

5Appx.2518 (emphasis added). That should be the end of the matter— just as it was in the district court, where the government candidly acknowledged (and defended) the instruction's plain and obvious meaning. *E.g.*, 5Appx.2351.

In response, the government first sidesteps this definitional instruction entirely, addressing instead the permissive language that follows it (discussed below, at 12-14). GB 35. Its surprising justification appears later: the instruction has nothing to do with the standard of care, the government now says, because "the word 'care' and the phrases 'duty of care' and 'standard of care' appear nowhere in" it. GB 36-37. That should be dismissed out-of-hand: the phrases are synonyms for the government's phrase "standard of medical practice

generally recognized and accepted in the Commonwealth of Pennsylvania." *E.g., Brady v. Urbas*, 111 A.3d 1155, 1161 (Pa. 2015).

Next the government says the instruction is accurate under *Ruan* because it defines an objective standard; is consistent with *Moore* because it mirrors the instruction implicitly approved there; and in any event was overridden by other language allowing jurors to consider the standard of care when deciding whether Dr. Evers prescribed outside the usual course of professional practice.  GB 35-36.  None of these responses has merit either.

First, the instruction does define an objective standard—but that does not make it accurate.  The issue on appeal is *what the objective standard is*, and whether breaching the standard of care is the extent of it.  *Ruan* has no bearing.  AOB 38-39, 40.

Second, the instruction *does not* mirror that given in *Moore* (which, again, did not decide whether the instruction was proper).  That instruction required the jury to find two separate things to convict:  that the prescribing was outside "the usual course of a professional practice," *and* that it was not "in accordance with a standard of medical practice generally recognized and accepted in the United States."  423 U.S. at 138-

39.  The *Moore* instruction neither equated those requirements nor reduced criminal liability to a knowing breach of the standard of care.[2]

The instruction given at Dr. Evers's trial is actually *inconsistent* with *Moore*.  As explained in the opening Brief, *Moore* set the threshold for criminal liability at acting as "a 'pusher' not as a physician," which the Ninth Circuit has correctly recognized as a higher bar than knowingly breaching the standard of care.  AOB 40-41 (citing *Moore*, 423 U.S. at 143; *Feingold*, 454 F.3d at 1010).  *Moore* further distinguished the criminal threshold from the standard of care by identifying at least one standard-of-care breach (failing to prescribe in writing) as *not* a Section 841(a) violation.  AOB 38, 40 (citing 423 U.S. at 136 & n.12).  The government ignores all of this—offering no response at all.

Finally, telling jurors they "may consider" the standard of care in determining whether Dr. Evers prescribed outside the usual course of professional practice did not trump the clear instruction that the entire *actus reus* is "defined" by the standard of care.  Most obviously, jurors

---

[2]    Only later, after 21 C.F.R. § 1306.04(a) was promulgated, have some courts equated "in the usual course of professional practice" with the standard of care, to distinguish it from the regulation's legitimate-medical-purpose requirement.  *E.g.*, *Feingold*, 454 at 1006, 1012.

were not told they may consider the standard of care *only* with respect to the "usual course of professional practice," nor instructed *not* to consider it with respect to "for a legitimate medical purpose."  The record does not support the government's silent premise:  that the jury, by negative implication, put the standard of care out of mind when assessing the "for a legitimate medical purpose" requirement—which, on this hypothesis, was left undefined.  Yet the judge instructed jurors to do the opposite moments earlier, telling them that both "for a legitimate medical purpose" and "in the usual course of a professional practice" are "defined" by the standard of care.  5Appx.2518.

Moreover, the permissive instruction was followed immediately by another that again linked both requirements of the *actus reus*—and tied both back to the medical-expert testimony:

> You have heard testimony about what constitutes prescribing controlled substances in **the usual course of professional practice, as well as for a legitimate medical purpose**, and you are to weigh that evidence the same way that you would weigh any other evidence in this case.

5Appx.5219 (emphasis added).  And all of these followed a government summation that reminded jurors that its expert witness "explained that . . . a legitimate medical purpose involves sound clinical judgment, current best practices, appropriately-documented care, and making sure

that care is of demonstrable benefit to the patient"—*i.e.*, elements of the standard of care.  5Appx.2404.

Of course, the record shows what actually happened:  *adding* the permissive standard-of-care language to the definitional instruction equating the entire *actus reus* with the standard of care, instead of *substituting* it for that instruction (as the defense requested, AOB 26-27), created—at best, from the government's perspective—a potentially confusing directive.  The Court may not presume that the jury sorted the confusion correctly.  *Francis v. Franklin*, 471 U.S. 307, 322 (1985).  To the contrary, here the only clear instruction the jury received was the erroneous one the government requested:  that both "for a legitimate medical purpose" and "in the usual course of professional practice" are "defined" by the standard of care.[3]  5Appx.2518.

The government's attempt to walk back that error through an about-face on appeal and an unsupportable negative inference that would contradict the remaining instruction must be rejected.

---

[3]    That disposes of the government's passing suggestion that the defense "invited" any error (which, raised only in a cursory footnote, is waived regardless).  GB 40 n.15.  Tacking the defense's suggested language onto the government's erroneous instruction did not cure the error, but neither did it create it.  5Appx.2358, 2518.

**II.    The standard for criminal liability instructed and argued to the jury—knowingly deviating from the generally-accepted standard of medical care—is unconstitutionally vague as applied to Dr. Evers, who prescribed to *bona fide* patients with serious medical conditions.**

Dr. Evers has challenged the criminal liability standard instructed and argued to the jury as unconstitutionally vague as applied because it invites arbitrary enforcement.  AOB 47-50.  All agree that challenge must be assessed under the undisputed facts of this case:  Dr. Evers was a salaried employee running a primary care office of a nonprofit health system, who prescribed opioids to less than 7% of his patients (all of them primary-care patients), never bartered a prescription for his personal benefit, and was prosecuted on an atypical theory that he moved three longstanding patients with pain-inducing conditions along with his prescription pad.  AOB 50-51; GB 41.[4]

---

[4]    The government quibbles over precisely how unusual these undisputed facts are (GB 43-45), but the Court can decide based on the many doctor-distribution cases that have come before it and other courts (AOB 1 & n.1).  We note only two things.  First, the government misrepresents the record in characterizing Dr. Evers as controlling his salary through patient volume (GB 43 n.16):  his salary was capped at the 90th percentile of primary care doctors, and included administrative duties.  2Appx.488.  Second, most of the cases the government claims were similarly benign involved trading prescriptions for sex, or running a pill mill with no medical treatment at all.  *United States v. Singh*, 54 F.3d 1182, 1185 (4th Cir. 1995) (sex); *United States v. Abovyan*, 988 F.3d 1288, 1293-97 (11th Cir. 2021) (pill mill/sham addiction treatment

In response, the government claims arbitrary-enforcement vagueness does not exist in the criminal context—that fair notice is all that matters here.  GB 41.  Further, the government says, objective criteria by definition cannot be vague even if arbitrary-enforcement vagueness does exist.  GB 45-46.  And finally, the government says that in any event "for a legitimate medical purpose" and "in the usual course of professional practice" are not vague as defined at trial.  GB 46-47.  Each of these claims fails.

It is startling to see the government even venture its first claim—it is frivolous.  The Supreme Court has long applied arbitrary-enforcement vagueness in the criminal context.  *See, e.g.*, *Smith v. Goguen*, 415 U.S. 566, 574-76 (1974); *Grayned v. City of Rockford*, 408 U.S. 104, 108-09, 114 (1972); *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921).  Indeed, a criminal case was the first to establish arbitrary enforcement as the primary rationale for vagueness doctrine:  the Supreme Court warned against "allow[ing] policemen, prosecutors, and juries to pursue

---

center); *United States v. MacKay*, 715 F.3d 807, 813 (10th Cir. 2013) (pill mill) ); *United States v. Li*, 819 F. App'x 111, 114-15 (3d Cir. 2020) (not cited by government) (sexual activity with opioid-dependent patients; cash payments of at least $832,980.45 not reported to IRS, and more than $2 million forfeited as drug proceeds and/or involved in money laundering offenses).

their personal predilections." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983). Compounding its problems, the government purports to support its argument with a criminal case, *Maynard v. Cartwright*, that *applies* arbitrary-enforcement vagueness, albeit under the Eighth Amendment (because a capital crime was at issue). 486 U.S. 356, 361-62 (1988).[5]

The government fares no better with its second claim, that objective criteria cannot be unconstitutionally vague. *Of course* they can be: "reasonableness" is the paradigmatic objective criterion in the law, but a criminal prohibition on "unreasonable" conduct would be unconstitutionally vague. And here, the Supreme Court describes the objective criteria "for a legitimate medical purpose" and "in the usual course of professional practice" as "ambiguous," "open to varying constructions," and making "prohibited conduct (issuing invalid prescriptions) often difficult to distinguish from acceptable conduct (issuing valid prescriptions)." *Ruan v. United States*, 597 U.S. 450, 467, 459 (2022). That does not mean the criteria are unconstitutionally

---

[5]    Because fair-notice vagueness is not at issue in this appeal, the government's extended discussion claiming that Dr. Evers had notice (even knowledge) is irrelevant. GB 41, 47-48.

vague in every case, but certainly as-applied vagueness challenges are cognizable. No court has rejected such a challenge on the ground that objective criteria cannot be vague. AOB 50; GB 42 (collecting cases).

Finally, the definitions of "for a legitimate medical purpose" and "in the usual course of professional practice" the jury heard here demonstrate the vagueness. As detailed in the opening Brief, the government's expert, Dr. Thomas, stitched together the definitions from an assortment of medical adages, the standard medical model, Pennsylvania rules for administering controlled substances, and professional guidelines requiring—among other things—"sound clinical judgment." AOB 12.

The government's only response is that no *single* person (Dr. Thomas, prosecutor, juror) could arbitrarily draw the line between criminal and noncriminal conduct because the definitions derive from the understanding of "the medical profession as a whole." GB 46-47. That makes no sense. The fact that the entire medical community agrees that "the secret of the care of the patient is to care for the patient"—an adage to which Dr. Thomas testified and that kicked off the government's summation, calling it "one of the most critical principles of medicine" (5Appx.2370-2371)—does not mean it provides a

nonarbitrary basis for defining criminal conduct.  And heaping on other adages, the standard medical model, and the amorphous requirement of "sound clinical judgment" in a 27-page, PowerPoint-illustrated monologue only granted Dr. Thomas, the prosecutor, and jurors even more discretion to define the standard arbitrarily.  3Appx.840-876; AOB 49-50 (discussing Dr. Thomas's arbitrary application of standard).

As applied to these facts, the criminal liability standard instructed and argued to the jury is unconstitutionally vague.  The superseding indictment must be dismissed.

## III.    Admitting the testimony of government expert Stephen Thomas that Dr. Evers knowingly deviated from the standard of medical practice violated Rule 704(b).

In its opening statement, the government told the jury that Dr. Thomas would testify Dr. Evers crossed the line from malpractice to criminal conduct because he "knew what he shouldn't do and he did it anyway."  2Appx.178-79.  Dr. Thomas did just that, testifying that knowledge is baked into the definition of "outside the usual course of professional medical practice and not for a legitimate medical purpose," and testifying that each of the charged prescriptions met that standard.

4Appx.1346 (definition); 3Appx.1062, 1071, 1238-1295; 4Appx.1347-1352 (charged prescriptions). That is a clear violation of Federal Rule of Evidence 704(b), as this Court held in *United States v. Bennett*, 161 F.3d 171, 182-83 (3d Cir. 1998). AOB 52-54.

In response, the government claims *Bennett* has been superseded, and that in any event Dr. Thomas was referring to Dr. Evers's knowledge of facts in patients' medical charts (*e.g.*, test results), not knowledge that he was prescribing in an unauthorized manner. GB 48-52. The government also claims any error was harmless, or at most prejudicial only on Counts 40-71 (relating to Robert Konikowski). GB 54-55. Each of these responses fails.

### A.    *Bennett* has not been superseded.

The supersession argument is based on the 2011 amendment to Rule 704, which among other wording changes deleted "or inference" from 704(b)'s prohibition on mental state testimony. GB 48-49.[6] The government says the deletion permits Dr. Thomas's definitional two-

---

[6]    The relevant change was: "No expert . . . may state an opinion or inference as to whether the defendant did or did not have the mental state" to "an expert witness must not state an opinion about whether the defendant did or did not have a mental state." F.R.E. 704(b) (2010 & 2022).

step, which *Bennett* previously barred, because two-steps involve an inference.  *Id.*

The problem for the government is that the Advisory Committee went out of its way to explain that the 2011 Amendment—including the deletion of "or inference"—is "stylistic only," does not "change any result in any ruling on evidence admissibility," and effects "no change in current practice"—including on the topic of "inference":

> The Committee deleted all reference to an "inference" on the grounds that the deletion made the Rule flow better and easier to read, and because any "inference" is covered by the broader term "opinion."

F.R.E. 704, Advisory Committee Note on 2011 Amendments.  The government simply ignores these clear statements, which foreclose its argument.

Unsurprisingly then, this Court continues to follow *Bennett* post-2011 amendment—a fact the government also ignores.  *See, e.g.*, *United States v. Womack*, 55 F.4th 219, 229 (3d Cir. 2022) ("Expert testimony is admissible . . . so long as . . . the ultimate inference or conclusion does not necessarily follow from the testimony.") (quoting *Bennett*); *United States v. Davis*, 726 F.3d 434, 446 (3d Cir. 2013) ("[An] expert may not . . . testify in such a way that the ultimate conclusion is inevitable.").  Nor

can the government muster a single case, from any court, blessing a definitional two-step on mental state—pre- *or* post-2011 amendment.

Instead, the government points generally to *Diaz v. United States*, 602 U.S. 526 (2024), saying it establishes that Rule 704(b) targets only actual conclusions.  GB 49-50.  But *Diaz* simply reaffirms the general rule, recognized by *Bennett*, that expert testimony merely supporting an inference about the defendant's mental state is permitted—there, testimony that *most* drug couriers (not the defendant in particular) know they are carrying drugs.  602 U.S. at 534-35.  If anything, *Diaz* reaffirms *Bennett* and confirms the error here:  the Supreme Court blessed the expert testimony because it "does not *necessarily* describe [the defendant's] mental state."  *Id.* 534 (emphasis added).  Making knowledge a necessary ingredient in the expert's finding *does* necessarily describe the defendant's mental state, which is why *Bennett* correctly prohibits—consistent with *Diaz*— "testimony from which [the defendant's mental state] necessarily follows."  161 F.3d at 182-83.

**B.     In the challenged testimony, Dr. Thomas referred
to knowledge of unauthorized prescribing, not
knowledge of facts in patients' charts.**

Dr. Thomas testified many times that Dr. Evers knew certain facts
about the patients at issue because those facts appeared in their charts
or were told to him by others—*e.g.* a patient returned a problematic
drug screen or exhibited drug-seeking behavior during an emergency
room visit.  Dr. Thomas testified that Dr. Evers's continued prescribing
after learning those facts breached the standard of care or crossed the
line into criminal conduct in those instances.  There is nothing wrong
with such testimony.

But Dr. Thomas *also* testified at length about the civil standard of
care, the standard of criminal liability, and how to distinguish the two.
That was the subject of his PowerPoint (3Appx.840-876), and a
recurring point throughout his testimony regarding each of the three
patients at issue in this case.  It was with respect to distinguishing the
standards that Dr. Thomas incorporated knowledge of wrongdoing into
the criminal standard—taking the first of step of the definitional two-
step:

> So the distinction between substandard practice, or you're
> just not doing it right, and not for a medically legitimate

purpose in the usual course of practice is *when you're not doing it right and you know it.*

4Appx.1346 (emphasis added).  Plainly, the "it" in "know it" refers to "not doing it right"—*i.e.*, not prescribing appropriately.  That is basic syntax.  *Cf.* Antonin Scalia & Bryan A. Garner, *Reading Law* 144 (2012) (last-antecedent canon).

The government nonetheless claims the "it" in "know it" refers instead to red-flag facts in patients' charts, because immediately prior to this Dr. Thomas had testified that Dr. Evers knew some such facts regarding Robert Konikowski.  GB 51-52.  But in the quoted testimony, Dr. Thomas had pivoted from discussing Mr. Konikowski in particular (and Dr. Evers's knowledge of particular facts) to the more general point of distinguishing the civil and criminal standards.  The government's substitute referent for "it" would make no sense in this context:  civil liability is not prescribing appropriately, and criminal liability is knowing Robert Konikowski had a second problematic drug screen.

**C.     The error was prejudicial as to all counts.**

The government's failure to acknowledge Dr. Thomas's pivot to the general point of distinguishing the civil and criminal standards leads it to contend the Rule 704(b) error was at most prejudicial only on Counts 40-71, relating to Robert Konikowski.  GB 54-55.  Because Dr. Thomas was defining the criminal standard in general, which he applied to all three patients at issue, the error was prejudicial as to all counts.

The government's broader point, that other "significant" evidence of Dr. Evers's knowledge rendered the Rule 704(b) error harmless, ignores the legal standard and the context at trial.  This Court has recognized that Rule 704(b) errors are prejudicial when the wrongly admitted testimony goes to the heart of the government's case.  *United States v. Watson*, 260 F.3d 301, 310 (3d Cir. 2001).  That makes sense, because expert witnesses are offered for their authority and weigh heavily with jurors.  Knowledge was certainly at the heart of this case (AOB 54-55), which the government does not deny.

Instead of addressing this, the government footnotes evidence that Dr. Evers breached the standard of care and baldly asserts that it is evidence of knowledge that drowned out Dr. Thomas's testimony.  GB 54 n.20.  Even if the government recounted that evidence accurately, it was

indirect evidence of knowledge at best—not akin to Dr. Thomas's expert

testimony that the criminal standard requires knowledge and the

charged prescriptions met that standard.[7]  In short, there was a reason

the government promised jurors Dr. Thomas would tell them a crime

was committed "because [Dr. Evers] knew what he shouldn't do and []

did it anyway" (2 Appx.178-179)—that was damning evidence of guilt

from an expert that was bound to sway them.  The government has not

met its burden to show the Rule 704(b) error was harmless.

## IV.    Excluding the testimony of defense expert Richard Rauck that improper trading for a prescription is an important criterion for determining its legitimacy was an abuse of discretion.

The government concedes it was error to exclude Dr. Rauk's

testimony that improper trading of something of value (*e.g.*, cash or sex)

for a prescription is an important criterion for determining whether the

prescribing is authorized.  GB 55.  But it says the error was harmless

because Dr. Rauk managed to slip the criterion in at one point during a

---

[7]    In fact, the government's recounting is inaccurate in numerous respects.  For instance, Dr. Evers did not "fail[] to document certain particularly unjustifiable prescriptions" (GB 54 n.20)—in the many years scrutinized at trial, there was evidence of *one* undocumented prescription (3Appx.667).

four-day cross-examination[8]—and defense counsel argued lack of trading in summation despite the lack of evidentiary support.  GB 55-57; 4Appx.1644.  That is wrong.

The gravity of this error, and the impropriety of the government's dismissal of it, cannot be overstated.  It is no exaggeration to say this case turned on the standard for criminal liability, and the defense's evidentiary centerpiece on that point was the lack of improper trading for prescriptions.  Trial was the proverbial battle of the experts, whose testimony consumed 7 of the 10 days evidence was presented.  The entire defense case was built around the fact that Dr. Evers was a legitimate doctor who prescribed opioids to less than 7% of his patients and provided medical treatment to the patients at issue—not a pill-mill drug-dealer selling drugs out the back door or exchanging them for sex. *E.g.*, 2Appx.183-186; 5Appx.2431-2439.

In that context, hobbling the defense expert on the relevance of improper trading for prescriptions was devastating.  And doing it while

---

[8]    This did not occur "numerous times," as the government states. GB 55-56.  The three other cross-examination exchanges the government cites involve vague references to a doctor not doing "other things"—passing comments that were meaningless since they could not be tied to the lack-of-trading evidence at trial.  4Appx.1544-45, 1546, 1637.

the government's expert was permitted to offer his version of the criminal liability standard unimpeded (in a PowerPoint-illustrated 27-page monologue, no less) was even worse. And doing it at the government's request—when the very same prosecutor has offered trading-for-sex testimony from Dr. Thomas when it helps the government—is, frankly, inexcusable. *E.g.*, *United States v. Li*, 819 F. App'x 111, 114-15 (3d Cir. 2020).

It is a safe bet that the exclusion of evidence the government fights tooth-and-nail to keep out and then highlights the absence of in summation is prejudicial. 4Appx.1495-1496, 1499; 5 Appx.2386. After successfully limiting Dr. Rauk's testimony, the government time and again during cross-examination and summation lampooned him as "part of the problem" in the opioid epidemic because—with his improper-trading criterion excluded—the government could say that he thought any pain complaint authorizes a prescription and immunizes the doctor from prosecution, and that "obviously [he] believes drug laws should only apply to people who don't have medical degrees." *E.g.*, 5Appx.2386-2387.

The fact that Dr. Rauk managed to slip in the improper-trading criterion once during a four-day cross-examination in no way cures its

wholesale and repeated exclusion from his direct testimony, where he should have been allowed to articulate his full definition of the criminal standard.  Indeed, even assuming jurors tied the cross-examination comment back to Dr. Rauk's definition of the criminal liability standard in his direct-examination testimony, they could only have concluded he was inconsistent on this point, defensively adding criteria as the government poked holes in his previous formulation.  Nor is it a cure that defense counsel argued the point despite the absence of an evidentiary basis.  Indeed, counsel's unsupported argument boomeranged when the government used the absence of evidence as a ground to tell jurors they were being actively deceived by the defense. 5Appx.2485-2486.

It again bears mention that, however far below the standard of care Dr. Evers may have fallen, it is undisputed that he ran a legitimate medical practice, prescribed opioids to less than 7% of his patients, and was prosecuted on an atypical theory that he moved three longstanding patients with pain-induing conditions along with his prescription pad. Before being sent to prison for the rest of his life, he was entitled to a fair trial—instead of one where the government blocked key

exculpatory evidence of the type the government itself introduces when it happens to be inculpatory instead.

## V.    Admitting the testimony of local pharmacists that they expressed concern to Dr. Evers that he was overprescribing controlled substances to patients not named in the indictment violated Rule 404(b).

As explained in the opening Brief, admitting the pharmacists' testimony violated Rule 404(b) because it was used for an improper purpose (as direct evidence of guilt, using an inference the government knew was false) and the government did not offer a non-propensity inference between the testimony and knowledge as to the patients at issue in this case (in fact, it argued propensity to the jury).  AOB 63-67.

In response, the government denies using the pharmacists' testimony as direct evidence (GB 62-65), and says it offered a non-propensity inference pretrial and did not deviate from it (GB 61-62, 65-67).  It also says any error was harmless.  GB 59 n.22, 68-69.  None of these claims has merit.[9]

---

[9]    The government's one-sentence assertion that review of the propensity use in summation is for plain error is wrong, and requires no extended response.  GB 68.  Dr. Evers objected to the evidence on propensity grounds under Rule 404(b), the first two requirements of which prohibit propensity use.  DDE 212 at 11-13, 2Appx.118-130 (pretrial); 2Appx. 501-503, 509-510 (trial).  After those objections were

### A.    The testimony was used falsely as direct evidence.

The government claims it "never suggested" the pharmacists who

testified had been asked to fill prescriptions for the three patients at

issue in this case, and says any suggestion to the contrary came from the

defense.  GB 63-64.

The record contradicts that.  Here, again, is the sequence of

events:

- ·    the government acknowledged that the pharmacists' testimony is only indirect evidence of knowledge because the prescriptions were not for the patients at issue, but says the pharmacists themselves cannot confirm that because they do not recall (2Appx. 121, 503-504, 505-506, 510);

- ·    while cross-examining the pharmacists, the defense tried to confirm the undisputed fact the prescriptions were not for the patients at issue through the pharmacies' records (3Appx. 682-683, 692-694, 703, 704, 714-715);

- ·    on redirect, the government elicited from the pharmacists that unfilled prescriptions for the patients at issue would not appear in the records (3Appx.710);

- ·    in summation, the government told jurors as to a patient at issue "[I]f [the prescription's] not filled, it's not [in the records].  So showing the [records, as

---

overruled, he was not required to renew them after the propensity use
came to fruition.  Fed. R. Evid. 103(b).

defense counsel did] doesn't mean anything."
5Appx.2493-2494.

The record could not be clearer:  the government implied that the

pharmacists were addressing prescriptions for the patients at issue and

invited jurors to conclude precisely that—impermissibly using the

testimony as direct evidence of knowledge.  The government's counter-

record claim to the contrary must be rejected.

### B.    A non-propensity inference was never articulated, and propensity was argued.

The government claims it offered a non-propensity inference in a

pretrial submission.  GB 61-62 & n.24.  That filing, cited in the opening

Brief (AOB 18), added nothing to the inadequate proffer at trial.  The

government merely asserted a proper purpose (knowledge) and offered

no inferential chain other than Dr. Evers "was engaged in a pattern" of

unlawful prescribing—in other words, propensity.  GB 62 n.24 (quoting

DDE 231 at 17).

The government next claims it never argued propensity to the

jury—citing in support the fact that it framed its argument in terms of

proving knowledge.  GB 65-67.  The government misunderstands Rule

404(b) and the error at issue.  Of course the government argued that it

was proving knowledge; the problem is *how it was doing so*.  What it did

was tell jurors Dr. Evers knew the prescribing at issue was unauthorized because he knew *other* prescribing was unauthorized and "was engaged in a pattern" of unlawful prescribing. That is proving knowledge through propensity, in violation of Rule 404(b).

### C.    The error was prejudicial.

As to prejudice, the government says the pharmacists' testimony was "relatively short" (consuming a half-day of trial), and any propensity argument was not inflammatory and cured by the limiting instruction. GB 59 n.22, 68-69. That is not a fair characterization of the proceedings or the impact of the testimony.

Again, a good indicator of prejudice is how fiercely the parties contested the admission of the evidence, and the use the offering party made of it. That demonstrates clear prejudice here. Aside from the authorization standard, the admissibility of the pharmacists' testimony was the most contested issue in this case, engendering extensive pretrial litigation that spilled over into trial. AOB 18-22. The government previewed the testimony in its opening statement, where the defense again objected it (2Appx.177-178), and reviewed it at length during summation (both initial and rebuttal), where it called Dr. Evers's arrogance with the pharmacists "telling" and "mind-boggling" because

"what legitimate doctor would not want to work with another

professional in the best care for that patient?" (5Appx.2376-2379, 2426,

2493-2494).

Remarkably, the government defends its rebuttal summation as

merely responding to defense counsel's point about one of the patients

at issue in this case, Michelle Clancy—not as hammering home the

pharmacists' testimony. GB 64-65. That is starkly wrong. The

government reviewed the pharmacists' testimony in rebuttal

summation while making its most egregious appeal to propensity:

> The purpose of the testimony of the pharmacist[s] was to
> exemplify the prescribing practices of the Defendant,
> because those practices that were noted by these
> pharmacists were the same practices that he was using with
> these three patients. ....
>
> The pharmacist[s] came in and testified about the pattern of
> prescribing that they observed that caused them to refuse to
> fill the Defendant's prescriptions, that caused them to
> globally refuse to fill Dr. Evers' prescriptions at any Wal-
> Mart and Sam's club.

5Appx.2493-2494.

In reality, the government's rebuttal reference to Michelle Clancy

shows the government inviting jurors to draw an inference the

government knew was false: that the testifying pharmacists may have

been addressing her prescriptions. 5Appx.2494 ("Here's the [record]

[the defense] pulled up, there's no prescription due [for Michelle Clancy]. We don't know that, because if it's not filled, it's not [in the records]. So showing the [records] doesn't mean anything."). The government's mischaracterization of the record only underscores the fact that it does not even try to argue that this independent aspect of the Rule 404(b) error was harmless. The prejudice is clear.

## CONCLUSION

For the reasons discussed above and in the opening Brief, the judgment should be vacated and the case remanded with instructions to dismiss the superseding indictment or, alternatively, to order a new trial on all counts of the superseding indictment, as amended (2Appx.68-69).

Respectfully submitted,

 /s/ Lisa A. Mathewson
LISA A. MATHEWSON
Mathewson Law LLC
1617 John F. Kennedy Blvd., Suite 2027
Philadelphia, PA 19103
215-399-9592
lam@mathewson-law.com

*Counsel for Appellant Martin Evers*

Dated: September 17, 2025

## <u>REQUIRED CERTIFICATIONS</u>

A.  Type-Volume.  Pursuant to Rule 32(a)(7)(B)(ii) of the Federal Rules of Appellate Procedure, I certify that, according to the word-counting function of my word processing system (Microsoft® Word for Microsoft 365 MSO),this Reply Brief contains 6,960 words, including footnotes, and employs 14-Point Cambria font.

B.  Bar Membership.  Pursuant to Rules 28.3(d) & 46.1(e) of the Local Appellate Rules, I certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

C.  Electronic Filing.  Pursuant to Rule 31.1(c) of the Local Appellate Rules, I certify that the text of the electronically filed Brief is identical to the text in the paper copies of this Brief as filed with the Clerk. The electronic (PDF) version of this Brief has been checked for viruses using Trend Micro Security Agent, an antivirus program, with all current updates, and no virus was detected.

*/s/ Lisa A. Mathewson*

Dated: September 17, 2025

## <u>CERTIFICATION OF SERVICE</u>

I certify that on this date, I served a copy of the foregoing reply brief via this Court's CM/ECF system upon parties of record.


<u> /s/ Lisa A. Mathewson</u>

Dated:  September 17, 2025